**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| Ryan Koenig and Kellie Everett, | C/A No. 2:18-cv-03599-DCN |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MOTION TO PRECLUDE EXPERT TESTIMONY OF BRIAN BOGGESS, P.E., AND MEMORANDUM IN SUPPORT** |
| Edward Johnson, | |
| Defendant. | |

Plaintiffs respectfully ask this Court to preclude any expert testimony of Brian Boggess, PE, as his testimony fails to meet the reliability thresholds of Federal Rule of Evidence 702, *Daubert,*[1] and its progeny.

## I. FACTS AND RELEVANT TESTIMONY

This case involves an incident that occurred on December 5, 2017, when the Plaintiffs were hit by a car driven by the Defendant who was stopped in the parking lot of a private business, James Island Cleaners, waiting to turn right onto Maybank Highway. The incident was captured on a surveillance camera located inside James Island Cleaners. Plaintiff Ryan Koenig has no memory of the incident, but Plaintiff Kellie Everett testified that Johnson was not over the sidewalk when he stopped before pulling out and hitting the plaintiffs:

> Q: Do you recall specifically where his vehicle was stopped?
>
> A: It – it was just in the – the exit from the dry cleaner. He was not over the sidewalk at all.
>
> Q: So it's your recollection he was not over the sidewalk?
> A: I don't believe so.
>
> Q: So your recollection is that Mr. Johnson had stopped before he got to the sidewalk?

---

[1] *Daubert v. Merrell Dow,* 509 U.S. 579 (1993).

1

A: Correct, and he was just sitting and waiting.

Everett Depo p.18, line 25-p.19, line 11 (Excerpt attached as Exhibit A).

There were several independent eyewitnesses to the incident. Elizabeth Lane testified:

Q: Okay. At any point in time, did you ever see either Ryan or his wife, who was with him, did you ever see them walking in Maybank Highway?

A: I don't think I saw the wife walking at all, but I saw him on the sidewalk. I mean, I don't – so, you know, the sidewalk crosses the parking lot, so I don't know if you call that the street or the sidewalk still, but it's that's the only part that I remember him being on.
…
Q: Okay. And when you saw Ryan, was he in – so when I talk about the sidewalk, I'm referring to not just the sidewalk with the raised curb, but also the sidewalk that runs across the parking lot. Do you understand that?

A: Okay. Yes.

Q: Did you ever see Ryan outside of that sidewalk?

A: I'm not sure. Standing, no, but once he was hit, I'm not sure exactly where he was…
…
Q: Okay. And this area you're pointing to –

A: I'm sorry. Right before – like where the dip is.

Q: Can you – can you just mark with an X on Exhibit 2 where you were pointing?

A: (Witness complies.)



Q: And that's where you saw Ryan, to the best of your recollection?

A: Yes, to the best of my recollection.

Q: Okay. And just to be clear, that's – is that where you saw him walking or after he had been hit?

A: If I remember, that was where I saw him walking.

Lane Depo p.11, line 21-p.12, line 5; p.13, line 8-p.14, line 9 (Excerpts attached as Exhibit B).

Carole Borden also witnessed the incident and testified as follows:

Q: Got it. All right. And that morning, according to your statement, you said you saw what appeared to be a man and his wife. Is that correct?

A: His wife, companion, a couple. I had seen them at other days walking the same path.

Q: Okay. And what were they doing that morning when you saw them?

A: They each had what appeared to be a cup of coffee, and they were talking with each other walking down the sidewalk.

…

Q: And I'm looking at your statement. It says they were walking on the sidewalk. Is that accurate?

A: They were on the sidewalk.

Q: And how would you describe traffic that morning, Ms. Borden?

A: It was bumper to bumper, stop and go. Not much progress was being made at all.

Q: Okay. And before the actual incident, before the car struck the pedestrian, did you see any cars on Maybank Highway have to stop or swerve because there were people walking out in the roadway?

A: No.

…

Q: Yes, ma'am. Okay. So you see them, and you see the vehicle, and tell us, Ms. Borden – I know we've got the statement here, but just in your own words, will you tell us what happened next?

A: I saw them walking down the sidewalk. I was there stopped, and I looked up, and I saw a dark smaller SUB leaving the dry cleaners, and they were headed toward the sidewalk. And I would just kind of ask myself if the driver saw the people or not because it seemed as though they were getting quite close to each other, and then the next thing I know, the gentleman was on the ground.

Q: Did you see the gentleman actually get hit by the SUV?

A: I did.

Q: And when he got hit by the SUV, was the gentleman on the sidewalk?

A: He was on the sidewalk.

Q: When he got –

A: They both – they both were on the sidewalk.

Q: The gentleman walking was on the sidewalk when he got hit, correct?

Mr. Kern: Objection.

Q: Is that right?

A: The gentleman was on the sidewalk when he was hit.
…
Q: And Carole, I believe you put an X where you believe Mr. Koenig was at the time the SUV struck him?

A: Its approximately where we made the X earlier, yeah, just to – I'll just draw on top of it.



Borden Depo p.6, line 20-p.7, line 5; p.7, lines 10-23; p.22, lines 20-25 (Excerpts attached as Exhibit C).

The Defendant, Edward Johnson, was noncommittal as to the location of his vehicle before he pulled out and hit the plaintiffs:

> Q: Do you agree that Ryan and Kellie were lawfully on the sidewalk when they were hit by your car?
>
> A: No.
>
> Q: You do not agree with that?
>
> A: I do not agree.
>
> Q: Okay. Where were they?
>
> A: I don't know. But if you look there, and I'm not an expert, at all, but I have to see exactly, but I think where – I don't know if my car was – because if you look at Maybank Road there, I don't know if my car was – I don't know exactly where they were in relation to my car. Was I over the sidewalk? Was I before? I think that the driveway there part intersects the sidewalk, but I'm not certain.

Johnson Depo p.26, lines 2-16 (Excepts attached as Exhibit D).

The defense hired Brian Boggess, an engineer employed by S-E-A, a forensic engineering and litigation consulting firm, who issued a report, attached as Exhibit E. On pages four and five of the report, Mr. Boggess lists several "conclusions", not repeated here verbatim. Mr. Boggess opines, essentially, that the Johnson vehicle was covering the sidewalk the entire time before it pulled out and that it was actually partly in the roadway. Mr. Boggess further opined that the plaintiffs actually left the sidewalk and entered Maybank Highway in front of the Johnson vehicle where they were hit. Mr. Boggess gives several other opinions that derive from that ultimate conclusion, that the Johnson vehicle was covering the sidewalk and sticking out in the roadway. that the Johnson vehicle "covered the sidewalk and extended partially into the roadway at all times."

Boggess also came up with several drawings to show where he thought the Johnson vehicle was both right before it pulled out and hit the plaintiffs and where the vehicle came to its final rest after reversing. This is the drawing Boggess rendered of the vehicle's location before pulling out:



**Figure 7: Camera match of Audi's reverse position.**

This is Boggess's drawing of where he believed the vehicle was when plaintiff Koenig was hit, with the green mark referring to Koenig:



**Figure 8: Camera match of Audi at impact.**

Finally, Boggess rendered a drawing indicating the final resting place of the vehicle, which was also memorialized with paint marks by the investigating officer and could be seen in a still from the officer's dashcam video, attached as Exhibit F.



Figure 10: Camera match of Audi's final reverse position post impact.



Boggess's drawings showed the Johnson vehicle in ostensibly the same location before pulling out and striking the plaintiffs (figure 7 above) and at the vehicle's final rest (figure 10 above).

> Q: Okay. All right. So if you look at Figure 7 and figure 10 kind of, you know, together just from sort of a layman's perspective, it appears to me the vehicle is essentially in the same place, it's just at an angle to the right in figure 10?
>
> A: There's a little bit more angle, it looks like, for the figure 10 than for the figure 7.
>
> Q: But other than that, they appear to be pretty much in the same place?
>
> A: Very close, yes, sir.
>
> Q: Okay. Just want to make sure that wasn't –
>
> A: No, no, no.
>
> Q: I wasn't mis-seeing that.
>
> A: No, sir.
>
> Q: Okay. All right. And your testimony is that consistent with what's in the video?
>
> A: Yes, sir.

Boggess Depo p.60, line 9-p.61, line 2, all excerpts attached as Exhibit G.

Stills from the surveillance video inside the cleaners were introduced at Boggess's deposition as exhibits, attached hereto as Exhibits H and I, respectively. The surveillance video had previously been sent to the Court with another motion. Exhibit G corresponds with Boggess's Figure 7:



PLAINTIFF'S
EXHIBIT

Exhibit H corresponds with Boggess's figure 10:



PLAINTIFF'S
EXHIBIT

A close-up of the vehicle can be seen here, from the upper left-hand corner of the video:



When asked about the discrepancy in the location of the vehicles in the video versus the drawings, the following exchange took place:

> Q: Okay. All right. So if you compare -- here's my question: So if you look at Exhibit 2 and Exhibit 3 and where the vehicles are, it looks to me like the -- well, let me back up. So there's reference points in the screenshot to where the vehicle is?
>
> A: I mean, there's other objects to kind of compare where it is in space, yes.
>
> Q: Right. So you've got the window pane?
>
> A: Correct.
>
> Q: You've got that blue sign, whatever that is?
>
> A: Correct.
>
> Q: Okay. So that can kind of give you an idea of where the vehicle's located, correct?
>
> A: Correct.
>
> Q: Okay. All right. So if you compare Exhibit 2 with Exhibit 3, and you look at those markers, those sort of vantage points where you can determine where the vehicle is --
>
> A: Yes.
>
> Q: -- isn't the vehicle pulled further up in Exhibit 3 than it is in Exhibit 2?
>
> A: No.
>
> Q: Tell me why not.

A: It's the rotation you're talking about. So if you take – and if you even look at figure 7 and 10 in my report, if you look at the rear-end of the vehicle relative to the cracks on the pavement, you'll see that the right rear corner in 10 versus 7 is rotated, and I'm guessing here 'cause I don't have it, you know, pulled up and in scale, but a good foot and half or so to the left. So in terms of a distance away, if you kind of look at and saw draw a line across this black – I don't know if that's the open sign, forget what that sign says – but kind of draw and extend that line across how fav above that is, they're very close to kind of the rear of the vehicle. Again, if you make a -- how far above there you can see some separation there, separation there to that rear wheel is very similar. What you don't see -- or what we do see, actually, is the difference in how far left or right it is in that frame, and that's because of the rear rotation. And if you look -- actually, if you look at the report here, you can see a crack pattern here on the pavement here in figure 7. You can see that same pattern --

Q: You mean figure 6?

A: I'm sorry, 6. Let me point 7. I pointed to the wrong one. If you look at the dark lines in the pavement there you can see kind of where it is relative to that little V in the crack there. I don't know how well you can see that in this print. And then you can see it here, and you can see that the right rear is rotated over a good, you know, I don't know, 25 percent of the bumper, 20 percent, which represents a significant distance, which is why 2 versus 3 the vehicle does look like its shifted over, and it is, at least at the rear-end because of that change in rotation that you pointed out a minute ago.

Q: Okay. So you're saying the only reason -- the reason those vehicles look like they're in difference places is because of the rotation --

A: That's correct.

Q: -- not because of the distance further up?

A: That's correct, right.

Q: All right. So looking at Exhibit 2, I mean, you can see – if you'll look at it with me – when you look at the vehicle that I'm pointing to, so you can see the entire right side of the vehicle's basically over on that window pane?

A: Correct.

Q: And part of it is even obstructed by that window pane, correct?

A: That's correct. It overlaps with it, that's correct, 'cause it's rotated over -- it's more to the right in that picture.

Q: And then you look at Exhibit 3, the same place, you can see the entire right side of the vehicle, correct?

A: Yeah. And there's a little bit of separation even there.

Q: There's space between that and the window pane?

A: That's correct.

The back and forth goes on for several more pages with little progress made. Boggess Depo p.64, line 12-p.70, line 25.

In addition to Boggess's conclusion about the location of the Johnson vehicle before it pulled out, Boggess also opines that Johnson "would not readily perceive the presence of the pedestrians", that Johnson initially reversed his vehicle due to a tractor-trailer coming down the road, that Johnson would have been focusing his attention on traffic coming to his left rather than the approaching pedestrians to his right, and that the plaintiff's expert, Tyler Black did not base his opinions on the objective evidence. See Boggess Report p.5.

## II.    **LEGAL STANDARD**

Federal Rule of Evidence 702 permits '[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to offer opinion testimony only if:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b)    the testimony is based on sufficient facts or data;
(c)    the testimony is the product of reliable principles and methods; and
(d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 imposes a "basic gatekeeping obligation" on the trial court to ensure

that an expert witness "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). This is determined by whether the witness's opinion "rests on a reliable foundation," i.e., "whether the reasoning or methodology underlying the testimony is scientifically valid"—and whether the opinion is "relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 582-83, 597 (1993); *Nease v. Ford Motor Co.*, 848 F.3d 219, 230 (4th Cir. 2017) ("Rule 702 imposes a special gatekeeping obligation on the trial judge to ensure that an opinion offered by an expert is reliable.") (citation omitted), *cert. denied*, 137 S. Ct. 2250, 198 L.Ed. 2d 680 (2017). The proponent of expert testimony must demonstrate that the testimony satisfies these requirements. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) ("The proponent of the testimony must establish its admissibility by a preponderance of proof.").

In *Daubert*, the Supreme Court set forth non-exclusive factors on which district courts may rely in evaluating whether a proposed expert has used a reliable methodology to arrive at his or her opinion: "(1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Cooper*, 259 F.3d at 199. Which factors to consider is based on the facts of the case and left to the discretion of the district court. *Kumho Tire*, 526 U.S. at 152; *Daubert*, 509 U.S. at 593. Nevertheless, "[f]ailure to satisfy any of the four reliability factors recognized in *Daubert* is sufficient to preclude the testimony of any of the general causation experts from testifying at trial." *Chapman v. Procter &*

*Gamble Distrib., LLC*, 766 F.3d 1296, 1307 (11th Cir. 2014) (citing *Daubert*, 509 U.S. at 593–94), *cert. denied*, 135 S. Ct. 2312 (2015)). [2]

Although the *Daubert* inquiry should "focus . . . on principles and methodology" rather than the proposed expert's conclusions, "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Expert opinions should be "connected to existing data" by something other than "the *ipse dixit* of the expert," and where "there is simply too great an analytical gap between the data and the opinion proffered," the opinion should be excluded. *See id.* (citation omitted); *see also Holesapple v. Barrett*, 5 Fed. App'x 177, 180 (4th Cir. 2001) ("[I]t still is a requirement that the expert opinion evidence be connected to existing data by something more than the 'it is so because I say it is so' of the expert.").

## III.    **ARGUMENT**

A. *Boggess's opinions regarding the location of the Johnson vehicle pre-incident, along with any opinions stemming from that conclusion, should be excluded.*

In this case there is a great deal of evidence – eyewitness testimony, paint markings at the scene to indicate vehicle rest position, police dashcam videos, and video evidence of the actual incident. Overwhelmingly, what that evidence shows, is that the Johnson vehicle was not all the way across the sidewalk and into the roadway as Boggess claims. He is essentially ignoring all the eyewitness testimony (two separate independent witnesses both have Koenig in virtually the same

---

[2]    The advisory committee notes to Rule 702 provide that other factors that a court may consider are "[w]hether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying," "[w]hether the expert 'is being as careful as he would be in his regular professional work outside his paid litigation consulting,'" "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion," and "[w]hether the expert has adequately accounted for obvious alternative explanations." Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

location on the sidewalk before he was hit) and, perhaps more importantly, the video evidence. Boggess went to great lengths to try and explain why his drawings did not match up with what was in the video, but despite that effort at persuading that the eyes are clearly being deceived, it is painfully obvious that Boggess has simply drawn his own conclusion and will not be swayed from it - a conclusion that is, of course, favorable to the party that hired him. The defendant ran over one person and hit another pulling out of a driveway. The defendant himself has no explanation for why it happened, and if the plaintiffs are lawfully on the sidewalk then there can be no real defense to liability. So Boggess has manipulated the evidence, hidden behind his "photogrammetry" analysis, along with a convoluted explanation about how the vehicle being at a different angle can account for why it is in a different location, all to say brazenly that his drawings actually match up to the video evidence.

Boggess is a retained expert. He is hired by litigants, overwhelming defendants, and one does not necessarily expect him to give up the case when faced with conclusive evidence that he is wrong. Professional experts would likely not be employed very long if they routinely changed their minds on cross examination. But that is why the Court's role as a gatekeeper for this type of testimony is so important. The foundation of FRE 702 is that expert testimony "be based upon sufficient facts or data" to be admissible. A court may exclude expert testimony where "there is simply too great an analytical gap between the [facts] and the opinion proffered." 522 U.S. at 146. *See also Kumho Tire,* 526 U.S. at 153-56 (analyzing lack of sufficient data and evidence to support expert's conclusions). As a result, expert testimony has been excluded in dozens of cases where experts either made assumptions, ignored relevant facts, or "cherry-picked" only those facts which were consistent with the opinion being advanced. *See, e.g., Mohney v. USA Hockey, Inc.,* 138 Fed. Appx. 804, 809 (6th Cir. 2005) (excluding the testimony of an engineer who performed

his calculations based on a series of assumptions but did not utilize actual data to support his conclusions); *Bryte v. Am. Household, Inc.,* 429 F.3d 469, 477 (4th Cir. 2005) (excluding expert testimony on the cause of a fire when the expert "did not exclude all or even most of the other possible sources of the fire" because the trial court is "not obliged to credit [the expert's] say-so supporting his own reliability by way of excluding other causes"); *Nebraska Plastics, Inc. v. Holland Colors of Am., Inc.,* 408 F.3d 410, 416-17 (8th Cir. 2005) (noting that "[a]n expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported"); *Barber v. United Airlines, Inc.,* 17 Fed. Appx. 433, 437 (7th Cir. 2001) ("Because in formulating his opinion Dr. Hynes cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and *Daubert,* and it thus fails to 'assist the trier of fact.") (quoting Fed. R. Evid, 702); *see also Newman v. Hy-Way Heat Sys., Inc.,* 789 F.2d 269, 270 (4th Cir. 1986) ("[N]othing in the Rules [of Evidence] appears to have been intended to permit experts to speculate in fashions unsupported by, and in this case indeed in contradiction of, the uncontroverted evidence in the case." ); *Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC*, Civ. No. WDQ-11-2478, 2012 WL 3115867, at *4 (D. Md. July 25, 2012) ("An opinion is irrelevant when it assumes facts inconsistent with the record, because it lacks a 'logical connection between the expert's theory and the facts of the case.'") (citing *Boss v. Nissan N. Am., Inc.,* 228 Fed. App'x 331, 338 (4th Cir. 2007)). Similarly, Boggess's testimony regarding the locations of the vehicle should be excluded.

Boggess further opines, via a vis his report, that since the Johnson vehicle was blocking the sidewalk and partially in the roadway, that the plaintiffs must have also entered the roadway in front of his vehicle before impact. See Boggess Report p.4. However, this conclusion assumes that Boggess is correct about the location of the Johnson vehicle pre-impact. Since his analysis on that front is

fatally flawed, Boggess cannot bootstrap that fatality into an argument that the plaintiffs were walking down Maybank Highway rather than on the sidewalk. Likewise, the two opinions that follow at the top of page 5 of his report should be excluded for the same reason.[3]

B. *Boggess's remaining opinions should be excluded because they are based on either pure speculation or personal opinions.*

Boggess opines that "[i]t is reasonably foreseeable that Mr. Johnson would not have readily perceive[sic] the presence of the pedestrians to the east at the time he pulled to the end of the Driveway." Despite the fact that this opinion is based on Boggess's faulty finding of where the vehicle was pre-impact, Johnson's testimony was that he looked to the right, then he looked to the left, and then he pulled out, never seeing the plaintiffs. When asked in his deposition about whether there were any obstructions, Boggess gave several different answers, testifying that during the 13 to 15 seconds prior to impact "there's going to be some points where they may not be visible" and agreeing that a mirror and A-pillar would not completely obstruct two pedestrians, to settling on "there may be instances where they become obstructed" and "it's possible completely." Following up on that questioning, Boggess could not say when a complete obstruction could have happened but testified "if it happens, it's going to be for a very brief instant." Boggess Depo p.50, line 22-p.55, line 6. Boggess certainly could not testify to a reasonable degree of engineering certainty that there was any time when the plaintiffs would have been completely obstructed from Johnson's view in the 13 to 15

---

[3] Boggess opines that the Johnson vehicle would have been visible as covering the sidewalk and extending into the driveway for 15 seconds. He further opines that the plaintiffs entered the roadway in front of the vehicle and that if the plaintiffs had confirmed their actions with Johnson or walked behind his vehicle as opposed to Maybank Highway, then the accident would not have occurred. These opinions are all based on Boggess's conclusion that the vehicle was covering the sidewalk and was sticking out in the roadway.

seconds pre-impact. Therefore, any opinion regarding whether Johnson should have "readily perceived" the plaintiffs, whatever that phrase means, should be excluded.

Shortly before impact, Johnson reverses his vehicle a small distance. Tyler Black, in his report, states that this move could be perceived by pedestrians as moving to allow room. Plaintiff Everett in her deposition did not recall seeing the vehicle back up but it is visible in the surveillance video. Boggess opines, with no evidence in support, that Johnson backed up due to a tractor-trailer that passes down the road shortly thereafter. Boggess admits that he has no support for that conclusion other than seeing Johnson reverse and then seeing a truck go by. Boggess Depo p.84, line 21-p.85, line 18. But again, Boggess is bootstrapping his opinion based on his own (faulty) conclusion as to where the Johnson vehicle was pre-impact. Any testimony about why Johnson reversed his vehicle is pure speculation and should be excluded.

Boggess next opines that "[a] driver, such as Mr. Johnson, would more likely than not have focused his/her attention directed toward oncoming traffic to the left and away from the approach of Mr. Koenig and Ms. Everett." Boggess Report p.5. It is not clear what the scientific basis is for this opinion, but Boggess agreed in his deposition that the potential hazards for any driver, including Johnson, turning right out that particular driveway would be traffic from the left and pedestrians from the left or the right. Boggess Depo p.77, lines 2-19. Boggess further begrudgingly agreed, after some prodding, that sidewalks do in fact exist so that people can **walk** on them. Drivers in South Carolina have a duty to yield to pedestrians. What Boggess is basically doing is nothing more than excusing Johnson's failure to yield to the pedestrians with no scientific basis to back it up (the defense's other liability expert, Stephanie Borzendowski, gives a similar opinion which is flawed for the same reason and the subject of a separate Motion to Exclude). His proposed testimony amounts to nothing more

that "subjective belief or unsupported speculation" which as a matter of law does not meet the *Daubert* standard. *Daubert,* 509 U.S. at 589-90.

Lastly, Boggess's final opinion is critical of the plaintiffs' accident reconstructionist, Tyler Black. Tyler Black's Report attached as Exhibit J. Boggess states that Black's drawings are not supported by the objective evidence and therefore any opinions based on the positions of the vehicle are in error. Aside from the obvious "pot calling kettle Black" that comes to mind, Boggess should not be allowed to criticize another engineer's work simply because he disagrees with the conclusion. Black based his opinions on his review of the evidence, including the paint marks, video, scene-mapping, deposition testimony, and witness statements. Not coincidentally, Black's opinions are in harmony with and consistent with all of the objective evidence, particularly the most recent witness testimony. Allowing Boggess to testify that Black's analysis was in error simply because he came to a different conclusion than he did is not proper for expert testimony.

## IV.   CONCLUSION

For the reasons previously stated, Plaintiffs request this Court preclude any expert testimony of Brian Boggess, PE.

Respectfully submitted,

LAW OFFICE OF KENNETH E. BERGER, LLC

/s/ Bradley L. Lanford
blanford@bergerlawsc.com
Federal Bar No.: 9371
5205 Forest Drive, Suite Two
Columbia, SC 29206
(803) 790-2800 (phone)
(803) 790-2870 (fax)
Attorney for Plaintiff Ryan Koenig

/s/ Kenneth E. Berger
Kenneth E. Berger
kberger@bergerlawsc.com

Federal Bar No.: 11083
5205 Forest Drive, Suite Two
Columbia, SC 29206
(803) 790-2800 (phone)
(803) 790-2870 (fax)
Attorney for Plaintiff Ryan Koenig

FINNEY INJURY LAW

/s/ Christopher J. Finney
Christopher J. Finney
Chris@finneyinjurylaw.com
Federal Bar No.: 62888MO
225 S. Meramec Avenue, Suite 821T
Clayton, MO 63105
(314) 293-4222 (phone)
(314) 754-9477 (fax)
Attorney for Plaintiff Ryan Koenig

JOYE LAW FIRM

/s/ Mark J. Bringardner
Mark J. Bringardner
mbringardner@joyelawfirm.com
Federal Bar No.: 12342
5861 Rivers Avenue
North Charleston, SC 29406
(843) 554-3100 (phone)
(843) 529-9180 (fax)
Attorney for Plaintiff Kellie Everett

Columbia, South Carolina
February 21, 2020