# EXHIBIT 1    Page 1

<pre>
 1            UNITED STATES DISTRICT COURT
              DISTRICT OF SOUTH CAROLINA
 2               CHARLESTON DIVISION
 3            CASE NO.: 2:18-cv-03599-DCN
 4
 5   RYAN KOENIG and KELLIE EVERETT,
 6
             Plaintiffs,
 7
     vs.
 8
     EDWARD JOHNSON,
 9
             Defendant.
10   _____/
11
12                        Veritext Legal Solutions
                          Premier Executive Suites
13                        1415 Panther Lane
                          Naples, Florida 34109
14                        Wednesday, October 2, 2019
                          10:00 a.m. - 1:00 p.m.
15
16        DEPOSITION OF ROBERT EILERS, FAAPM&R
17
18        Taken on behalf of the Defendant before
19   Jacqueline A. Komin, Registered Professional
20   Reporter, Florida Professional Reporter and Notary
21   Public in and for the State of Florida at Large,
22   pursuant to Defendant's Notice of Taking Deposition
23   in the above cause.
24
25
</pre>

```
 1    APPEARANCES:
 2    ON BEHALF OF PLAINTIFFS:
 3         LAW OFFICE OF KENNETH E. BERGER
           BY: KENNETH E. BERGER, ESQUIRE
 4             (Via Telephonic Appearance)
           5205 Forest Drive - Suite Two
 5         Columbia, South Carolina 29206
           Office: 803-790-2800
 6         Fax: 803-790-2870
           bergerlawsc.com
 7
           FINNEY INJURY LAW
 8         BY: CHRIS FINNEY, ESQUIRE
               (Via Telephonic Appearance)
 9         1600 South Brentwood Boulevard
           Suite 220
10         St. Louis, Missouri 63144
           Office: 314-334-1814
11         Fax: 31-754-9477
           info@finneyinjurylaw.com
12
13    ON BEHALF OF DEFENDANT:
14         HOOD LAW FIRM, LLC
           BY: BRIAN E. JOHNSON, JR., ESQUIRE
15         172 Meeting Street
           Charleston, South Carolina
16         Office: 843-577-4435
           Fax: 843-722-1630
17         brian.johnson@hoodlaw.com
18
19
20
21
22
23
24
25
```

Page 3

1                    INDEX

2  WITNESS                              PAGE

3  ROBERT EILERS, FAAPM&R

4      Direct Examination by Mr. Johnson .......4

5      Cross-Examination by Mr. Berger ........118

6      Redirect Examination by Mr. Johnson .....119

7                  - - - - -

8                DEFENSE EXHIBITS

9  DESCRIPTION                          PAGE

10 Exhibit 1  08-22-19 Letter to Dr. Eilers ...8
              from Brian Johnson
11

   Exhibit 2  Affidavit and various documents .9
12

   Exhibit 3  Federal Court Testimony List ....24
13

   Exhibit 4  Notice of Physician's Lien ......30
14

   Exhibit 5  05-06-19 Outpatient Call ........45
15            Traffic Delay Prevented Recheck

16 Exhibit 6  05-18-19 Neuropsychological .....45
              Evaluation

17

18

19

20

21

22

23

24

25

1   Thereupon:

2                  ROBERT EILERS, FAAPM&R,

3   was called as a witness by the Defendant, and after

4   having first been duly sworn, was examined and

5   testified under oath as follows:

6                  THE WITNESS:  I do.

7                     DIRECT EXAMINATION

8   BY MR. JOHNSON:

9        Q.   Good morning, Dr. Eilers.

10       A.   Good morning.

11       Q.   We met off the record.  My name is Brian

12   Johnson.  I represent defendant Edward Johnson in a

13   lawsuit filed by Ryan Koenig.  And it's my

14   understanding you've been identified as a witness in

15   this case.

16            Is that your understanding?

17       A.   Yes.

18       Q.   And you understand we're here to take your

19   deposition this morning?

20       A.   Correct.

21       Q.   And I know you've been through this

22   process before, but if you need to take a break at

23   any time, please let me know.

24       A.   I understand.

25       Q.   And if you don't understand any of my

Page 5

1    questions at any point in time, please let me know,

2    and I will do my best to rephrase it.  Okay?

3         A.   That's fine.

4         Q.   What's your full name?

5         A.   It's Robert Edwin, E-D-W-I-N, Eilers.

6         Q.   And what is your profession?

7         A.   I'm a physician.  I specialize in physical

8    medicine rehabilitation.

9         Q.   Can you explain to me what that entails,

10   physical medicine and rehabilitation?

11        A.   Primarily we deal with the diagnosis and

12   treatment of individuals who have strokes, spinal

13   cord injury, amputations, progressive neuromuscular

14   disease, like ALS, Lou Gehrig's, or MS.  We deal

15   with patients with amputations, patients who have

16   traumatic brain injuries, spinal cord injuries.

17            Basically, it is a lot of neuro and

18   orthopedic practice, whether acquired or

19   developmental, like children with CP we take care

20   of.

21            So basically neuro, orthopedic,

22   neuromuscular types of, either traumas or diseases,

23   that have an impact on function ability on a

24   day-to-day, or sometimes somebody might be a month

25   in our care and then they're okay.

1        Q.    Where are you employed?

2        A.    I'm self-employed.  I work at my own

3   practice in Illinois, and then I also see patients

4   in Naples.

5        Q.    What's the name of your practice?

6        A.    It's Physical Medicine & Rehabilitation

7   Associates.

8        Q.    How long have you had that business?

9        A.    I think since 1981, somewhere in there.

10        Q.    Are you the only physician in that

11   practice?

12        A.    At this time, yes.

13        Q.    And you mentioned that you have that

14   practice in Illinois.  We're here in Naples, Florida

15   today.

16              How do you split your time in your

17   practice?

18        A.    I probably -- if you add up over the year,

19   I'm probably here about seven months, and then I'd

20   be up north maybe five months.  I try and avoid

21   January, February and March, but that doesn't

22   generally quite work out.  I go back and forth,

23   depending on patients who are scheduled or

24   cross-covering, those types of things.

25        Q.    When you're here in Florida, what's a

1  typical workweek for you?

2     A.   Generally, I would see some outpatients,

3  do outpatient consultation, meet with patients'

4  families.  And then I'd cover inpatient consults in

5  our admissions at -- NCH would be consults in the

6  downtown hospital, and North Collier's right up here

7  would be the rehab unit.

8     Q.   Do you have a physical office location

9  here in Naples?

10    A.   Yes, over here on Tamiami Trail.

11    Q.   And you work there full-time when you're

12 in Naples?

13    A.   I probably would do anywhere from 20 -- it

14 could be 40 hours a week that I'd work at things, so

15 it just depends.

16    Q.   And with which hospitals are you

17 affiliated here in Naples?

18    A.   It's Naples Community Hospital and their

19 other hospital, Naples Community Hospital.  NCH is

20 basically an umbrella.  It has the hospital downtown

21 NCH and North Collier Hospital, and at some other

22 outpatient facilities.

23    Q.   How much time on a typical week do you

24 spend seeing patients in the hospital?

25    A.   It could be anywhere from a day a week to

1  two or three days week, or if they need a week

2  covered.  It just depends.

3      Q.   And as far as your practice, when you're

4  in Illinois, what is the scope of your practice in a

5  typical workweek?

6      A.   Again, I probably spend anywhere from 20

7  to 40 hours meeting with patients and families, et

8  cetera, that would probably be outpatient.  And then

9  I would cover the inpatient, depending on consults.

10 You might have a week without any.  You might get

11 five or ten.  It just depends.  And then I'd cover

12 patients if somebody's away, to make sure their

13 patients are covered.  That might be by phone or

14 going in, just depending on what you need to do.

15     Q.   What hospitals are you affiliated in

16 Illinois?

17     A.   It would be Hinsdale Hospital and LaGrange

18 Hospital, and they're in Hinsdale and LaGrange,

19 Illinois.  I think now they're owned by Ameda, but

20 Ameda -- anyway, they're all just kind of merging

21 all over.  I can't even keep up.  The name changes

22 annually.

23     Q.   How would you describe your patient

24 population?

25     A.   Probably about 20 percent would be

1    pediatric, or children under 18 to 20, and the

2    remainder would be adults.  And they cover from 102

3    down to -- you know, we'll see some children right

4    after birth if they have a brachial plexus injury,

5    things like that, but from a year to 102.  Don't

6    have a whole lot of 102s, but it's becoming more

7    common.

8         Q.   Do you know what percentage of your

9    practice would be patients who have experienced some

10   sort of head trauma or brain injury?

11        A.   Probably 40, 50 percent of the patients

12   would have some type of head injury or brain trauma.

13   Some get, obviously, strokes coupled with their

14   trauma, that type of thing.

15        Q.   Do you know what percentage of your

16   patients are involved in litigation?

17        A.   I don't know the exact number percentage,

18   but, obviously, a lot of our patients end up in the

19   legal process with work injuries, disability, auto

20   crashes, falls.  So it's not unusual at all.

21             (Thereupon, marked as Defense Exhibit 2.)

22   BY MR. JOHNSON:

23        Q.   We've marked as Exhibit No. 2, and I'll

24   hand it to you, it's a response to a subpoena that

25   we received from your office.  And included in this

1    is a copy of your CV, I think, near the front of the
2    stack of the documents.
3              If you could just glance at that and let
4    us know if it appears to be up to date.
5         A.    That appears to be.  Yeah.  12 pages,
6    that's correct.
7         Q.    And can you give me a snapshot of your
8    educational background?
9         A.    I did my undergraduate work and my medical
10   school at the University of Louisville in
11   Louisville, Kentucky from 1972 to '79.  And then I
12   did my internship and residency at Northwestern
13   University Medical School and at that time, the
14   Rehabilitation Institute of Chicago.  It's now known
15   as Shirley Ryan AbilityLab, from 1979 until 1982.
16             And then I completed part two of my
17   boards, the orals, in 1983.  And I practiced since
18   1982 in the area of physical medicine rehabilitation
19   at Northwestern and other communities, where we set
20   up -- or actually, I set up rehab units.  There was
21   a shortage of physiatrists in those days.
22        Q.    And you said that you've had your
23   business, Physical Medicine & Rehab, since the 1980s
24   as well?
25        A.    Yes.

Page 11

```
 1        Q.    Since completing your residency, have you
 2   worked out of that practice?
 3        A.    Yes.
 4        Q.    And you said you don't currently have any
 5   partners?
 6        A.    I do not.
 7        Q.    Have you previously?
 8        A.    We had up to, I think it was six,
 9   physicians in the practice.  And people moved, got
10   married and just changed.  And I just -- you know, I
11   didn't want to be dealing with a lot.  So we
12   cross-cover with other solo practitioners.  Medicine
13   is kind of a changing breed as a solo practitioner.
14        Q.    And I noticed you had went to law school
15   as well?
16        A.    I did.
17        Q.    And you completed law school at the
18   University of Louisville?
19        A.    Correct.
20        Q.    What was the purpose for your attending
21   law school?
22        A.    My grandparents are immigrants from
23   Ireland, and my other grandparents maybe had
24   elementary education, so they all said get all the
25   education you can.  One was a track foreman, and my
```

1  grandmother worked as a maid in homes and things

2  like that.

3          So when you were in Louisville, you could

4  go to any school within the university for the same

5  tuition.  And a fellow had mentioned that, so I went

6  over to law school and asked if I could go, and they

7  said sure.  And so I filled out whatever paperwork

8  they required, I think the LSAT, or something.  And

9  I started law school at night and the summers.

10     Q.   And you finished law school when?

11     A.   1979.  I went to med school in the day and

12  law school at night.

13     Q.   Have you been admitted to practice in any

14  states?

15     A.   I took the bar and took my week vacations

16  as an intern in 1980 and took the bar in Illinois,

17  and I did pass.

18     Q.   You did?

19     A.   I did.  I wouldn't want to do that again.

20     Q.   Are you still a member of the bar in

21  Illinois?

22     A.   I pay my dues.  I don't practice.  I wrote

23  a will after I passed the bar, and that pretty much

24  closed the deal for me doing any more of that.

25     Q.   Have you taken the bars in any other

Page 13

1    states?

2         A.    No, I have not.  No interest.  Not the

3    legal bars.

4         Q.    Do you currently have any teaching

5    responsibilities?

6         A.    I'm on faculty at Northwestern as an

7    instructor; at this time, whatever the chairman

8    assigns, but I've been there 40 years or so.  So

9    whatever he asks me to do I'll work with some of the

10   amputees or if he asks for a lecture, talk to

11   residents.  Whatever he wants me to do at this

12   point.  So if I'm in Chicago, he'll say will you do

13   this or that.

14        Q.    Are you currently teaching in any

15   capacity?

16        A.    This month, no.  I was up there last month

17   and met with some of the orthotics, prosthetics, but

18   not this month.

19        Q.    Last month your teaching responsibilities

20   were of a clinic capacity?

21        A.    Yes, it's clinical.  I'm not a publisher

22   in academic admissions.

23        Q.    You said you give lectures sometimes as

24   well?

25        A.    It's more one-on-one lectures teaching

Page 14

1    patients.  I mean, I did in the past, but I don't do

2    classroom lectures at this time.

3        Q.    When were you last involved in classroom

4    lectures?

5        A.    I think that was maybe three our four

6    years ago.

7        Q.    What topic would you lecture on?

8        A.    I think a lot of that had been amputations

9    and some will be on stroke or orthotic management.

10       Q.    And do you have any administrative

11   responsibilities at Northwestern?

12       A.    You know, I was on the med school

13   admission committee from the department for, I

14   think, for five or six years.  I'm not now.  But,

15   no, I don't deal with administrative issues, other

16   than if somebody asks me a question, but no.

17       Q.    And have you published in the medical

18   literature?

19       A.    I have not.

20       Q.    Have you given any seminars or

21   presentations that you think are pertinent to the

22   issues involved in this case involving Mr. Koenig

23   and Miss Everett?

24       A.    No, I don't believe so.

25       Q.    And your board certification is in what

Page 15

1    area?

2         A.    In physical medicine and rehabilitation.

3         Q.    Did you pass your boards on your first

4    attempt?

5         A.    Yes.

6         Q.    And there are subspecialty or fellowship

7    programs within physical medicine and

8    rehabilitation, correct?

9         A.    There are now, yes.  You can subspecialize

10   if you choose to.

11        Q.    What are those subspecialty programs?

12        A.    You could do pediatrics.  You can do

13   movement disorders.  Now they just started one at

14   Northwestern.  You can do head injury, spinal cord.

15   You can do electrodiagnostics.  Those are the

16   general areas.  And pain management.  I'd have to

17   doublecheck to be absolutely certain, but those are

18   the ones that are commonly done.

19        Q.    Did you do any fellowship or subspecialty

20   training?

21        A.    No.  When we were trained, we did

22   pediatrics, EMGs, pain management.  We had to do all

23   of it.  Then later they started focusing, but there

24   weren't enough physiatrists.  We did it all.  And

25   then later now they started, like all specialities,

1  starting to do more subspecialization.

2      Q.   You don't have any fellowship training or

3  certifications in any subspecialty?

4      A.   I do not.  We just did it all.

5      Q.   And your licenses and certifications,

6  those are listed on your CV?

7      A.   Yes, they are.

8      Q.   And this is on page 4 of your CV.  It

9  lists Illinois, Indiana, Kentucky, Michigan,

10  Wisconsin, Georgia and Florida, is that correct?

11      A.   Yes, that is.

12      Q.   And have you previously been licensed in

13  any additional states?

14      A.   No.  I kept all my licenses in states

15  where I practice.

16      Q.   Did you practice in each of these states?

17      A.   I practiced -- I set up the rehab program

18  in South Bend, so that's why in Indiana.  Then we

19  did consults in Michigan, and I covered in Michigan

20  for a fellow, and I covered in Georgia.  And I still

21  see some patients in Georgia.

22           And then Wisconsin I had covered for a

23  colleague up there to help him out.  And Illinois,

24  obviously, was a primary focus and then, obviously,

25  Florida.  Kentucky, I went to medical school there.

Page 17

1   My family's been there, so I keep my Kentucky

2   license.  I have a few patients in Kentucky I

3   follow.

4        Q.   Has any state taken any action against any

5   of your licenses?

6        A.   No.  I haven't had any actions,

7   reprimands, or anything like that.

8        Q.   Have you ever been a party to a

9   malpractice suit?

10       A.   You know, in 1986, I was sued.  Allegedly

11  a fellow smoked four packs a day and we caused his

12  heart attack in therapy.  It was dismissed.

13       Q.   Is that the only suit?

14       A.   Yes.

15       Q.   The professional organizations in which

16  you're a member of is all listed on your CV?

17       A.   Yes.

18       Q.   And that's starting on page 11?

19       A.   I believe that's correct.

20       Q.   Do you know if those organization

21  memberships are still active?

22       A.   Most are.  The one that I deal with would

23  be Florida, Illinois and our PM&R societies, the

24  Academy and the Association of Academic

25  Physiatrists.

Page 18

1      Q.   Do you know if any of those organizations
2  have set forth any guidelines or standards for
3  expert witness testimony?
4      A.   Yeah.  I don't know if they have or have
5  not.  I'm not aware in our field if they have.
6      Q.   Do you have an independent recollection of
7  Ryan Koenig as a patient?
8      A.   I do.
9      Q.   Tell me what you independently recall.
10      A.   He was kind of a man in black.  He likes
11  to dress in black.  He basically is fairly slow,
12  methodical.  His gait is described he does weight
13  shifting.  He's very slow in his responses.  Has a
14  lot of problems necessarily following directions,
15  recall.
16           He's pleasant, but he's really blunted in
17  affect.  You know, he has some stiffness getting up
18  to move because of his leg.  But basically,
19  relatively blunted non-animated person.  I just
20  remember him dressing in black.  Whether it was kind
21  of -- you know, he's an artist kind of guy.  And I
22  mean, I just remember he liked wearing all black.  I
23  don't know why.
24      Q.   Anything else that you independently
25  recall apart from your records?

Page 19

1        A.   I have to refer to my records.  I mean,

2   those are the basic things.  I mean, he's polite and

3   he's pleasant, but he's just not quite all there.

4        Q.   And how about Kellie Everett?  Do you

5   recall her?

6        A.   I do.

7        Q.   Tell me what you independently recall

8   about Miss Everett apart from your medical records?

9        A.    Kellie is very pleasant.  I think she's a

10  very sweet young lady, somewhat naive in terms of

11  the problems that are going on.  Maybe to a degree

12  some denial, but very supportive.

13         She's trying to do everything possible to

14  help Ryan.  And, obviously, I see this every day.

15  It's the first time she's had to deal with head

16  injuries and their sequella, so she's on a rapid

17  learning curve.  But very nice lady, accepting in

18  many ways, trying to understand, and hoping that

19  everything will turn out okay.

20          And not that she's naive.  I think she

21  sets out a hopeful expectation, as many of our

22  patients' families and spouses do.  That's why I

23  talk about meeting with families.  A lot of it's

24  helping them understand with what they're

25  confronting.

1     Q.   Do you subscribe to any professional

2  journals?

3     A.   They basically come through the

4  associations, the AAP&R and the AAP, which are the

5  American Academy of Physical Medicine

6  Rehabilitation, and then the Association of Academic

7  Physiatrists.

8     Q.   Are there any publications that you

9  consider to be authoritative in the field of

10  rehabilitation and medicine?

11     A.   It's a compendium of everybody's

12  literature.  There's no one definitive.  There's so

13  many different journals and articles and access

14  online, that there isn't one that I could say any

15  more is the authority.

16     Q.   And Dr. Eilers, how do you view your role

17  in this case?

18     A.   A treating physiatrist.  I saw Ryan,

19  obviously, with Kellie, their question being what

20  problems does he have?  What do you recommend we do?

21  I think they're looking for -- they're really

22  looking for a miracle, which I don't have.

23        But they started early.  Obviously, some

24  of the things they were able to improve in terms of

25  his middle ear reconstruction because of his

1   temporal lobe fracture, temporal bone fracture.

2          The other things are what they're going to

3   be.  I mean, they aren't going to be cured or fixed.

4   As I said, Kellie's a little naive, thinking

5   everything will be okay.  And I'm not being critical

6   of her.  I mean, she's being very committed and

7   honest.  But they're looking for what's wrong with

8   Ryan.  Why isn't he the Ryan he used to be?  My job

9   is to try and assess that more thoroughly.

10          We ordered some diagnostic tests,

11  reordered neuropsych testing to follow up with time

12  because he reaches a maximum at about two years.

13  And to try and help them understand what these

14  issues are going to be.

15          He has a lot of issues that, you know,

16  with anxiety, which he needs to get into further

17  treatment, things like that.  And I discussed what

18  they need to do.

19      Q.   How is it that they came to see you as a

20  physiatrist?

21      A.   They've contacted the office, and the

22  office scheduled them for an evaluation.

23      Q.   Do you have an understanding as to why

24  they contacted you?

25      A.   You know, I'm not absolutely certain.

1    Q.   Are there physical medicine and rehab
2  physicians in St. Louis?
3    A.   Yes.  There are people in rehab in St.
4  Louis.
5    Q.   Did you ask them why they chose to travel
6  out of state to see you?
7    A.   When somebody comes to see me, I just see
8  them.  It's not my job to ask why or why not.  A lot
9  of people like to leave their town and get
10  additional opinions.  People from Chicago might go
11  to another center, whether they go to Michigan or
12  somewhere else, to get input.  Not uncommon, but
13  you'd have to ask them what their thinking or
14  decision-making was.
15    Q.   Prior to your involvement in the treatment
16  of Ryan Koenig, did you know or had you worked with
17  any of his attorneys before?
18    A.   I don't know.  I think -- I don't know the
19  attorney, other than the names here, but, no, I have
20  not.  I don't even know who they are.  I know we
21  have the name of Finney.
22    Q.   Prior to this matter with Mr. Koenig, had
23  you ever worked with any other clients of
24  Mr. Finney?
25    A.   As far as I know, absolutely not.  I don't

Page 23

1    know who he is.  I wouldn't know him if he walked in
2    the door.
3         Q.    How about Mr. Berger, another attorney for
4    Mr. Koenig?
5         A.    I don't know who he is or where he is.
6         Q.    Dr. Eilers, you do some work as a retained
7    expert witness as well, is that right?
8         A.    I have, yes.
9         Q.    How long have you been doing that?
10        A.    Probably since I was a resident.  The
11   attendings used to give it to us to do.  Say, for
12   instance, can you go and explain what this fellow
13   needs or doesn't need.  And in those days you had to
14   get on the phone and call or go over to the billing
15   department and ask those questions, so we'd do that.
16   And they just say -- I guess in those days, they
17   sent us as residents to go and explain the problem
18   or whoever you treated.  That wouldn't be as common
19   now, but back then it was like, well, you're a
20   doctor, you go explain.  So I've done that for --
21        Q.    Forty years?
22        A.    37 to 40 years.  I did it in residency, so
23   37 to 40 years, somewhere in there.
24        Q.    Approximately how many cases are you
25   currently reviewing as a retained expert witness?

Page 24

1      A.    I think there are maybe two or three, at

2    the most.

3            (Thereupon, marked as Defense Exhibit 3.)

4    BY MR. JOHNSON:

5      Q.    And we've marked as Exhibit 3 a case list

6    that you brought with you.  This is entitled

7    "Federal Court Testimony List."  Goes back to, it

8    looks like, July of 2014, is that correct?

9      A.    Correct.

10     Q.    Does this include all of your deposition

11   and trial testimony for the previous -- well, I

12   guess, five-year period?

13     A.    No.  This would just be cases in which I

14   was a retained expert or hired as an expert.  No, I

15   wasn't treating.

16     Q.    So in the cases listed on Exhibit 3, you

17   are retained as an expert witness, you are not

18   involved as a treating physician?

19     A.    I was not.  Some I followed up with and

20   provided some care.  But I was brought in to

21   evaluate them as an expert.

22     Q.    But you view these cases listed on Exhibit

23   3 as different than your involvement in this case?

24     A.    In this case, I'm just a treating

25   physician.  So if I see somebody and they have a

Page 25

1  workers' comp issue, I don't track what depositions
2  I've done or not, except having dealt with this in
3  the past we're supposed to keep files or records of
4  whoever we work as an expert.
5       Q.   So a case like this here today, you would
6  not list this on your case list going forward?
7       A.   No, because I just saw him as a patient.
8       Q.   And you understand you've been identified
9  as a non-retained expert in this case?
10      A.   I don't know what I've been identified as,
11 to be honest with you.
12      Q.   Can you tell me what you've done in
13 preparation for your deposition today?
14      A.   I read through my notes and reports.  I
15 know we had to send records and things before and do
16 some affidavits or whatever, but that's pretty much
17 it.
18      Q.   The cases listed here on Defendant's
19 Exhibit 3, were you retained by the plaintiff or
20 defendant in those cases?
21      A.   I think it's both.  Probably the most are
22 plaintiff, I would suspect, but I think Pugh was a
23 defendant.  I think that's it.
24      Q.   So the Pugh vs. Myer case you think was
25 for the defendant?

Page 26

```
 1        A.   Yes, it was.

 2        Q.   Do you know in your career approximately

 3   how many times you've testified in a deposition,

 4   whether it as a treating physician or a retained

 5   expert?

 6        A.   I've done hundreds of depositions over the

 7   years.

 8        Q.   And how about trial testimony?

 9        A.   I would assume -- at this point, I might

10   have to go to court once or twice in a year.  I

11   think I've been once this year.

12             So that's about it.  I mean, court, you

13   know, in the past years ago I might have had to go

14   eight or ten times a year or sometimes five.  But it

15   just depended on who you saw or treated.

16        Q.   So do you know approximately how many

17   times you've testified at trial in your career?

18        A.   It would be hundreds of times.  I don't

19   know the exact number.  I don't track it, but it's

20   not a rarity in my world.

21        Q.   And the cases that you review, are those

22   90 percent on behalf of the plaintiff?

23        A.   I would say most of the things I do are

24   involved with are going to be patient plaintiff or

25   these, where I think mainly -- I think most of those
```

Page 27

1    are plaintiff.

2       Q.   And from your prior testimony, I think you

3    said 90 percent of your work was on behalf of

4    plaintiffs; is that accurate?

5       A.   Yeah, I think that would be fair.  It's

6    going to be high.

7       Q.   Have you ever reviewed a matter on behalf

8    of a defendant in South Carolina?

9       A.   I can't say that I did.

10      Q.   And how about on behalf of plaintiff in

11   South Carolina?

12      A.   I don't believe so.  As far as I know, no.

13      Q.   Have you ever come and testified at trial

14   in South Carolina?

15      A.   No, I don't believe so.  I mean, I could

16   be wrong, but I don't recall anything in South

17   Carolina.

18      Q.   Do you know approximately how many states

19   you've testified in?

20      A.   I've probably been in 15 or 20 states over

21   the years.  Because we saw a lot of people in

22   Chicago that returned to -- or they had come there

23   and returned to their community.

24      Q.   Have you ever done any advertising for

25   your services as a retained expert?

Page 28

1       A.   No.

2       Q.   Have you ever gone and spoken to attorney

3   groups at conferences, or anything like that?

4       A.   I have not.

5       Q.   When was the last time you gave a

6   deposition before today?

7       A.   I would guess four, six weeks ago,

8   something like that.

9       Q.   What are you charging for your work in

10  this particular matter?

11      A.   The first two hours for the deposition,

12  they're 950 for the first hour and then 475 per hour

13  thereafter that was reserved.  And if it goes beyond

14  that, it goes back to 950.

15      Q.   Do you charge anyone for your time spent

16  preparing for your deposition?

17      A.   No, because there's not much to do.

18  That's why I charge more in the first hour.

19      Q.   And how about for your evaluations in this

20  case?

21      A.   They were paid by the Koenigs.

22      Q.   How much did you charge for that?

23      A.   I think it's in the records.  Let's see.

24  I saw it in here.  I know it's in here.  It was

25  $950.

Page 29

1      Q.   And that was paid personally by Mr. Koenig
2    and Miss Everett?
3      A.   Right.   They paid a check.   I think it was
4    No. 1048.
5      Q.   Subsequent to that charge, have you billed
6    Mr. Koenig and Miss Everett?
7      A.   I had two phone calls with them.   No, I
8    didn't see a bill for that, actually.
9      Q.   Do you intend to bill for that?
10     A.   Well, I didn't, so I don't believe I
11   would.   They were just phone calls at that time.
12     Q.   Before we went on the record you referred
13   to lien letters.
14          Can you tell me what you're referring to
15   in that?
16     A.   My secretary just gave them to me because,
17   obviously, there's litigation to -- I think it's
18   Ryan Koenig.   Yeah, it was about Ryan for -- Finney
19   is the person that was on the notice, so we're going
20   to give that to him.   She asked me to do that.
21   Mainly if there are additional charges or somebody
22   doesn't pay for the dep or whatever, then the
23   patient is still responsible.   You know, our
24   involvement is that whatever we have to do,
25   ultimately the patient's responsible for.

Page 30

1      Q.    So you've issued a lien letter in this
2  particular case?
3      A.    Well, I haven't yet.  It's here.  I have
4  to get it to the plaintiff's attorney, unless you
5  want it.  Here you go.
6      Q.    And do you have another copy of the letter
7  there with you?
8      A.    Yeah, I do.  You can mark it, then it's in
9  the record, and whoever is supposed to will be aware
10 on notice.
11     Q.    We'll mark that as Exhibit No. 4.
12     A.    That's fine.  Then that way whoever gets
13 it.  I've done my duty with my secretary.
14           (Thereupon, marked as Defense Exhibit 4.)
15 BY MR. JOHNSON:
16     Q.    Are you planning to come to the trial of
17 this case in Charleston, South Carolina?
18     A.    I don't even know where it's going to be.
19 I haven't been asked.  I don't have a plan and I
20 don't even know when it is.
21     Q.    So if you are asked to come to the trial
22 of this case, will you charge for your time?
23     A.    Oh, absolutely.
24     Q.    What would you charge?
25     A.    It would be 475 per hour and, obviously,

Page 31

1   any expenses that I incur.

2       Q.   475 per hour portal to portal?

3       A.   Well, the travel time out of the practice.

4   So normally if I was working eight or ten hours,

5   then I would charge eight or ten hours.

6       Q.   Per day you're gone?

7       A.   Right.

8       Q.   Plus travel expenses?

9       A.   Correct.

10      Q.   And would you expect Mr. Koenig and

11  Miss Everett to pay that to you?

12      A.   Well, they are ultimately responsible if I

13  do it, so either they or their counsel.  Whoever is

14  responsible for that would have to clarify who's

15  going to be responsible.

16      Q.   What percentage of your annual income

17  comes from your work as a retained expert witness?

18      A.   Oh, I don't know the exact percentage.

19  It's probably less than a percent or two.  So

20  definitely less than 5 percent would be coordinating

21  depositions, things like that.

22      Q.   Have any of your opinions or testimony

23  been limited or excluded, to your understanding?

24      A.   No, not that I'm aware.

25      Q.   Have you ever submitted your testimony for

Page 32

1  peer review?

2      A.   As far as I know, no.  I don't know

3  anybody who does that or whether it has been or not,

4  I don't know.

5      Q.   Have you ever been qualified as an expert

6  witness in federal court?

7      A.   You know, I don't know if I've been

8  qualified or not.  I've testified a number of times

9  in federal court, but that's -- nobody tells me or

10 asks me or exactly that I am, but I recall that I

11 testified.

12     Q.   Have you ever been qualified as an expert

13 in federal court in the field of life care planning?

14     A.   I think it was discussed at some point in

15 a court up in New Hampshire, and we presented all

16 that information.  I think it was just to a judge.

17 So, yes, I guess.  I don't know.

18     Q.   Can you tell me what you're referring to

19 in New Hampshire?

20     A.   There was a fellow, I think it was on one

21 of the cases.  I think it was Mr. Farley,

22 F-A-R-L-E-Y.  It's on one of those.

23     Q.   Is it listed on Exhibit 3?

24     A.   Yes.  It was Janice Farley, his wife,

25 against the United States.  I think it was Concord,

1    it said, New Hampshire.

2         Q.   And what do you recall from that

3    testimony?

4         A.   I had worked with a family to explain what

5    they wanted to bring him home, so we outlined the

6    things that they needed to care for him at home.

7    And then I had to go up to Concord and testify.  And

8    I think it was -- I don't know.  It would have been

9    federal district court.

10        Q.   Was that a trial of the case?

11        A.   Yes.  As far as I know, it was the full

12   trial.  But I was only there to talk about what I

13   had recommended and what I had done, et cetera.

14        Q.   When did you begin doing life care plans?

15        A.   Well, our residency from the very

16   beginning, you do that with every patient.  You

17   explain what they need, what they need to do, how

18   they need to change their home.  So it's something

19   you do with almost every patient.

20             You need to modify your home.  You need

21   attendant care.  You need to follow up with these

22   tests.  It probably became more formalized.  I think

23   that became more formal.  Maybe it was a little bit

24   more formalized ten or 15 years ago, but it's

25   something you discuss with every patient, and if

Page 34

1    they needed it written down, you'd dictate it,

2    whatever they needed.

3            A lot of the worker comp carriers would

4    ask us to outline what that person is going to need.

5    So I'm not -- whether life care planning.  I mean,

6    it's basically the recommendations of what the

7    patient would make is something you did as guidance

8    as a physiatrist.

9        Q.    Do you know approximately how many life

10   care plans you've created in your career?

11       A.    I'm sure I've done hundreds and hundreds

12   over the years.

13       Q.    Did you go to school to become a life care

14   planner?

15       A.    No, not at all.  That's what you do as a

16   physiatrist.

17       Q.    You did not complete any specific life

18   care planning programs?

19       A.    No.  I think they started for nurses and

20   vocational rehab people maybe ten or so years ago.

21   I don't know when they start.

22       Q.    And you've not completed any of those

23   courses?

24       A.    Life care planners have to generally come

25   to the physiatrists and the physicians to get the

Page 35

1    formation that they would write up.  So they have to
2    rely upon what we would say or what another
3    physician in another area would say.
4        Q.    You don't have any particular degrees in
5    life care planning?
6        A.    No.  It's an unlicensed area.  I don't
7    know that they're actually degrees or schools.
8        Q.    There are certifications in life care
9    planning, is that correct?
10       A.    I think there's some certified life care
11   planners, usually voc rehab people, and people who
12   are not medical, because they can't prescribe or
13   actually order things.
14            It's for them to record.  A life care
15   planner, for instance, for an insurance carrier will
16   come in and ask us, well, what does Mr. Koenig need?
17   And I can lay that out, the same as I discussed with
18   the family.  And then they would go ahead if they
19   want to research it or put numbers with it, they do
20   so.
21       Q.    So you have not obtained any certification
22   to life care planning?
23       A.    I don't need to.  It's like I write the
24   prescription.  No, I have not.
25       Q.    So the answer to my question is no?

Page 36

1        A.    That's what I said.

2        Q.    Have you reviewed any literature provided

3    by life care planners in this matter?

4        A.    I have not.

5        Q.    Do you subscribe to any professional

6    journals regrading life care planning?

7        A.    I do not.

8        Q.    Have you formally taught life care

9    planning in any capacity?

10       A.    I've explained it to residents, certainly.

11       Q.    Have you given lectures on it?

12       A.    I don't know if it was lecture, more

13   roundtable.  It's just more of a simple discussion

14   about what they need to explain to families.  It's

15   not a -- no, I don't think I've done formal lectures

16   about it.

17       Q.    And you understand that Mr. Koenig has

18   health insurance now, is that correct?

19       A.    I'm not certain what he does or doesn't

20   have.

21       Q.    Have you billed his health insurance?

22       A.    I have not.

23       Q.    Why not?

24       A.    We generally don't bill health insurance

25   unless it's in the hospital.  It's all private pay.

Page 37

1    We give them a super bill, and they can submit that

2    to their carrier, if they choose to.

3         Q.   So none of the patients that see you in

4    your private practice, you don't bill insurance for

5    any of those patients?

6         A.   No, I do not any longer.

7         Q.   How long has that been the case?

8         A.   Oh, I would guess maybe probably ten

9    years.

10        Q.   Have you taken any continuing education

11   courses regarding life care planning?

12        A.   I have not.

13        Q.   Dr. Eilers, prior to your deposition, you

14   received a deposition notice and subpoena from our

15   law firm, is that correct?

16        A.   Yes, I believe so.

17        Q.   And we've marked as Exhibit 2 a stack of

18   records that we received in response from your

19   office, but I see that you brought a folder of

20   materials with you.

21             Can you just list for me what it is that

22   you brought with you?

23        A.   I think you have all the stuff because

24   you've sent us, like, three subpoenas for records.

25   Is this just the last one or not?

Page 38

1      Q.    That is the last one.

2      A.    Okay.  So I have -- let's see.  I have a

3    neuropsych follow-up from Dr. Morris from May 8th of

4    2019.  You have the physician lien.  I have an email

5    from Hood Law Firm asking, I think, where the

6    subpoena was or these records.  Maybe that was in

7    February.  And then I've got email sending records

8    to your office April 2nd, 2019, and a bunch of other

9    emails related to that.  And all the paperwork

10   asking for records.  I think that was in February.

11   Yeah, we sent those out back then.

12         Then I've got emails, looks like,

13   August 22nd, 2019, or a letter by email, which was

14   asking for our records again.  I think that's this

15   Exhibit 3 was asking for, either updated additional

16   records, or whatever we had.

17         We sent all those.  And then I had to go

18   get the notary to sign your affidavit and all that

19   sort of junk.  And there were A to S requests, and

20   we provided everything we had in there.

21         And then there's a check for payment for

22   $87 for -- I think that was the records.  Then I had

23   another -- oh, you all didn't want the email as a

24   bill.  And then we had to do an invoice for your

25   people, and then they wanted W-9s, and God knows

1   what else.  I got more papers relating to requests

2   for records.  And then there's another payment of

3   101 for records.

4           Then I had a call with Ryan Koenig May

5   6th, 2019, when they couldn't get to the office.  We

6   had an appointment scheduled.  And I have a

7   September 2nd email.  I think that's when we were

8   sending you some of the records back September 2nd,

9   the CV.  And then you needed a notarized affidavit.

10  We sent that.

11          There's a super bill, but it's not

12  completed, since he had to cancel.  September 9th of

13  '19, he was coming to the office, and then his ride

14  cancelled, so he couldn't get there.

15          And then September 11th was another thing

16  for requests of records and emails about records and

17  these, and we sent that.  Or Sharon did, I should

18  say.  Then there's an email to Kellie that I

19  understood that his ride didn't make it, and we

20  appreciated her calling and letting us know.

21          Then March 2nd of 2018, was the email from

22  Sharon to help them coordinate an evaluation.  And

23  we sent them a patient history forms that we ask

24  patients to fill out.  So Sharon sent that

25  automatically; their patient information, kind of

Page 40

1  their basic information, when they called the office
2  March 2nd, 2018.
3          And then there are records from his
4  physician care specialist, Dr. Fitch, F-I-T-C-H,
5  March 12th of 2019.  And then emails about
6  scheduling a follow-up, I think, for May, and just
7  scheduling.
8          And Kellie had contacted the office
9  wanting to set up the follow-up.  That was around
10  January 28th of '19.  And there is August 20th of
11  2018 was, we sent them or our office sent the
12  dictation that I had dictated about his visit
13  about -- it was a phone follow-up that we had after
14  we got the tests and the information back.  And that
15  was dated August 14, 2018.  And that was about eight
16  pages.
17          And then I had his repeat MRI of the brain
18  that he got done in St. Louis that showed all the
19  temporal lobe and encephalomalacia and changes in
20  his brain.  And then he had had an EEG, which was
21  then found to be normal.  That was done at Barnes.
22  And then I had a note from Dr. Morris that she --
23  well, she said she had had some surgery and sent the
24  evaluation to me.  I think that was around
25  August 13th.  So she sent her neuropsych eval.

Page 41

1      Q.   That's from 2018?

2      A.   Right.  That was the May 1, 2018

3   neuropsych.  And let's see.  Okay.  And then I was

4   going to follow up.

5           My staff, we set up a conference call for

6   August 14th that was just setting up the follow-up

7   on the tests.  And then -- okay.  I think Kellie had

8   called, and we called her back.  And Sharon got a

9   phone call set up August 14th to talk about all the

10  tests.  And there was -- and they had an email

11  August 10th to talk about scheduling.

12          And then July 11th we had gotten some of

13  the information on testing about the EEGs, and I

14  think he was going to have some surgery.  So just

15  some email notes.  Kellie had kept us informed that

16  they had completed testing May 23rd of 2018, and

17  that we'd be getting the reports.

18          We had written asking if they had been

19  completed back May 23rd.  And then she wrote back

20  that they were done and was getting us the

21  information.  And she had a case manager.  We had to

22  give her some ICD-10 codes.  I don't know if they

23  were submitting his bills.  And then we sent

24  Mr. Koenig the evaluation and recommendations, our

25  dictation of April 2nd, 2018, and we sent those on

Page 42

1    the 12th, the evaluation recommendations.  I think

2    that was a 12-page about.  And then the bill for

3    4/2/18 we talked about was 950 that they paid.

4          And then there are prescriptions dated

5    4/2/18 for brevity, one for an MRI, one for a

6    24-hour EEG, and one for neuropsych testing.  And I

7    suggested they try Northwestern because they have a

8    program with rehab of musicians; and then, again,

9    audiogram, vestibular testing, and he was following

10   up with his EMT specialist.

11          Then there are patient history forms that

12   they fill out, or he would have filled out or Kellie

13   filled out, before coming.  And then I reviewed

14   those and put my writing on it as well.  I've got a

15   bold fountain pen writing.  And I think Ryan filled

16   them out.  I don't know if that's his or her

17   signature.

18          And then the forms are filled out for

19   HIPAA and for billing, and then there's a neuropsych

20   eval.  They had a copy of the St. Louis University

21   neuropsych that was done early.  And that's it.

22      Q.   Okay.  Thank you, Dr. Eilers.

23          Have you reviewed anything related to this

24   case outside of what you brought with you here

25   today?

Page 43

1    A.    I know they have records originally, so I

2  would have seen some of their acute care records,

3  but I don't keep those with patients.  I just want

4  to look through them.  So there may be some details

5  in here, like the CTs and things like that, that I

6  made notes off of.

7    Q.    Do you know which medical records you

8  would have reviewed?

9    A.    I might have referenced them in the eval.

10  I try to do that, but I don't make a note of every

11  record usually.

12    Q.    And I think you mentioned some records

13  that when you were going through the list, that I do

14  not believe that I have copies of, and some of those

15  may have been subsequent to when you responded to

16  our most recent subpoena.

17          It looks like you have seen or talked with

18  Mr. Koenig in September?

19    A.    Well, I didn't talk with him, actually.

20  It was the fact that he couldn't make the visit.

21  His wife called to let us know that the fellow who

22  was going to give him a ride couldn't do it, so she

23  was kind enough to let us know that they wouldn't be

24  there that day.

25          I think you have everything else, where we

Page 44

1    have conference or discussion calls.  May 6th of

2    '19, you should have that.

3        Q.    You had a call with --

4        A.    May 6th of '19.

5        Q.    I do not believe I have that.

6            And did you say you also have an

7    evaluation from Jeri Morris in May?

8        A.    There's a follow-up I got later.  She had

9    talked to me, but then I think in the last few weeks

10   I've gotten that actual dictation.  So you have

11   August 14th.

12       Q.    From review of the materials we received,

13   I think the most recent thing I have is the letter

14   from Dr. Fitch in March of 2019.

15       A.    Fitch?

16       Q.    Optometrist.  It's in your file.

17       A.    Okay.  This is the call I had on May 6th

18   of '19.  I'm pretty sure, because we sent -- we did

19   a records request.  This is the last records request

20   you have here, and we sent you the prior, plus the

21   current.  So you should have had all of that because

22   I've had three record requests, at least from what I

23   can see in here.

24       Q.    And I don't see that we received that.

25       A.    And maybe it's possible that it may not

Page 45

1    have gotten in there.  I don't know.

2        Q.    And you said you have a May evaluation

3    from Jeri Morris as well?

4        A.    Right.  She had mailed the neuropsych eval

5    from May 8th of '19.  That one I don't think would

6    have been in the records because that was on top of

7    these.

8              MR. JOHNSON:  Chris and Kenny, I'm going

9         to take a break and make a copy of these

10        records and mark them as the next exhibit.

11             MR. BERGER:  Sure.  Would you do me a

12        favor?

13             MR. JOHNSON:  Yeah.

14             MR. BERGER:  If there's a way, not only to

15        copy them, but if there's a way to scan, if you

16        can scan them, would you shoot me an email and

17        Chris a quick email with that record?

18             MR. JOHNSON:  I will see if that can be

19        done.

20             (Recess taken 10:51 a.m. - 11:04 a.m.)

21             (Thereupon, marked as Defense Exhibit 5

22        and Exhibit 6.)

23    BY MR. JOHNSON:

24        Q.    We'll go back on the record.

25             Dr. Eilers, we have marked as Exhibit 5

Page 46

1   some documents that you brought with you.  And this

2   begins with a May 6, 2019 outpatient call with Ryan

3   Koenig.  And included in that stack of documents are

4   some emails and other documentation from September

5   of 2019 related to communications with Mr. Koenig

6   and Miss Everett.  And we've marked as Exhibit 6 an

7   evaluation dated May 8 of 2019 by Jeri Morris.

8   Okay?

9       A.   Okay.

10      Q.   Before we took a break to copy those

11  materials, I was asking you about other materials

12  you reviewed.

13           Do you have an independent recollection as

14  to which medical providers you have reviewed records

15  from?

16      A.   I know I had the neuropsych from St.

17  Louis.  I've got that right here.  That was Schwarz,

18  Lauren Schwarz, S-C-H-W-A-R-Z.  And then I would

19  have had the records.  I had the records from South

20  Carolina and the hospital.  I don't know.  In my

21  eval, I think I talked about some of them.  Anyway,

22  I may have noted some records I looked at, but I had

23  CTs, MRIs.

24           I had the medical University of South

25  Carolina ER and EMS, and those types of records they

Page 47

1   brought with them, so I had some.  I can't tell you

2   every record I looked at.  Patients come, they bring

3   their records, and I just kind of look through and

4   see what happened to you.

5        Q.   So you would have reviewed some records

6   from the medical University of South Carolina and

7   also from Lauren Schwarz at St. Louis University?

8        A.   Right.  There may have been some other

9   records from St. Louis or the eye doctor.  Whatever

10  is referenced in my evaluation I would have gotten

11  that from, either Kellie or Ryan, or the medical

12  records.  So those are my sources that I had.

13       Q.   And all of the notes or handwritten notes

14  that you had made related to this matter are

15  contained in your file, and I think are included in

16  what we marked as Exhibit 2 as well, is that

17  correct?

18       A.   Correct.  Usually I wrote it all on the

19  history form and the back pages in the bold fountain

20  pen.

21       Q.   And you don't make any notes or

22  highlighting or other markings on any of the actual

23  medical records you reviewed?

24       A.   No.  I gave up highlighters when I

25  finished school.  I don't highlight, no.

Page 48

1     Q.    Okay.  Other than the email communications

2     that are contained within your chart, have you had

3     any other email communications with Mr. Koenig or

4     Miss Everett?

5     A.    No.  Everything would be in here.

6     Q.    And do you personally send any emails with

7     them or does it come from -- I see a Sharon in your

8     office?

9     A.    It would go through Sharon, generally.

10    She'd do it.  I mean, it's possible that I -- I tell

11    her she needs to talk to them.  But I talked to them

12    after she had arranged it.  I dictate that note.

13    But generally she handled the coordinating.

14    Q.    Have you had any communications, whether

15    electronic communications or telephone calls, with

16    any of the treating providers involved in

17    Mr. Koenig's case?

18    A.    Other than Dr. Morris, no.  She had called

19    to tell me what her findings were in May, and then

20    she later sent the details.  But other than that,

21    no.

22    Q.    And that's in May of 2019?

23    A.    Yes.

24    Q.    And that was just one call with Jeri

25    Morris?

Page 49

1      A.    Right.

2      Q.    You've not spoken with anyone else

3  involved with his care and treatment?

4      A.    As far as I know, no.  I don't believe I

5  did.

6      Q.    Have you ever spoken with any of his

7  attorneys in this case?

8      A.    I have not.  I know they called the office

9  to set up deps.  I don't even think we had a records

10 request from them, as far as I can see.

11     Q.    For purposes of your opinions in this

12 case, did you review any medical literature?

13     A.    No.

14     Q.    Are you relying on any medical literature?

15     A.    No.

16     Q.    Have you reviewed any depositions of any

17 of the parties in this case, Mr. Koenig or

18 Miss Everett?

19     A.    No.

20     Q.    Have you reviewed testimony, any

21 deposition testimony?

22     A.    No, I have not.

23     Q.    Have you spoken with any friends or family

24 members of Mr. Koenig or Miss Everett?

25     A.    No.  It would have just been -- yeah, I

Page 50

1    didn't have any authorization to talk to anybody
2    else, not that I requested it.  But, no, I have not.
3         Q.   Have you requested any materials that
4    you've not been provided?
5         A.   No.  I think they sent everything we had
6    wanted; the repeat MRI, EEG, neuropsych.  And I had
7    gotten all of those.  And following their ENT, I
8    haven't gotten all of his information, but his
9    hearing's improved with the surgery, so that's good.
10        Q.   Can you walk me through the process --
11   from review of the records, it looks like your
12   office was contacted by Miss Everett some time prior
13   to April 2018, correct?
14        A.   Yes.  Whatever the date that was.  It's on
15   the -- there's a sheet if somebody calls in, we get
16   their basic information.  And that would have
17   been -- it would have been sometime before we saw
18   him.  I don't know the exact date.  You can go
19   ahead.  If I see it, I'll let you know.
20        Q.   April 2nd of 2018, I believe, was your
21   evaluation?
22        A.   Yes, I believe that's correct.
23        Q.   Do you know what information you had
24   available to you prior to your meeting with
25   Mr. Koenig and Miss Everett on that date?

Page 51

1       A.    No.  Well, we sent them the patient

2    history form to fill out, which they're to bring

3    with them.  And they had given our office some basic

4    information that -- I think he had a head injury.

5    When they called in -- I think it was Kellie who

6    called in to Sharon -- you know, they told us, I

7    believe, he had a head injury, and things like that

8    is what we knew.

9       Q.    And they came to see you April 2nd of

10   2019.  That's the day of your evaluation, correct?

11      A.    Correct.

12      Q.    And is that the only time you've

13   personally laid eyes on Mr. Koenig and Miss Everett?

14      A.    Yes.  That's the only time I had them face

15   to face.

16      Q.    And approximately how long does that

17   evaluation take?

18      A.    We would have told them two hours, which

19   is why the 950.  It was probably closer to three

20   hours.  We usually leave about three hours.

21      Q.    Do you independently recall how long it

22   was?

23      A.    I don't absolutely, but it was at least

24   the two hours.  It was probably longer than that.

25      Q.    Is that recorded anywhere in your records?

Page 52

1          A.    No.  We don't mark time.

2          Q.    And was anyone with you during the time of

3     that evaluation, anyone else in the room, other than

4     you, Mr. Koenig and Miss Everett?

5          A.    No, that's all.

6          Q.    And walk me through the process that you

7     go through in performing this evaluation.

8          A.    Basically, I go through the history form,

9     which you have.  I think it's 12, or whatever pages,

10    18, whatever the pages are in the patient history

11    form that they fill out.  Then I would take the

12    records they brought with them, review those, talk

13    to them and get the history of the accident, what

14    happened to them.  I'm more interested in what's

15    happened to you in the past and now what information

16    can you provide, and the detailed information I can

17    get from the records, like the type of fracture,

18    things like that, in more detailed information.

19              I incorporate that into the history form

20    because that's what I use then to dictate the

21    evaluation.  And after I gathered all that

22    information, reviewed records, talked with them,

23    then I'll do a physical examination.  And then I'll

24    discuss with them what I feel they should do, give

25    them prescriptions, discuss my recommendations,

Page 53

1    answer any questions that they have.  And then

2    that's pretty much it.  I recommend -- in this case,

3    I gave them prescriptions for testing.  Asked them

4    to get that done for those results.

5         Q.   And so you review the records while

6    they're there with you?

7         A.   Yes.

8         Q.   Do you do anything subsequent to your

9    evaluation before you dictate your report?  Do you

10   review anything additional?

11        A.   No.  Usually I just give them the records

12   back, unless there's a reason I needed to keep

13   something.  But usually I make my notes, and then I

14   dictate from that.  And just to clarify.  They had

15   actually called the office.  I found it, March 2nd,

16   2018.  They told me he had a traumatic brain injury,

17   fractured tibia, left ankle fracture, right skull

18   fracture, those types of things.

19        Q.   And they came to see you outside of

20   Chicago?

21        A.   Correct.  Yes.

22        Q.   I'm not asking if you've spoken with any

23   of the other treating providers, but do you

24   personally know any of the other treating providers?

25        A.   I don't know them personally.  I've seen

Page 54

1   Dr. Fitch's reports from time to time from Peoria,
2   but I don't know him personally.
3        Q.   You and Dr. Fitch have shared patients
4   before?
5        A.   I know his name.  I assume so, but I've
6   had patients from Central Illinois.  So the name's
7   familiar to me, but other than that, I couldn't help
8   you.
9        Q.   And Jeri Morris, you know her?
10       A.   Oh, I've known Dr. Morris.  She's an
11  excellent neuropsychologist.  Probably 35 years, 40
12  years, somewhere in there.
13       Q.   And did you refer the plaintiffs in this
14  case to Dr. Morris?
15       A.   I recommended they go to Northwestern.
16  And, you know, they checked with Northwestern, and
17  they were, either assigned or found Dr. Morris.
18  They may have called or asked us and I'd say, yeah,
19  she's great.
20       Q.   And have you and Dr. Morris shared
21  patients before?
22       A.   Over the years, yes.  Not huge numbers,
23  but when I was at Northwestern.
24       Q.   What do you mean when you say "huge
25  numbers?"

Page 55

```
 1        A.   Well, she was a staff neuropsychologist,
 2   and she's still at Shirley Ryan Northwestern.  She
 3   had seen all the brain damaged patients back in the
 4   '80s.  So she was very commonly involved with
 5   traumatic brain injuries, in the days when they said
 6   football players don't have brain injuries, that
 7   type of thing.  We're going back to when people
 8   laughed at us.  I'm not just saying her and myself,
 9   but the rehab community, in general.
10        Q.   Have you reviewed any billing medical
11   records?
12        A.   No, I have not.
13        Q.   Have you done any research for purposes of
14   your opinions in this case?
15        A.   No.
16        Q.   After your evaluation with Mr. Koenig and
17   Miss Everett on April 2nd, it looks like the next
18   thing I saw in your records was a conference recheck
19   from August 14 of 2018?
20        A.   I believe that's correct.  Yes, that's
21   correct.
22        Q.   And tell me what is involved in the
23   conference recheck from August 14th of 2018.
24        A.   Well, I had asked them to get a number of
25   tests.  So they completed the neuropsychs.  They got
```

Page 56

1    the EEG, the repeat MRI.  And so they got those all

2    to me, and I wanted to talk to them because I needed

3    some more updated information to affirm or explain

4    what I had talked to them about before was, you

5    know, clearly documented in this testing and the

6    evaluations, basically he had a significant head

7    injury.

8            The neuropsych, the MRIs, were all

9    consistent with that.  He was not showing seizures

10   at the time of his EEG.  It doesn't mean you don't

11   have them.  You've got a seven- or eight-year

12   window, but he's not having active seizures and is

13   not on medications at this time to manage seizures.

14   I talked to him about all those things.  I had

15   Dr. Morris's notes and the EEG and the MRI and

16   neuropsych.

17        Q.   And it looks like you just talked with

18   Kellie Everett on this call?

19        A.   I think that's -- yes.  I think I talked

20   with her to explain all of it to her, and then she

21   would explain it to Ryan.  He may also have been on

22   there for part of it.  But she's, obviously, the one

23   who has the ability or whatever.  So I explained a

24   lot of it clearly to her.

25        Q.   About how long does that phone call take?

Page 57

1      A.    I would suspect we probably talked about

2  45 minutes, maybe to an hour.  My notes are fairly

3  long, so I suspect it was fairly detailed.  The

4  note's about eight pages.

5      Q.    And then you had a call with Ryan on

6  May 6th of 2018?

7      A.    Yes, that's correct.

8      Q.    Did you have any interaction with Ryan and

9  Kellie in between August of 2018 and May of 2019

10 that you're aware of?

11     A.    I don't believe so.  It's just they were

12 trying to coordinate a visit around the time they

13 saw Dr. Morris.  You know, that's what they were

14 trying to coordinate.

15     Q.    And they were not able to see you?

16     A.    They got stuck with traffic on the day

17 that we had appointed, and they were going to be a

18 couple of hours late.  Because they redid that whole

19 interchange, so I couldn't change the schedule.

20     Q.    And they haven't come back to see you

21 since then?

22     A.    Ryan was going on the 9th of September,

23 but his ride fell through.  So, no, I have not seen

24 him.

25     Q.    What does your call consist of on May 6th

Page 58

1    2019?

2        A.    She called, obviously, to let us know

3    there was a problem.  But she noted that they were

4    in the car and they weren't going to be able to make

5    it.

6            We talked about the fact that he had had

7    his reconstruction for the ear.  Things really

8    hadn't changed a lot.  Still exhausted.  She's

9    traveling.  She's the primary -- it's all contained

10   in the notes.  I'm not going to -- but basically

11   that Ryan still needs continuous support,

12   supervision.  Sometimes he can drive, but that day

13   you could hear him in the car.  He starts freaking

14   out with traffic and becoming anxious.  So they had

15   issues in that regard.  And we talked about the fact

16   that he's probably self-medicating his anxiety from

17   the head injury with alcohol.  We talked about some

18   of those issues.

19            So basically recapping a lot of what we

20   had discussed before.  And I just asked him just

21   forward me whatever Dr. Morris's notes or follow-up

22   would be, that I'll have them, if they have any

23   further questions.  There's not a lot of change,

24   basically.

25        Q.    How long was the call on May 6th?

Page 59

1       A.   It was probably 15 minutes would be my
2   guess.
3       Q.   And since May of 2019, have you reviewed
4   any additional records on Ryan, other than the
5   May 2019 report from Jeri Morris?
6       A.   No.  Just Dr. Morris's notes.  She had
7   called after the date she saw him and kind of filled
8   me in that there really wasn't any big change in
9   improvement, and said she'll mail out her eval
10  eventually.
11      Q.   Have you communicated with a Trisha
12  Y-O-U-N-T, in this case?
13      A.   I don't believe so.
14      Q.   You don't know who she is?
15      A.   I don't.
16      Q.   Do you know a Dr. Herbst, H-E-R-B-S-T?
17      A.   Not specifically.
18      Q.   I think it's a radiologist.  Do you know
19  of a radiologist, Dr. Herbst?
20      A.   No, I don't.
21      Q.   Was anyone else involved in the drafting
22  of your reports, other than yourself?
23      A.   Just the transcriptionist would transcribe
24  it.  It's better than me typing.
25      Q.   Are there any other medical providers in

Page 60

1    your office who see Mr. Koenig and Miss Everett,

2    other than yourself?

3         A.    No.

4         Q.    Dr. Eilers, can you tell me what opinions

5    you intend to give if you're called as a witness at

6    the trial of this case?

7         A.    I'm really not sure what anyone's going to

8    ask me.  The only thing that I can tell you is,

9    obviously, Mr. Koenig sustained a number of

10   orthopedic injuries, which are described.  He had a

11   traumatic brain injury.  He, obviously, has

12   encephalomalacia or areas of brain atrophy.  He has

13   extensive cognitive deficits.  They're well-defined

14   by Dr. Morris, and they're detailed in those

15   reports.  You know, I've seen the same thing.

16           Obviously, his deficits are going to be

17   permanent.  He's several years out.  As I explained

18   to them, this is the way he's going to be.  I

19   explained to Ryan and Kellie I don't see him being

20   competitively employed.  He'll do things here or

21   there, particularly with changes in hearing, his

22   anxiety and he has perseverative behavior.  He has

23   memory problems.

24           He's not going to go back to what he did.

25   Obviously, he's had the ear surgery, but he may

Page 61

1   still have some issues with hearing, but at least

2   it's functional.  And he has one-sided tack

3   normally.

4            I explained that he's really going to need

5   somebody, like a parent or a spouse, living with

6   him.  He's not really that extraordinarily

7   functional on his own.  So he's going to really need

8   somebody to be with him living with him, basically

9   24 hours a day.  He can be left alone an hour here

10  or there, yes.  But he needs somebody to help with

11  shopping, remind him to bathe.  Help him go through

12  a lot of his ADLs.  He's not really safe with

13  cooking and cleaning.  He doesn't initiate any

14  perseverance on activities.

15           So those are the types of things he'll

16  need.  And, obviously, he needs to follow up with

17  psychology, potentially psychiatry.  And with his

18  orthopedic injuries, as he's aware, that type of

19  tibia plateau and the other fractures he had, the

20  condyle fractures, he's definitely going to end up

21  with a -- he's a young guy.  He's going to end up

22  with at least a knee replacement on that side.

23           His gait is altered, so he shifts over to

24  his normal side walking.  You know, he's -- he'll

25  live into his seventies, at least, on average.  So

1    probably he's going to end up with multiple lower

2    extremity joint replacements because of his, what

3    we'd call a biomechanically altered gait; obviously,

4    the direct trauma with the knee.

5          And then he had some of the malleolar

6    involvement and fibular involvement, the ankle's

7    fibrous joint and that, of course, the other hip and

8    knee because he weight shifts.

9          So those are the types of things he's

10   going to confront over time.  He's not going to be

11   able to effectively manage his affairs.  Somebody

12   needs to pay his bills.  He's not incompetent, but

13   he's just not safe and competent in managing bills.

14   He's not very effective in making decisions.

15          You know, does he know who he's related to

16   in his family, things like that?  Absolutely.  And

17   can he make some decisions about his medical?  Yes.

18   But somebody should be involved to help him

19   understand.  Finances, he's easily manipulated.  You

20   can get him to do just about anything.  So he really

21   needs a parent the rest of his life, and somebody to

22   look out for him, be there, support him, whether

23   that's going to be a spouse, a caregiver, a parent

24   role, is what they're going to be confronting.  And

25   I think she's beginning to understand that a little

Page 63

1    bit more, but I can't answer for Kellie.

2        Q.   Are the opinions that you intend to give

3    at the trial of this, are they contained within the

4    records that we've marked here, your evaluation from

5    April 2nd, 2018, and subsequent phone calls?

6        A.   I mean, what I've told them is what's in

7    the records.  So, therefore, what I would be telling

8    you is what I told them, so pretty much it's

9    contained in the records.  There could be some

10   little thing or item or elaboration, but I believe

11   it's all pretty much contained in the records.

12       Q.   And from the summation you just gave me a

13   moment ago, it sounds like if you're called to

14   testify at the trial of this case, you intend to

15   give opinions on future needs of Mr. Koenig; is that

16   accurate?

17       A.   What I talked to them about, I think I

18   dictated some of that in my notes what I recommended

19   they plan and think about, and I was just kind of

20   summarizing that.  I had read through these.  So

21   that's what I expressed to them.  That's what I

22   would -- I'd tell you the same thing.

23       Q.   What principles and methodology did you

24   employ in reaching those opinions?

25       A.   Just 40 years of practice experience,

Page 64

1    doing this for that entire time, following people

2    for upwards of 40 years in my practice, 37 who've

3    had these types of injuries.  I've been treating

4    head injuries for 40 years long before people ever

5    talked about traumatic brain injury.

6             So it's something that is -- it's what

7    you've done for 40 years.  And that's a compendium

8    of literature and patients and reading and

9    understanding and seeing what happens over those

10   years.

11        Q.   So that's the principle and methodology

12   you employed?

13        A.   Yes.  The practice of physical medicine

14   rehabilitation, what I counsel and advise patients

15   about.  I do that all the time.

16        Q.   What testing or experiments did you

17   perform in reaching your conclusions?

18        A.   Well, I can't do experiments because I

19   need to have that approved.  So you can't experiment

20   on patients without board review and various

21   protocols.  But basically, it's from the exam, the

22   observation, the review of the diagnostic studies.

23             I mean, a first year med student can look

24   at his MRI scan and go, oh, wow, he's got

25   significant brain damage.  He's got significant

Page 65

1    brain wasting or encephalomalacia on the scans.  I

2    mean, this is a first year med school issue.

3         Q.   You didn't like my word "experiments."  So

4    let me --

5         A.   No.  I understand, but we can't -- without

6    a -- I mean, there are all these federal procedures,

7    so we can't experiment on patients without the IRB

8    reviewing it, an Internal Review Board.

9         Q.   So let me rephrase the question, as far as

10   what testing did you employ in reaching your

11   conclusions?

12        A.   Obviously --

13             MR. BERGER:  Real quick.  Dr. Eilers, just

14        to put it on the record, I'm going to object to

15        the form of that question.  But, Dr. Eilers,

16        you can certainly answer.

17             THE WITNESS:  The tests that have been

18        done are the neuropsych testing done by

19        Dr. Morris.  I know Dr. Schwarz did, I think

20        it's -- Dr. Schwarz did some neuropsych testing

21        and Dr. Morris has done it twice.

22             His MRI is clearly in the records showing

23        the encephalomalacia and the temporal frontal

24        lobe.  Anyway, the report is what it is.  It's

25        pretty straightforward with the

1    encephalomalacia.

2        His EEG was done.  That's not showing

3    seizures or specific deficits at this point in

4    time.  Obviously, he's got prism glasses from

5    the optometrist, who's treating him providing

6    those because of his brain injury.

7        Yeah.  I think the major tests that makes

8    it eminently clear on the deficits is when we

9    look at the MRI done 4/10/18.  And it showed --

10   just so we're clear, he, obviously, has the

11   left temporal lobe more involved than the right

12   temporal lobe.  He has cortical

13   encephalomalacia, which means that the brain is

14   dead, and it's been resorbed.  Cortical is

15   known as the deep subcortical white matter

16   which goes along with white matter shearing.

17   And they found gliosis, indicating the damage

18   and the attempt to heal.  And they're talking

19   about the encephalomalacia.  And, obviously, he

20   had a history when we look back at his -- why

21   don't we look at his evaluation just so I'm

22   tying it out to the subsequent MRI, or his CT

23   originally.

24       His CT scan showed the left subdural

25   hematoma, subarachnoid hemorrhage, left

Page 67

1    hemisphere swelling, and that it closed out the
2    ventricle because of the amount of brain
3    swelling.  And that goes along with the area of
4    encephalomalacia.  He also had a left shift, or
5    basically a shift to the right of the midline.
6    He had bilaterally temporal hemorrhagic
7    contusions.  Those now have encephalomalacia,
8    so it bled and it died.
9        The left frontal lobe hemorrhagic
10    contusion goes along with the encephalomalacia
11    on the left.  Obviously, he had the inner ear
12    damage because he had like a -- he had a
13    basilar skull fracture.  He fractured through
14    the temporal bone and part of the parietal
15    bone, and that caused a lot of his additional
16    brain damage.  Probably the one thing that
17    saved him was the fracture may have diffused
18    some of the pressure that would have made this
19    a lot worse.
20        So, in a sense, the fracture is bad that
21    it may have been more helpful in diffusing some
22    of the pressure.
23    BY MR. JOHNSON:
24    Q.    I asked you what testing you performed in
25    reaching your conclusions, and you referred to

1  testing done by Jeri Morris and Dr. Schwarz as well,

2  correct?

3      A.    Correct.

4      Q.    And that you refer to the MRI from April

5  of 2018 and the EEG study.

6          Was there any other testing that you

7  actually performed?

8      A.    When I did his reflexes, he had more

9  hyperreflexia in the lower extremity than I would

10 have anticipated, which goes along with upper motor

11 neuron damage and brain damage.  He didn't have

12 specific deficits and graphesthesia.  Obviously, his

13 neuro exam was relatively normal, except for his

14 hyperreflexia, which can go along with brain damage.

15         I know that he had a positive

16 cross-abductor reflex.  He had very hyper reflexes

17 in the lower extremity, which would go along with

18 motor pathway involvement in the brain.  He had that

19 bilaterally.

20         Obviously, he can only remember three out

21 of five objects by the end of the examination.  He

22 had problems with memory with me, recall.  He shows

23 the blunting affect.  Basically my exam, and I've

24 described it, it's fairly consistent with what was

25 showing up in the neuropsych testing.

1          So my physical examination is consistent

2     with most of his findings in it, and I defined his

3     orthopedic deficits as well.

4          Q.   Do you have an understanding as to when

5     this underlying incident was?

6          A.   His original injury was when he was run

7     over by the car.  That would have been on -- I

8     believe it was December 5th, 2017, was the day he

9     was run over by a car.

10          Q.   And you testified earlier that he would

11     reach his maximum in about two years?

12          A.   Right.  Usually about 18 months you'll

13     start pretty much hitting a plateau.  Twenty-four

14     months there's absolutely -- 18 to 24 months is the

15     range, which is why just getting this repeat

16     neuropsych was pretty much about the same.  He's

17     pretty much where he's going to be.

18          Q.   And you haven't seen him since April 2018?

19          A.   I have not.

20          Q.   Do you know if there have been changes in

21     his condition since April 2018?

22          A.   From the information from Kellie and also

23     Dr. Morris's note, he's having a lot more problems

24     with anxiety.  He's perseverating on subjects much

25     more.  By way of history, that's relevant and not

Page 70

1    unexpected.

2          He's a little bit more irritable.  His

3    temporal lobe damage, that's consistent.  He has the

4    memory, attention, concentration issues, which you'd

5    expect, so it is what it is.  He's not going to get

6    a lot better.

7       Q.   So you haven't modified any of the

8    recommendations based on any changes in his

9    condition since April of 2018?

10      A.   No.  It just reinforces what I explained

11   to them.  They really need to have him supervised.

12   She's on the road.  She's trying the best she can.

13   She was very frustrated with getting him in for a

14   visit and travel.  She's doing the best that she

15   can.  But frankly, I think she's now beginning to

16   understand this is the way it's going to be.  And I

17   don't know if she really understood how devastating

18   this would be long-term.

19      Q.   Do you intend to do any further elevations

20   with Mr. Koenig?

21      A.   I suggested when he couldn't get his ride,

22   I'd be glad to see him in follow-up.  That would be

23   unto him.  I don't have a date.  I suggested that

24   they follow up or coordinate a follow-up visit, if

25   they have any questions.  I honestly am not probably

Page 71

1    going to tell them a whole lot that's new.

2         Q.   Did you charge Mr. Koenig and Miss Everett

3    for any of the appointments they missed?

4         A.   I did not.  They have enough challenges.

5         Q.   And who was it that asked you to make the

6    recommendations?  It looks like you assigned costs

7    to these as well, correct?

8         A.   Right.  What I told the family is what I'm

9    familiar with.  So it was just I dictated what I had

10   explained to them.

11        Q.   And did you do anything to independently

12   verify the information that was provided by

13   Mr. Koenig and Miss Everett?

14        A.   No.  I mean, I'm not going to go to St.

15   Louis and follow him around.  That's not my job.

16        Q.   Do you know if your recommendations are

17   consistent with the recommendations of Mr. Koenig's

18   other treating physicians in this case?

19        A.   I can't answer for them.  I don't know.

20        Q.   And you haven't reviewed their records?

21        A.   I have not.

22        Q.   Do you know with whom he's currently

23   treating?

24        A.   I'm just following in terms of rehab.  I

25   know he was following with the ENT.  Obviously, he's

Page 72

1   following with Mr. Morris.  And he's seeing a

2   psychologist in St. Louis, if I'm correct, from my

3   recollection.

4        Q.   You've not reviewed any records from the

5   ENT, Dr. O'Bert?

6        A.   No.  I mean, he had a surgery, and he did

7   improve from that.  They've been happy with what's

8   happened there.  But as far as I know, that's

9   improved.  I'm not sure what the long-term outcome

10  would be.

11            He's the otolaryngologist, and he'd be

12  able to address, you know, would he need to redo

13  surgery.  I can't address what the long-term

14  sequella are going to be with that.

15       Q.   You haven't reviewed those records?

16       A.   As far as I know, I have not.

17       Q.   You have not reviewed any records from

18  Agility Orthopedics?

19       A.   I don't believe so.

20       Q.   You've never been given your records from

21  Barnes-Jewish Hospital?

22       A.   Other than I think the MRI -- no, I think

23  the EEG was there.  I don't know if there are other

24  records.  He was getting therapy back in St. Louis

25  when I saw him initially, and then that ended, but I

Page 73

1    haven't seen any records, additional records, since
2    I originally saw him.
3        Q.   Have you reviewed any records from Summers
4    Healthcare?
5        A.   I don't believe so.
6        Q.   Have you reviewed any records from
7    Neurosurgery & Neurology?
8        A.   I don't believe so.  Anything that was
9    prior to the initial eval I would have seen, but
10   anything since then, I haven't seen any new records,
11   other than what we've talked about; the MRI, the EEG
12   and the optometrist.
13       Q.   Have you ever reviewed any chiropractic
14   records?
15       A.   No, I have not.
16       Q.   Have you reviewed any records from Mark
17   Tobin counseling?
18       A.   No.  I just was told that he's seeing him.
19       Q.   In your report from April 2nd, 2018, what
20   process did you go through in terms of assigning
21   costs to various aspects of treatment?
22       A.   That's what I'm intimately familiar with
23   in terms of patients and families and advising them
24   on those costs.  So that's very much what I'm aware
25   of.

Page 74

1          Q.    So that's the process you went through?

2          A.    Correct.

3          Q.    You didn't do any research?

4          A.    I can.  It's just going to be the same, so

5    I'm not going to charge them to spend a lot of time

6    to look up what I already know.

7          Q.    So the answer is, no, you didn't do any

8    research?

9          A.    No.  I didn't do any new research, other

10   than what I've routinely done in caring for

11   patients.

12         Q.    Tell me what you've routinely done that

13   applies to Mr. Koenig's case.

14         A.    For instance, for attendant care, we call

15   the agencies.  I check with them in terms of telling

16   what it's going to roughly cost to provide that.

17   And, obviously, calling to get tests done for

18   patients.

19              It's the same thing.  You give them

20   information on what it's going to cost for those

21   services.  You know, we've, obviously, seen a lot of

22   patients with joint replacements and provide that

23   information to them.  That's fairly routine.  These

24   are pretty routine charges and costs.

25         Q.    And you did not compare your projections

Page 75

1  to any past medical bills to see if they're in line
2  with what has been incurred in this case?
3      A.   No.  I did not do that.
4      Q.   Going back through your evaluation from
5  April 2nd of 2018, about how long does it take you
6  to dictate and draft a report like this?
7      A.   Probably about 30 minutes.
8      Q.   And are there any other drafts or
9  revisions of this report?
10     A.   No.  I just dictate it, it's transcribed,
11 and it goes to the patient, and it goes in the file.
12          If there's a question, the
13 transcriptionist would say, what did you say, or I
14 couldn't understand.  But I really haven't had an
15 issue.
16     Q.   Looking at the first page, second
17 paragraph, where you state, "Unfortunately, Ryan
18 sustained multiple injuries, including a severe
19 traumatic brain injury."
20          Is there any sort of classification
21 criteria that you're relying upon to classify his as
22 a severe traumatic brain injury, because I've seen
23 it described otherwise in some other records?
24     A.   Well, when you've got multiple
25 intracranial bleeds, you've got a skull fracture and

Page 76

1     a Glasgow coma scale of about seven or eight, that's

2     severe.

3          Q.   Is that criteria anywhere in the peer

4     review literature?

5          A.   I don't know.  I don't look for that.

6     It's definitely not mild, and it's not moderate.

7     It's pretty severe.

8               This is a fellow that had increased

9     intracranial pressure, decreased responsiveness.

10    This is something that he ended up needing

11    ventilator support, et cetera, so that's severe.

12         Q.   So if one of his other treating providers

13    described it as mild or moderate, you would say they

14    are inaccurate?

15         A.   Well, no.  I think you need to talk to

16    them what's their basis.  If they feel a mild head

17    injury, that's going to be one where you generally

18    don't see intracranial bleeding.  You don't see

19    subarachnoid hemorrhages.  You don't see fractures

20    of the skull, but I'm not sure what their point of

21    reference is.  I mean, if severe means that the

22    person is dead and not responsive or merely

23    unresponsive, okay.

24              You have to ask them what their point of

25    reference is.  If they said it's mild, I'd have to

Page 77

1    absolutely disagree.  And I don't know anyone who

2    would describe this as mild.  Maybe somebody would

3    say moderate to severe, but you have to talk to them

4    on what their basis is.  I can't answer for another

5    physician.

6         Q.   To your knowledge --

7              MR. BERGER:  Brian, real quick.  This is

8         Kenny Berger.  The phone for some reason on

9         this end cut off.  Brian, you were asking about

10        anyone else's characterization of Ryan's brain

11        injury, but I had to call back, so just for

12        purposes of the record.

13             MR. JOHNSON:  Okay.

14   BY MR. JOHNSON:

15        Q.   Continuing in the report on the bottom of

16   page 3, you indicate that Miss Everett reported to

17   you she thought perhaps at one point in time he had

18   had a seizure, is that correct?

19        A.   Correct.

20        Q.   You have not reviewed any medical records

21   that indicate Mr. Koenig has had any seizures, have

22   you?

23        A.   No.  We repeated his EEG.  I'm not certain

24   if they went in then to the hospital.  There's a

25   question about it.  But she hadn't noted any since

Page 78

1    then, from what I recall.

2        Q.    The EEG that was performed was a normal

3    awake study, correct?

4        A.    Correct.  It wasn't a 24-hour, which would

5    be ideal, but they at least did the standard EEG.

6        Q.    Have any of his treating physicians

7    ordered him to have a 24-hour study?

8        A.    I ordered it, but I don't know what the

9    situation is on getting it done.

10        Q.    To your knowledge, is he currently taking

11    any medications?

12        A.    You know, he's self-medicating with

13    alcohol.  I don't know what else he may be -- let me

14    just see.  Well, he's taking, like, Aleve and Advil.

15    And she was saying he had been using Meloxicam, but

16    he moved over to aspirin.  I talked to him about

17    some of that, but that's really it that I'm aware

18    of.

19        Q.    And as far as the current medical

20    treatment that he's receiving, what is your

21    understanding of that?

22        A.    He's working with a psychologist and

23    there's not a lot.  I mean, he still has some knee

24    pain and an altered gait.  He finished therapy.

25    He'd benefit being able to continue with some

Page 79

1    therapy, but I don't know what their situation is on

2    funding that now.

3        Q.    When you say "therapy," are you referring

4    to --

5        A.    Physical therapy.  And I mean, certainly,

6    he's seeing the psychologist.  He should be involved

7    with psychology and psychiatry to manage the

8    anxiety.  We don't want him self-medicating with

9    alcohol.  That's a very common thing that you'll see

10   after a head injury.  Mood changes, depression, are

11   very common.

12       Q.    To your knowledge, has he seen any

13   psychologists or psychiatrists?

14       A.    I think he's working with Dr. Taub,

15   T-A-U-B, and I'm not certain what his credentials

16   are.  He's a counselor.  Whether a social

17   psychologist, I'd have to check, whatever his

18   credentials were.

19       Q.    Mr. Koenig has not been medicated for

20   depression or anxiety, to your knowledge?

21       A.    No.  He's self-medicating.  That's the

22   problem.  Alcohol is a common go-to for people like

23   this.

24       Q.    What is your understanding of his alcohol

25   use prior to this incident?

Page 80

1      A.   He might have had a drink or two in a day.
2    Now his wife's noting it's a little bit more.  And
3    she's aware it's a concern, and that's all we can
4    make him aware of.
5      Q.   The records that you have with you contain
6    an evaluation that was performed in January of 2018
7    by a Dr. Schwarz at St. Louis University, is that
8    correct?
9      A.   Correct.
10     Q.   Do you know Dr. Schwarz?
11     A.   I do not.
12     Q.   And what is her occupation, if you're
13   aware?
14     A.   I think she's a neuropsychologist.  Yes.
15     Q.   Is that the same occupation as Dr. Jeri
16   Morris?
17     A.   Correct.
18     Q.   And do you know how it is that Mr. Koenig
19   came to see Dr. Schwarz?
20     A.   You know, I'm not certain.  I think they
21   were trying to get somebody or somebody -- I'd have
22   to ask the family.  I don't know.
23     Q.   Have you had any conversations with
24   Miss Everett and Mr. Koenig regarding Dr. Schwarz's
25   evaluation?

Page 81

```
 1        A.    No.   I mean, they had done it.   It was
 2   through the case manager, I guess, who was working
 3   with them or something after their injury.   That's
 4   all I can tell you.
 5        Q.    You've reviewed her report, correct?
 6        A.    I did, yes.
 7        Q.    Are you relying on her report for purposes
 8   of your opinions in this case?
 9        A.    I mean, I've considered it.   She,
10   obviously, showed low average to average attention
11   working memory, speed of process, same language,
12   learning, et cetera.   And at that time, she felt
13   there was minimal depression and anxiety.
14              She thought he had excellent cognitive
15   recovery from a moderate TBI.   But as she noted,
16   he's only one and a half months post injury, so it's
17   in the recovery period, so he'd need to be further
18   evaluated, which is what was done.
19        Q.    As far as reports of depression or
20   anxiety, are you relying upon the patient to tell
21   you that information?
22        A.    Well, it's the patient and his wife.   His
23   wife is probably the better observer with those
24   sorts of issues.
25        Q.    Do you know if what is reported to you is
```

1  consistent with what's been reported to other

2  medical providers?

3      A.    I don't live with them.  I don't know what

4  she's told other people.  I haven't been present at

5  any other visits that they've had.

6      Q.    Do you have any criticisms of the

7  evaluation performed by Dr. Schwarz in this case?

8      A.    I'm not a clinical --

9          MR. BERGER:  Real quick, Dr. Eilers.

10         Objection to the form and the commentary.  I'd

11         say it probably amounts to the opinion of the

12         witnesses which is disallowed, but just

13         objection to the form.  And, Dr. Eilers, you

14         can answer.

15         MR. JOHNSON:  In South Carolina, we can

16         just object to the form.  That's all we need to

17         do.

18         THE WITNESS:  The neuropsych testing would

19         be better reviewed by a neuropsychologist to

20         determine how or what's been done, you know,

21         which is why I asked for the other neuropsych

22         because we needed a follow-up.

23         So I don't see anything that seems way out

24         of line.  He still has all the same types of

25         deficits that she was noting early on.  And she

Page 83

1          recommended that he have repeat neuropsych

2          testing, which has been done.  So there's

3          nothing unusual in that.

4     BY MR. JOHNSON:

5          Q.    But they didn't go back to Dr. Schwarz,

6     they went to Dr. Morris?

7          A.    Yes, they did.  I suggested they go over

8     to Northwestern, and that's all.

9          Q.    From your review of the records, are the

10    findings from Dr. Morris inconsistent with some of

11    the findings from Dr. Schwarz?

12         A.    No.  He has memory attention concentration

13    transportation problems.  In her evaluation, he had

14    issues with that and the initial evaluation.  It's

15    just the same types of problems, and they weren't

16    abating, and they're continuing to persist.

17         Q.    Did you tell Mr. Koenig or Miss Everett

18    that the evaluation and/or testing performed by

19    Dr. Schwarz was somehow incomplete or inaccurate?

20         A.    No.  I don't think I discussed that.  You

21    know, as I indicated, they need to get repeat

22    neuropsych testing done so he can determine where he

23    is.  And usually you'll do it at a year and 18

24    months and reassess where they are.

25         Q.    From your review of Dr. Schwarz's records,

Page 84

1   she found that Mr. Koenig performed within

2   expectations on all measures?

3       A.   Her report states what it states.  I

4   haven't talked to her about it or anything else, but

5   her report is what it is.

6       Q.   Have you reviewed any medical records from

7   the time period before this incident in

8   December 2017?

9       A.   I don't know.  I think that all the

10  records I saw were from the time of his injury

11  forward.  I mean, I would have taken a history from

12  them.  His prior medical, I don't think, was very

13  interesting.  But, no, I don't think I saw any prior

14  medical records.  He had had a broken right arm in

15  the first grade.  He had myringotomy tubes in his

16  ear when he was a young kid.  That's about it from

17  what I noted.

18      Q.   Looking at page 5, it looks like you've

19  made some references in your report to PTSD?

20      A.   Correct.

21      Q.   No treating provider has diagnosed

22  Mr. Koenig with PTSD, to your knowledge, have they?

23      A.   I don't know if they have or not.  It's a

24  question that could be posed to Dr. Morris as well.

25  I don't know if she -- I have to take a look at her

Page 85

1   note.

2             He just has lots of problems.  In a car,

3   he also gets panic attacks, so he's having anxiety

4   issues.  Whether we classify that as PTSD from being

5   run over or just the environment, it's,

6   unfortunately, one of the least of his problems.

7        Q.   Because you're not aware if anyone's made

8   that diagnosis?

9        A.   I don't know.  I'd have to doublecheck.  I

10  don't know that Dr. Morris necessarily addressed

11  that.  I'll take a quick look.  I think she talks

12  about the anxiety and the fear and the apprehension

13  as related to anxiety related to his head injury.

14            So, actually, maybe it's more the issue of

15  anxiety related to his head injury and its impact on

16  mood.  It's a question, in all fairness, I just have

17  to put directly to her.

18            She talked about panic attacks and

19  anxiety.  So I don't have a label of post-traumatic

20  stress disorder.  There is the issue of anxiety

21  related to -- basically, he has an anxiety disorder,

22  and that is probably related to his head injury.

23  What are the contributing triggers?  Is there a

24  trigger?  You know, there's things she talked about

25  triggering panic attacks.  It's a question I

Page 86

1    proposed to her, does she feel it arises to PTSD, or

2    is it anxiety secondary to his head injury?

3        Q.    You note in your report that you do not

4    think Ryan will be able to be competitively

5    employed?

6        A.    Correct.

7        Q.    Tell me what you mean by that.

8        A.    He's not going to be able, for instance,

9    in his field go on the road, travel, be away,

10   changing schedules.  He can play an instrument.  He

11   has that long-term.  You know, people will give him

12   something to do, but he's not going to really be

13   back competitively playing with what he did.  He has

14   trouble with remembering verse.  He gets anxiety

15   attacks with lights and stimulation.

16            They talked about trying to deal with some

17   of that.  But he has trouble -- you know, it's like

18   this flat tire issue.  He decompensates over that.

19   He can't deal with unusual stresses.  He starts

20   perseverating on topics.  He has trouble getting

21   through day to day.  His ability to be competitively

22   employed, where somebody says you're going to work

23   eight hours a day or we're going be on the road, or

24   we're going to travel, I don't see that happening.

25   From my understanding is, he's tried that a couple

Page 87

1    of times.  His wife was there.  He had to break off,
2    go back.  I don't see his anxiety working out well.
3    And I just don't feel he's going to be competitively
4    employed.
5         Q.   When you say he's tried that a couple of
6    times, what do you mean?
7         A.   I think he went back trying to go on tour
8    doing a couple of performances, and his wife was
9    with him.  He had to leave the tour and
10   decompensated.  I talked about it in some of my
11   notes.
12        Q.   First, what methodology did you go through
13   to determine he was not competitively able to be
14   employed?
15        A.   It was based on my experience.  You have a
16   fellow who's having, whether it's a panic attack,
17   PTSD, can't remember things, he's got to be told
18   what to do.  He's having trouble with remembering
19   lyrics.  The lights, he has a lot of photophobia,
20   which is very common with head injuries; you know,
21   the anxiety, the stress getting on stage.  Something
22   that never bothered him.  And there are problems
23   orthopedically with him standing, walking, moving.
24   He used to stand and perform.  Now he's got to do a
25   stool.  I don't think that's going to get better.

Page 88

1    And he didn't help with the rigging, but that's

2    something he's not going to do.

3            And the constant change in his

4    environment.  Date and schedule doesn't go well for

5    somebody with a head injury.  They need very

6    structured, predictable day-to-day activities just

7    in their regular life for work.  Work is not

8    predictable and structured.  It doesn't go that way.

9        Q.    So you don't think he's going to be able

10   to stand to perform?

11       A.    For a brief time he can do things, but the

12   totality competitively doing that 40 hours a week or

13   whatever they require, I don't see him being able to

14   do that.  Can he maybe perform for an hour here or

15   there?  Probably.  How well?  I'm not a musician.  I

16   can't rate the quality in what he does or doesn't

17   do.

18           So there may be somebody who can tell us

19   more than that.  But from an emotional, cognitive

20   and physical perspective, I don't see that happening

21   in light of his head injury and orthopedic issues.

22       Q.    On page 5, you noted that he was having

23   some difficulty with songs and recall, but that he

24   noted that was somewhat gone?

25       A.    Well, he says he's okay.  You talk to him,

Page 89

1    he thinks, well, I'm okay.  He forgets to bathe.  He

2    doesn't do the dishes.  He doesn't take out the

3    garbage.  He has very little insight into his own

4    deficits.

5            And you talk to his wife and you begin to

6    find out what's happening.  So we have to look at

7    the totality.  He feels he's okay.  He thinks he's

8    performing.  He goes to a bar, he performs a bit.

9    They give him a sandwich or a drink.  I don't think

10   he's getting paid wages, but I haven't gotten into

11   talking with them about that.

12       Q.   You do make comments in your reports about

13   wages and earning.

14            What understanding do you have about that?

15       A.   I don't know what he made or didn't make.

16   I don't know how that industry pays people, doesn't

17   pay people.  That's not my forte.

18       Q.   You don't know what he was making before

19   versus what he was making after?

20       A.   Oh, I don't deal with economic assessment.

21   I don't know whether they get paid cash, whether

22   they get paid W-2.  I don't know how these people

23   are paid.  That's not my expertise.

24       Q.   And you don't know what -- do you have any

25   understanding as to what Miss Everett's workload was

Page 90

1    before versus what it was after?

2        A.    I don't know specifically.  You're best to

3    be asking her.  I can't say.

4        Q.    And you understand he was back performing

5    within a couple of weeks after this incident?

6        A.    He indicates he went back performing, but

7    I'm not certain what he really did.

8        Q.    Do you know how many times he's performed

9    since this incident?

10       A.    I can't answer all those vocational issues

11   specifically.

12       Q.    Have you reviewed any videos of his

13   performances?

14       A.    No, I have not.  As I said, I'm not going

15   to be the person to make judgment on music.

16       Q.    Well, you're giving opinions on his

17   capacity to be employed.

18       A.    Well, I don't see him with his cognitive

19   status and his physical abilities to be able to be

20   competitively employed.  Could he perform for an

21   hour and do something that's not stressful and all?

22   Sure.  Is he going to be able to do that

23   competitively and really keep up with a group, or

24   whatever he did before?  I don't see it.

25       Q.    What do you mean when you say

Page 91

1    "competitively?"

2         A.    If he's doing a gig every night, every

3    other night, he's on the road, he's traveling,

4    they're performing three hours, they're going to the

5    next town, they're doing the next thing, I think

6    that's going to be problematic.

7         Q.    Do you know if he's performing every night

8    or every other night currently?

9         A.    I don't know what he's doing.

10        Q.    Would it surprise you if he was?

11             MR. BERGER:   Just for the record,

12        objection to the form.   You can answer,

13        Dr. Eilers.

14             THE WITNESS:   I don't know exactly what

15        he's doing.   He can answer that.   Musicians can

16        critique it.   From a cognitive and physical

17        capacity, I just don't see him doing it

18        competitively.   I don't know if he's getting

19        paid or not, if he's performing well.   And

20        somebody can make that more subjective

21        determination.

22    BY MR. JOHNSON:

23        Q.    Looking at page 8 of your April 2nd, 2018

24    evaluation, under the topic of "Previous

25    Rehabilitation --"

Page 92

1      A.    Which page?  I'm sorry.

2      Q.    Page 8.

3      A.    Thank you.

4      Q.    You refer to the neuropsychologist.  And I

5    guess at this point in time, is that referring to

6    Dr. Schwarz who did the previous evaluation?

7      A.    Yes, that's correct.

8      Q.    And you noted that the neuropsychologist

9    is feeling that he might be able to return to work?

10     A.    She had indicated that he might, and that

11   there should be further testing and follow-up.  You

12   know, see what he does, see how it goes, is

13   basically what she was saying.

14     Q.    And the statement from her report was

15   actually that there was no evidence to suggest that

16   he could not return to work.

17     A.    Well, I don't know if she stated that.  If

18   she did, then that's inconsistent with her noting

19   some of those issues, but she didn't talk about

20   anything orthopedically.

21          She said, "From a cognitive perspective

22   there is no evidence to suggest the patient could

23   not return to work.  It is recommended he initially

24   do so on a part-time basis and increase hours as

25   tolerated."  So it's not a go-back-to-work and

Page 93

1    you're okay.  It's let's look at this.  She talked
2    about the problems with his energy levels and maybe
3    a sleep study.  She thought maybe he should also see
4    a neurologist.
5              So, clearly, she has concerns that there
6    are issues that need further eval.  And it said,
7    neuropsychological reevaluation should be completed
8    in the future and clinically indicated.  And
9    persistence of his symptoms are a clinical
10   indication to repeat it.
11        Q.   What is your understanding as far as when
12   Mr. Koenig last saw a neurologist or neurosurgeon?
13        A.   I don't know.
14        Q.   And how about physical therapy?
15        A.   It would have been sometime after I saw
16   him in April of '18, and before I talked to him in
17   the subsequent phone call, I think, in -- I think in
18   May of '18.  So somewhere between August 14, 2018
19   and his initial evaluation done April 2nd, 2018.
20        Q.   Since your evaluation in April of 2018,
21   what is your understanding of what, if any, of your
22   recommendations have been implemented for
23   Mr. Koenig?
24        A.   He did start trying to meet with a
25   psychologist.  His wife is trying to get people to

Page 94

1  fill in, check in on him.  She's having to work, so

2  she's gone.

3            So they've had people check in on him or

4  have him come down and hang out, like, at the bar,

5  maybe let him play, things like that.  So he's

6  getting some interface with people.  But on the road

7  she's getting four, five, six calls a day.  So she's

8  serving as kind of an outreach for him.  She's just

9  trying to deal with what's not an easy situation.

10      Q.   So they started seeing a counselor at some

11  point?

12      A.   Well, he did.  I don't know if she's

13  seeing someone or not.  I don't know.

14      Q.   And you think that someone is checking in

15  on him periodically?

16      A.   She's talked about the friends checking.

17  She calls and talks to him four to five times a day.

18  She has to remind him to take a shower.  She'll come

19  back.  She tries to stock the house up before they

20  leave that he has things, because he won't go

21  shopping.  He just doesn't have the initiation to do

22  things.  He doesn't start things.  He has to be

23  prodded and reminded of those types of things.

24      Q.   Anything else as far as your

25  recommendations would have been implemented?

1    A.   He got the MRI, obviously, the EEG and

2    repeated the neuropsych testing.  You know, they

3    need to have somebody with him routinely.  They

4    aren't apparently able to do that financially.  She

5    has to work, so he's not getting 24-hour coverage.

6    Q.   So what methodology and principles did you

7    rely upon in giving the recommendation that

8    Mr. Koenig needs 24-hour care?

9    A.   I don't think he's really safe left to his

10   own devices.  He forgets to bathe.  He doesn't do

11   the shopping.  His wife's having to do things for

12   him or friends.

13        His flat tire was a meltdown that they

14   talked about.  His ability to deal with day-to-day

15   stresses in life is problematic.  He basically needs

16   somebody to guide and help him.  Kellie does as much

17   as she can, but she's not there all the time.

18   Q.   Is there any other basis or methods that

19   you've relied upon in making that recommendation?

20   A.   It's based upon what his diagnosis is,

21   neuropsych testing, the history which she's

22   providing and, obviously, his encephalomalacia brain

23   damage.

24   Q.   Do you know if that recommendation is

25   consistent or inconsistent with what his other

Page 96

1    treating providers have told him?

2        A.    I don't know what they told him one way or

3    the other or what information they have been

4    provided.

5        Q.    If his other treating providers have told

6    him that he does not need 24-hour care, you would

7    disagree with that?

8        A.    I do.

9        Q.    Have you seen any records that any other

10   provider has made that recommendation?

11       A.    If they have or they haven't, you all can

12   consider that.  My obligation to him and to his

13   wife, as explained, I don't feel he's safe being on

14   his own.

15             Now, if he burns the house down and dies,

16   I've told them my concern.  I have concerns about

17   him.  I really am not comfortable with him driving a

18   car, but that's his choice.  I'm not responsible for

19   that.  But if I tell her he's safe to be left alone,

20   I don't feel that he is really safe to be on his

21   own.

22             I told them what they need to consider.  I

23   don't tell her what she has to do, and I don't tell

24   Ryan what he must do.  I advise them what I feel

25   what is most appropriate and my concerns.  They make

Page 97

1   the decision.  They sustain any consequence that's
2   involved.  And I've advised them.  They've asked my
3   opinions.  I've told them, whether they like it or
4   not, I done what I need to do, and from there on
5   it's up to them.
6        Q.   To your knowledge, has he had anyone come
7   into the home to provide care during the time period
8   Miss Everett is away?
9        A.   My understanding is, his friends will come
10  in or check or they'll take him out or cut his
11  grass, things like that.  I would have to ask her
12  for specifics and people.  I just can't answer that
13  as specifically as you might like.
14       Q.   Do you have an understanding as to how
15  often she is away on tour?
16       A.   I think she's -- for some reason, 150 some
17  days sticks in my mind, but I would have to ask her
18  that.  But she's gone quite a bit now, like trying
19  to get a ride for him to come, and she's on tour and
20  she goes out on tour, I can't get everything
21  coordinated.
22            So I don't know the exact number of days
23  that she's gone.  For some reason I was thinking it
24  was 150 or something, but don't quote me.
25       Q.   Do you know if that's consistent or

Page 98

1    inconsistent with her touring frequency before this

2    incident?

3        A.   I don't know for sure.

4        Q.   In your recommendations on page 11, you

5    have documented regarding some lost hearing.

6        You understand he did have a surgical

7    procedure earlier this year, correct?

8        A.   Correct.  And he indicated, or Kellie,

9    they both indicated it had improved.  I don't know

10   what the audiogram showing in terms of any

11   persistent hearing loss or not.

12       Q.   You note a number of future orthopedic

13   procedures that you opine he will require?

14       A.   Correct.

15       Q.   To your knowledge, is he currently seeing

16   any orthopedic providers?

17       A.   I don't believe so.  There's not a lot

18   that people can do at this point in time.  It's just

19   going to be the issue of long-term.

20       Q.   And what are you relying upon as far as

21   your opinions regarding future orthopedic

22   procedures?

23       A.   Over the 40 years, I follow people with

24   knee and hip and other traumatic injuries and

25   fractures.  You know, when I was in practice for

1    maybe the first five years, oh, they fixed you,

2    you're great, don't worry about it.

3          As you spend more time, those patients are

4    in your practice and you see the sequella of those

5    fractures or plateau fractures or ligamentous tears,

6    patella injuries, and you get biomechanical

7    misalignment inefficiency.  You see them 20, 25, 30

8    years later, they're getting knees replaced, the

9    hips replaced because of the altered body mechanics

10   and the biomechanics of gait, that eventually

11   results in the wear and tear and destruction of the

12   joint.

13          And so that's the situation that he's

14   going to see.  Right now he's what, 30?  His age

15   right now was 32.  You know, he's got another 43

16   years, roughly.  I mean, he may live longer, but on

17   average, 43 years.  In that time, he's going to have

18   a lot of problems with the joints.  He does still

19   have abnormal gait.  He weight shifts his extremity.

20          Those are all things that over time start

21   to wear down those joints.  And fortunately, you

22   have the option of doing a joint replacement at this

23   time.  And that's probably what he's going to

24   confront going forward.  And that's what I talked to

25   him about.

Page 100

1      Q.    Anything else that you're relying on for
2    purposes of that opinion?
3      A.    No.  We know traumatic joint injuries and
4    these types of fractures is not uncommon for them to
5    result into degenerative arthritis over time.  Not
6    in a day or two, but certainly, over 5, 10, 15, 20
7    years is what you'll see.  I don't think he's going
8    to have multiple joint replacements in terms of his
9    knee being done two times or more.  It's a
10   possibility.
11         And there will be some intermediate
12   treatments with joint injections that can be carried
13   out.  But eventually and in the future, maybe there
14   will be stem cell transplants and injections that
15   will help, but right now that's not an option.
16     Q.    You also included on page 11 some opinions
17   related to driving, correct?
18     A.    Correct.
19     Q.    And it was your opinion in April of 2018,
20   that he was unable to drive?
21     A.    I didn't feel he'd be safe driving,
22   correct.
23     Q.    Do you know when he returned to driving?
24     A.    I don't know the exact date he has
25   locally.  Obviously, he doesn't do really well

1  driving.

2      Q.   If he has reported recently to his

3  providers that his driving anxiety was in check, is

4  that inconsistent with what he reported to you?

5      A.   Not what his wife is seeing.  If he's

6  saying that, I don't think he has a great deal of

7  insight into his own problems.  It goes back to,

8  like, the whole flat tire issue.  He can't even

9  problem solve that.

10          I don't particularly want somebody with

11  his status really driving, but that's up to the

12  state to determine.

13     Q.   Do you know if he's renewed his driver's

14  license since this incident?

15     A.   I don't know.

16     Q.   Do you know if any other treating

17  providers have made a recommendations that he should

18  not have a driver's license?

19     A.   I don't know.  And if he wants to really

20  insist on driving, he can go through a driving

21  evaluation.

22     Q.   To your knowledge, has he gone through a

23  driving evaluation?

24     A.   No, he has not, as far as I know.

25     Q.   Do you know how frequently he's driving?

1     A.   I don't know the frequency.

2          MR. BERGER:  Can we take a quick break?

3          MR. JOHNSON:  Yes.

4          (Recess taken 12:22 p.m. - 12:33 p.m.)

5   BY MR. JOHNSON:

6     Q.   Dr. Eilers, I want to move onto the

7   conference recheck document from August 14th of

8   2018.

9     A.   Okay.

10    Q.   And this is based off your conversation

11  with Kellie Everett, correct?

12    A.   Yes.

13    Q.   And it looks like in this document -- and

14  when you get there, I'm referring specifically to

15  page 6.

16    A.   Got it.

17    Q.   -- that you make certain recommendations

18  regarding future care and treatment, correct?

19    A.   Correct.

20    Q.   I guess a lot of it comes from your

21  previous evaluation, correct?

22    A.   Correct.

23    Q.   But here it looks like you do give certain

24  cost projections and frequency projections and

25  things like that?

1     A.    Correct.

2     Q.    And I think you told me you didn't do any

3 particular research for purposes of those cost

4 projections?

5     A.    No.  I just dictated what I discussed with

6 them.

7     Q.    And what methodology or basis serves as

8 the basis for your opinions regarding the frequency

9 of medical treatment?

10     A.    Just my experience and the types of

11 injuries they have what I've seen with patients.

12 This is spending three or four times that number of

13 visits with an issue.  But they should try and

14 budget this on an annual basis.

15     Q.    And you note ear, nose and throat, four

16 time a year?

17     A.    Correct.

18     Q.    Do you know if that's consistent or

19 inconsistent with what their ear, nose and throat

20 physician has recommended?

21     A.    I can't tell you what he has stated.

22     Q.    And neuro-ophthalmology four times a year?

23     A.    Yes.  And that includes the optometrist,

24 who's managing his prism glasses, correct.

25     Q.    So that's Dr. Fitch?

Page 104

1          A.    Correct.

2          Q.    And you have the letter from Dr. Fitch in

3    your file?

4          A.    Correct.

5          Q.    I think that was from March of this year.

6          A.    I think you're right, correct.

7          Q.    So it's a letter from March 12, 2019?

8          A.    Correct.

9          Q.    And that is a letter from Dr. Fitch,

10   indicating that Ryan had came in with his glasses,

11   from August of 2018.  And he reported at that point

12   in time that most of his symptoms had eased up?

13         A.    Correct.  And they just made an adjustment

14   of the lenses.

15         Q.    In light of that information from

16   Dr. Fitch, do you continue to hold the opinion that

17   he needs to see an ophthalmologist,

18   neuro-ophthalmologist, four times per year?

19         A.    On the average over his lifetime, probably

20   he's getting prescriptions, the sunglasses, the

21   prism glasses and follow-ups.  But you can talk to

22   Dr. Fitch and ask him specifically as well.

23         Q.    And orthopedics four times a year?

24         A.    On the average over his lifetime, yes.

25         Q.    Do you know if any of his orthopedic

Page 105

1    providers indicated they need to see him four times
2    a year?
3        A.    I don't know what they've been asked or
4    what they recommended over his lifetime, what their
5    thoughts are in terms of the future and arthritic
6    changes.  I don't know what they've been asked or
7    what they've discussed.
8        Q.    And do you know if they've given any
9    opinions on future orthopedic surgeries?
10       A.    I don't know if they've been asked.  I
11   can't speak for them.  I don't know.
12       Q.    Cardiac stress test, what's the basis for
13   that?
14       A.    The problem with him is walking.  He's not
15   really able to pick up his pace or cadence, so he
16   can't do a conventional treadmill.  So you do a
17   nuclear medicine study, you know, maybe every 20, 30
18   years.  Just he needs to understand that he'll have
19   to have a different approach for cardiac assessment,
20   not a routine treadmill.
21       Q.    But what related to this particular
22   incident in December 2017, relates to him needing a
23   cardiac stress test?
24       A.    Well, it's a type of stress test.  He
25   can't get a conventional few hundred dollar stress

1    test.  He has to do it through an injection because

2    he can't walk and run to keep the pace to get his

3    cardiac rate up as much.  So it's an alternate that

4    can be done.  People with mobility issues would end

5    up going through a nuclear medicine or a profusion

6    imaging study to assess their cardiac status.

7        Q.    Is this a study that most people require

8    at some point in their lifetime?

9        A.    Well, not everybody.  But if they get on a

10   treadmill, he really can't do a conventional

11   treadmill with his orthopedic and his neurologic

12   issues and balance issues, so you do this type of a

13   study.

14       Q.    And you give the opinion closer to the

15   bottom of this page, that he will have some

16   hospitalizations due to symptomatology.

17           What is that?

18       A.    Orthopedic problems, the knee, the joint

19   problems; if he passes out, the concern of any type

20   of seizure activity he was going to have, whether

21   hospital or outpatient surgery center for his ear

22   reconstruction, all those types of things would

23   require some type of, either surgery center or

24   hospital support, those types of issues.

25       Q.    You've stated you expected he would be

1  hospitalized for his middle ear reconstruction?

2       A.   Either surgery center or hospitalized.

3  Basically a center where he'd have to have those

4  done.

5       Q.   What is your understanding as far as how

6  Mr. Koenig currently is able to get around?

7       A.   He walks.  He'll use a cane at times.  He

8  can well walk.  He does have a walker, but mainly

9  he'd just use a cane or not use a cane.  It depends

10  on where he's walking.  If it's more unlevel, that's

11  a little more challenging.

12          He's just not as stable.  He can walk with

13  or without a cane.  He's sometimes not as stable

14  without it.  But I can have him ambulate without the

15  cane.

16       Q.   And do you know how far he can ambulate?

17       A.   He can ambulate probably 75 to 100 feet.

18       Q.   Do you know if there are any limitations

19  on his ambulation?

20       A.   If he's on a level surface, a smooth

21  surface, he can do pretty well.  If he gets on

22  unlevel ground or gravel or a lot of great changes,

23  that's a little more difficult for him.

24       Q.   That's based on what he reported to you?

25       A.   On what I was seeing in terms of his

Page 108

1  walking.  We did some stairs.  We did some grass.
2  He didn't do as well on an unlevel.  And he knows
3  that.

4      Q.   What information do you have on the home
5  where he and his wife reside?

6      A.   I'm just trying to remember.  There are,
7  like, five steps into it.  It's a family home.  They
8  rent it from the family, and there are 15 or 20
9  steps to the basement.  It's in my report somewhere.
10  Basically an older home that's pretty much standard.

11          He added a bath bench for the shower, and
12  a grab bar in the bath bench so he's more stable
13  getting in and out, so he doesn't get as dizzy, and
14  those types of things.

15      Q.   You haven't made a home visit in this
16  case?

17      A.   No, I did not.

18      Q.   You don't intend to?

19      A.   If they want me to, I can.  But I think
20  they just need to relocate to a one-level residence
21  that's fully accessible.  It's pretty
22  straightforward.

23      Q.   Do you ever do a home visit in cases like
24  this?

25      A.   I do.  I see patients at home, their

1  families, sure.

2      Q.   Do you know what, if any, modifications

3  they made to their home, other than the bath bench?

4      A.   I think it was mainly the bathroom, the

5  grab bar.  They put in a bath bench.  Those, I

6  think, were changes that they made, as far as I can

7  tell.

8      Q.   And what methods and bases are you relying

9  upon for your opinions related to the need to be on

10  a one-level home?

11     A.   Considering his orthopedic and neurologic

12  issues, it's more sensible that he be on a one

13  level, if he does have orthopedic procedures in the

14  future.  That's why we talk about the widened

15  hallways at about five feet.

16          So it's a home in which he can age with

17  any of his disabilities over time.  You know, you

18  put in handrails in the hallways.  It gives him a

19  little bit more stability.  Some of the infrared

20  lighting is helpful.  The one level is the more

21  important element that they really need to look at

22  doing.

23     Q.   And I don't see in here that you've given

24  any opinions related to the cost of home

25  modification.

Page 110

1          Have you given those opinions?

2     A.   You know, I don't think I did.  I mean,

3  they're probably going to spend about 50, 60,000.

4  It will depend on what they end up doing, if you

5  have to buy the lot, redo it.

6          They don't own a home now, so they're

7  going to have to figure out how they're going to

8  fund that.  You know, a house built from scratch

9  with things they might need, particularly the

10  bathroom changes, and that can run them 370,

11  400,000.  You can back out the average cost of a

12  home in their community to give you an idea.  But,

13  no, I didn't come up with specific numbers in that

14  regard.

15     Q.   What education, training and experience do

16  you have in home modification?

17     A.   I've done it for probably 40 years.  I

18  actually am a broker in Illinois and here in terms

19  of real estate.  I don't actually go out and list

20  homes, but I've dealt with real estate for years.

21  And we worked with families, banks, trust

22  departments, the probate courts, assessing plans,

23  recommending home modifications and changes.  I've

24  done that, Illinois and here, and even gave some

25  input in other states.

Page 111

1      Q.   I did see that on your CV, that you're a

2  real estate broker.

3           What percentage of your professional time

4  is devoted to that?

5      A.   I don't.  I just had the license.  I can

6  help my kids buy property, and leave the money on

7  the transaction, things like that.  And we do have

8  farms, so if they're sold, I can just handle that.

9  It's simply for personal purposes.  And it's helpful

10 to know because I can gain access to listings for

11 patients and family members if they want to know

12 what's available or what isn't, or if they have a

13 question.

14     Q.   Did you do any research, as far as

15 listings or modifications, in this case?

16     A.   I didn't in St. Louis, no.

17     Q.   And your real estate broker's license, you

18 said, is solely for personal use?

19     A.   I mean, I can go out and represent people,

20 but I don't represent sellers, and I don't represent

21 buyers unless it's family.

22     Q.   When was the last time you represented a

23 seller or a buyer who wasn't family?

24     A.   I have not.  I don't, and I can't do that

25 with patients.  It would be a conflict.

Page 112

1          Q.    What is your understanding as to what

2    Mr. Koenig currently drives?

3          A.    I don't know.

4          Q.    When you give opinions as to vehicles he

5    needs, what is the basis for that opinion?

6          A.    That's if he's going to go using a scooter

7    for longer distances where he tires out.  If you

8    have the scooter, you're going to need to go to a

9    van, so you go to an accessible van, so you can

10   drive the scooter around and secure it.

11              He can get into an car, an RV or a van to

12   drive it, but if he uses a scooter or trying to get

13   it in the trunk or backseat, lift and move it in,

14   isn't practical.  You go to an accessible van.

15         Q.    At any point since this incident, has

16   Mr. Koenig required a scooter?

17         A.    No, he does not have it.  We talked about

18   the fact if he wants to go longer distances, places.

19   You know, let's say he goes to a fairgrounds, he

20   tires out.  He's going to be better off getting a

21   scooter for long distances.  I don't recommend that

22   he use that every day for every activity, but he has

23   limits with longer distances, and he can use it for

24   that purpose.  If he does that, then he has to think

25   about a van.

Page 113

1      Q.    What do you consider to be longer

2   distances?

3      A.    If he's going to walk more than a mile,

4   mile and a half.

5      Q.    Going back to my question a moment ago.

6   He has not used a scooter, to your knowledge?

7      A.    As far as I know, he has not.  He was in a

8   wheelchair after his accident, but then he got out.

9   That was due to his orthopedic issues.  So as far as

10  I know, he does not have one at this time.

11     Q.    And since his discharge from the hospital

12  in December of 2017, are you aware of him using a

13  scooter or wheelchair at any point in time?

14     A.    I think just his wheelchair.  When he was

15  out, he had a walker.  And I think he used a

16  wheelchair for some things.  But since he finished

17  therapy and his acute care, he has not had to do

18  that, either a wheelchair or school.  And it's

19  something he may consider more in his later years,

20  saying when he's in his 40s or 50s, more than likely

21  than even now.

22     Q.    Bear with me.  I'm looking through your

23  notes of May 6, 2019.

24           What is the basis for your opinions

25  related to ongoing physical therapy?

Page 114

1       A.    The problem is, we want to make sure -- he

2   still had some weakness in his exam and the lower

3   extremities he had a half to a grade of strength

4   reduction in quads, hamstrings.  That needs to be

5   maintained and encouraged more on a weekly basis.

6   And that may deter some of the problems he'll have

7   long-term.  He may choose to do it, he may not, but

8   I recommend he consider following up in that regard.

9       Q.    That's with regard to your evaluation of

10  April of 2018, you're referring to those findings?

11      A.    Correct.

12      Q.    Was he receiving physical therapy at that

13  point in time?

14      A.    He was, yes.

15      Q.    So that continued at that point in time?

16      A.    Correct.

17      Q.    Do you know if any of those symptoms have

18  resolved or lessened in any way?

19      A.    I can't tell you.  I haven't examined him

20  since that time, so that would have to be something

21  to do with his re-exam.

22      Q.    If he did come back to you for a follow-up

23  appointment, say, if he had come to see you in May

24  or September, as was scheduled, what would your

25  elevation have consisted of?

1    A.    Again, review the tests, the findings, the

2    neuropysch.  Discuss that him.  Reassess his

3    orthopedic findings, lower extremity findings.

4    Reassess his cognitive mental status, his mood, his

5    affect.  And talk with him about the same things

6    we've been talking about.

7         I think Kellie and Ryan need to develop a

8    course that's going to work for them.  I think that

9    this is going to be a real challenge for both of

10   them.  And, you know, we aren't going to fix him.

11   He is kind of what he is.  And, you know, I'm not

12   certain what their approach is going to be.

13        As I've explained to them, her concern is

14   if she's gone, what happens to him?  He's in

15   trouble.  So as I suggested, they may want to look

16   at planning some type of life or disability coverage

17   for her or something else, because she's worried

18   when she's on the road, he's on his own.  There

19   isn't somebody who really is hired to come in.

20   People volunteer, but people who volunteer, they're

21   only volunteering.

22        So they really have to think about what

23   their long-term plan is going to be, and only they

24   can answer that.

25        Q.    As far as home care, what type care

1   provider are you recommending?

2        A.   It's an aide, an attendant.  I mean, it's

3   basically a person who's a companion, who will do

4   the shopping, help cue him into things; make sure he

5   showers; make sure the meals are done; make sure

6   he's safe.  Get him to the store, make sure he's

7   doing things appropriately.

8             If his wife's gone, they're going to need

9   to pay the bills and handle finances, those types of

10  things.  Basically, a parent.  You know, a spouse

11  can do it, but is that the best relationship in a

12  marriage?  That comes with its own challenges, and I

13  can't answer that for them.  That's something they

14  have to decide.

15       Q.   I'm just looking through my notes.  I'm

16  about done.  I'm just making sure I don't have

17  anything else to cover.

18            When you see patients in your office, like

19  you did Mr. Koenig, approximately how many patients

20  do you see in a given day?

21       A.   I'd see maybe two or three.  If it's

22  rechecks, I can do -- I tend to do -- I might do

23  eight to 12.

24       Q.   For your evals, do you generally allow

25  about two hours?

1     A.    I block about three hours.

2     Q.    And for each of those patients, do you do

3 kind of a report, like you did here for Mr. Koenig?

4     A.    Correct.  I dictate my evaluation.

5     Q.    And make recommendations for them, as far

6 as the future?

7     A.    Whatever their situation is.  Some people

8 maybe just the finger's amputated, we know that

9 would be a shorter eval.  It's a little more direct.

10     Q.    Have you provided this evaluation to any

11 other treating providers involved in Mr. Koenig's

12 care and treatment?

13     A.    I have not directly.  We forwarded it to

14 the Koenigs, their email, or actually, Kellie, and

15 indicated to share that with their other treating

16 providers or counselors so they have it to provide.

17 I don't know if they passed that on.

18     Q.    And to your knowledge, have they passed

19 that on?

20     A.    I don't know.  I can't tell you.

21     Q.    Okay.  Do you know if any other medical

22 provider has given an opinion that the

23 recommendations outlined in your reports are

24 medically necessary for Mr. Koenig?

25     A.    I don't know.

1      Q.    And you've not referred to any studies or

2      data analysis or anything like that in drafting your

3      reports, correct?

4          A.    No.  I would not, and I did not.

5              MR. JOHNSON:  All right, Dr. Eilers.

6          Those are all my questions.  Thank you.

7              THE WITNESS:  Sure.

8                      CROSS-EXAMINATION

9      BY MR. BERGER:

10         Q.    Dr. Eilers, this is Kenny Berger.  I just

11     have a few short follow-up questions.

12             Dr. Eilers, you've been treating patients

13     in the field of physical medicine and rehabilitation

14     for approximately 40 years, is that right?

15         A.    Correct.

16         Q.    And you've seen the short-term

17     consequences in medical need, short-term

18     consequences of trauma in patients' accompanying

19     medical needs; is that accurate?

20         A.    Yes.

21         Q.    And you've also seen the long-term

22     consequences of trauma and those accompanying

23     medical needs?

24         A.    Yes, I have.

25         Q.    And are you applying your 40 years of

Page 119

1   experience treating patients from the field of

2   medical and rehabilitation medicine to Ryan's care?

3        A.   Yes.

4        Q.   And are you applying your 40 years as a

5   practicing doctor in the field of physical medicine

6   and rehabilitation to your conclusions regarding

7   Ryan's ongoing medical needs?

8        A.   Yes.

9             MR. BERGER:  I have no other questions.

10                 REDIRECT EXAMINATION

11  BY MR. JOHNSON:

12       Q.   Just briefly.  Dr. Eilers, I asked you

13  earlier regarding the methodology that you've

14  employed in this case.

15            And you told me that you're just relying

16  on your years of experience, correct?

17       A.   Right, and everything that that entails.

18  I mean, reading, learning, CMEs, education, et

19  cetera, sure.

20            MR. JOHNSON:  Okay.  That's all I have.

21            MR. BERGER:  That's it.  Thank you all.

22            (The taking of the deposition was concluded

23  at 1:00 p.m.)

24            (The reading and signing of the deposition

25  was waived.)

1

2    CERTIFICATE OF OATH

3    STATE OF FLORIDA      )

     COUNTY OF COLLIER     )

4

5         I, Jacqueline A. Komin, Registered Professional

6    Reporter, Florida Professional Reporter and Notary

7    Public, State of Florida, certify that ROBERT

8    EILERS, FAAPM&R, personally appeared before me on

9    the 2nd day of October, 2019, and was duly sworn.

10

11        Signed this 15th day of October, 2019.

12

13

14                    Jacqueline A. Komin, BS, RPR, FPR

15                    My Commission # GG 082799

16                    Expires:  April 2, 2021

17

18

19

20

21

22

23

24

25

1

2                CERTIFICATE OF REPORTER

3

4       I, Jacqueline A. Komin, Registered

5  Professional Reporter, Florida Professional

6  Reporter, certify that I was authorized to and did

7  stenographically report the Deposition of ROBERT

8  EILERS, FAAPM&R, and that the transcript, pages

9  1-119, is a true and complete record of my

10  stenographic notes.

11      I further certify that I am not a relative,

12  employee, attorney or counsel of any of the parties,

13  nor am I a relative or employee of any of the

14  parties' attorney or counsel connected with the

15  action, nor am I financially interested in the

16  action.

17

18  DATED this 15th day of October, 2019.

19

20

21       _____

22       Jacqueline A. Komin

23       Registered Professional Reporter

24       Florida Professional Reporter

25

**[& - 80s]**

| & |
|---|
| **&**   6:6 10:23 73:7 |

| 0 |
|---|
| **03599**   1:3 |
| **05-06-19**   3:14 |
| **05-18-19**   3:16 |
| **08-22-19**   3:10 |
| **082799**   120:14 |

| 1 |
|---|
| **1**   3:10 41:2 |
| **1-119**   121:8 |
| **10**   41:22 100:6 |
| **100**   107:17 |
| **101**   39:3 |
| **102**   9:2,5 |
| **102s**   9:6 |
| **1048**   29:4 |
| **10:00**   1:14 |
| **10:51**   45:20 |
| **10th**   41:11 |
| **11**   17:18 98:4 |
| 100:16 |
| **11399**   120:13 |
| 121:19 |
| **118**   3:5 |
| **119**   3:6 |
| **11:04**   45:20 |
| **11th**   39:15 41:12 |
| **12**   10:5 42:2 52:9 |
| 104:7 116:23 |
| **12:22**   102:4 |
| **12:33**   102:4 |
| **12th**   40:5 42:1 |
| **13th**   40:25 |
| **14**   40:15 55:19 |
| 93:18 |
| **1415**   1:13 |
| **14th**   41:6,9 44:11 |
| 55:23 102:7 |

**15**   27:20 33:24 59:1
100:6 108:8
**150**   97:16,24
**15th**   120:10 121:17
**1600**   2:9
**172**   2:15
**18**   9:1 52:10 69:12
69:14 83:23 93:16
93:18
**19**   39:13 40:10 44:2
44:4,18 45:5
**1972**   10:11
**1979**   10:15 12:11
**1980**   12:16
**1980s**   10:23
**1981**   6:9
**1982**   10:15,18
**1983**   10:17
**1986**   17:10
**1:00**   1:14 119:23

| 2 |
|---|
| **2**   1:14 3:11 9:21,23 |
| 37:17 47:16 89:22 |
| 120:15 |
| **20**   7:13 8:6,25 9:1 |
| 27:20 99:7 100:6 |
| 105:17 108:8 |
| **2014**   24:8 |
| **2017**   69:8 84:8 |
| 105:22 113:12 |
| **2018**   39:21 40:2,11 |
| 40:15 41:1,2,16,25 |
| 50:13,20 53:16 |
| 55:19,23 57:6,9 |
| 63:5 68:5 69:18,21 |
| 70:9 73:19 75:5 |
| 80:6 91:23 93:18 |
| 93:19,20 100:19 |
| 102:8 104:11 |
| 114:10 |

**2019**   1:14 38:4,8,13
39:5 40:5 44:14
46:2,5,7 48:22
51:10 57:9 58:1
59:3,5 104:7
113:23 120:8,10
121:17
**2021**   120:15
**20th**   40:10
**220**   2:9
**22nd**   38:13
**23rd**   41:16,19
**24**   3:12 42:6 61:9
69:14 78:4,7 95:5,8
96:6
**25**   99:7
**28th**   40:10
**29206**   2:5
**2:18**   1:3
**2nd**   38:8 39:7,8,21
40:2 41:25 50:20
51:9 53:15 55:17
63:5 73:19 75:5
91:23 93:19 120:8

| 3 |
|---|
| **3**   3:12 24:3,5,16,23 |
| 25:19 32:23 38:15 |
| 77:16 |
| **30**   3:13 75:7 99:7 |
| 99:14 105:17 |
| **31-754-9477**   2:11 |
| **314-334-1814**   2:10 |
| **32**   99:15 |
| **34109**   1:13 |
| **35**   54:11 |
| **37**   23:22,23 64:2 |
| **370**   110:10 |

| 4 |
|---|
| **4**   3:4,13 16:8 30:11 |
| 30:14 |

**4/10/18**   66:9
**4/2/18**   42:3,5
**40**   7:14 8:7 9:11
13:8 23:22,23
54:11 63:25 64:2,4
64:7 88:12 98:23
110:17 118:14,25
119:4
**400,000**   110:11
**40s**   113:20
**43**   99:15,17
**45**   3:14,16 57:2
**475**   28:12 30:25
31:2

| 5 |
|---|
| **5**   3:14 31:20 45:21 |
| 45:25 84:18 88:22 |
| 100:6 |
| **50**   9:11 110:3 |
| **50s**   113:20 |
| **5205**   2:4 |
| **5th**   69:8 |

| 6 |
|---|
| **6**   3:16 45:22 46:2,6 |
| 102:15 113:23 |
| **60,000**   110:3 |
| **63144**   2:10 |
| **6th**   39:5 44:1,4,17 |
| 57:6,25 58:25 |

| 7 |
|---|
| **75**   107:17 |
| **79**   10:11 |

| 8 |
|---|
| **8**   3:10 46:7 91:23 |
| 92:2 |
| **803-790-2800**   2:5 |
| **803-790-2870**   2:6 |
| **80s**   55:4 |

[843-577-4435 - approach]                                                            Page 123

**843-577-4435** 2:16
**843-722-1630** 2:16
**87** 38:22
**8th** 38:3 45:5

**9**

**9** 3:11
**90** 26:22 27:3
**950** 28:12,14,25
   42:3 51:19
**9s** 38:25
**9th** 39:12 57:22

**a**

**a.m.** 1:14 45:20,20
**aap** 20:4
**aap&r** 20:4
**abating** 83:16
**abductor** 68:16
**abilities** 90:19
**ability** 5:23 56:23
   86:21 95:14
**abilitylab** 10:15
**able** 20:24 57:15
   58:4 62:11 72:12
   78:25 86:4,8 87:13
   88:9,13 90:19,22
   92:9 95:4 105:15
   107:6
**abnormal** 99:19
**absolutely** 15:17
   21:25 22:25 30:23
   51:23 62:16 69:14
   77:1
**academic** 13:22
   17:24 20:6
**academy** 17:24
   20:5
**accepting** 19:17
**access** 20:13
   111:10

**accessible** 108:21
   112:9,14
**accident** 52:13
   113:8
**accompanying**
   118:18,22
**accurate** 27:4
   63:16 118:19
**acquired** 5:18
**action** 17:4 121:14
   121:15
**actions** 17:6
**active** 17:21 56:12
**activities** 61:14
   88:6
**activity** 106:20
   112:22
**actual** 44:10 47:22
**acute** 43:2 113:17
**add** 6:18
**added** 108:11
**additional** 16:13
   22:10 29:21 38:15
   53:10 59:4 67:15
   73:1
**address** 72:12,13
**addressed** 85:10
**adjustment** 104:13
**adls** 61:12
**administrative**
   14:10,15
**admission** 14:13
**admissions** 7:5
   13:22
**admitted** 12:13
**adults** 9:2
**advertising** 27:24
**advil** 78:14
**advise** 64:14 96:24
**advised** 97:2

**advising** 73:23
**affairs** 62:11
**affect** 18:17 68:23
   115:5
**affidavit** 3:11
   38:18 39:9
**affidavits** 25:16
**affiliated** 7:17 8:15
**affirm** 56:3
**age** 99:14 109:16
**agencies** 74:15
**agility** 72:18
**ago** 14:6 26:13 28:7
   33:24 34:20 63:13
   113:5
**ahead** 35:18 50:19
**aide** 116:2
**alcohol** 58:17 78:13
   79:9,22,24
**aleve** 78:14
**allegedly** 17:10
**allow** 116:24
**als** 5:14
**altered** 61:23 62:3
   78:24 99:9
**alternate** 106:3
**ambulate** 107:14
   107:16,17
**ambulation** 107:19
**ameda** 8:19,20
**american** 20:5
**amount** 67:2
**amounts** 82:11
**amputated** 117:8
**amputations** 5:13
   5:15 14:8
**amputees** 13:10
**analysis** 118:2
**animated** 18:19
**ankle** 53:17

**ankle's** 62:6
**annual** 31:16
   103:14
**annually** 8:22
**answer** 35:25 53:1
   63:1 65:16 71:19
   74:7 77:4 82:14
   90:10 91:12,15
   97:12 115:24
   116:13
**anticipated** 68:10
**anxiety** 21:16
   58:16 60:22 69:24
   79:8,20 81:13,20
   85:3,12,13,15,19
   85:20,21 86:2,14
   87:2,21 101:3
**anxious** 58:14
**anybody** 32:3 50:1
**anyone's** 60:7 85:7
**anyway** 8:20 46:21
   65:24
**apart** 18:25 19:8
**apparently** 95:4
**appearance** 2:4,8
**appearances** 2:1
**appeared** 120:7
**appears** 10:4,5
**applies** 74:13
**applying** 118:25
   119:4
**appointed** 57:17
**appointment** 39:6
   114:23
**appointments** 71:3
**appreciated** 39:20
**apprehension**
   85:12
**approach** 105:19
   115:12

**appropriate** 96:25
**appropriately**
  116:7
**approved** 64:19
**approximately**
  23:24 26:2,16
  27:18 34:9 51:16
  116:19 118:14
**april** 38:8 41:25
  50:13,20 51:9
  55:17 63:5 68:4
  69:18,21 70:9
  73:19 75:5 91:23
  93:16,19,20 100:19
  114:10 120:15
**area** 10:18 15:1
  35:3,6 67:3
**areas** 15:16 60:12
**arises** 86:1
**arm** 84:14
**arranged** 48:12
**arthritic** 105:5
**arthritis** 100:5
**articles** 20:13
**artist** 18:21
**asked** 12:6 29:20
  30:19,21 53:3
  54:18 55:24 58:20
  67:24 71:5 82:21
  97:2 105:3,6,10
  119:12
**asking** 38:5,10,14
  38:15 41:18 46:11
  53:22 77:9 90:3
**asks** 13:9,10 14:16
  32:10
**aspects** 73:21
**aspirin** 78:16
**assess** 21:9 106:6
**assessing** 110:22

**assessment** 89:20
  105:19
**assigned** 54:17
  71:6
**assigning** 73:20
**assigns** 13:8
**associates** 6:7
**association** 17:24
  20:6
**associations** 20:4
**assume** 26:9 54:5
**atrophy** 60:12
**attack** 17:12 87:16
**attacks** 85:3,18,25
  86:15
**attempt** 15:4 66:18
**attendant** 33:21
  74:14 116:2
**attending** 11:20
**attendings** 23:11
**attention** 70:4
  81:10 83:12
**attorney** 22:19
  23:3 28:2 30:4
  121:11,13
**attorneys** 22:17
  49:7
**audiogram** 42:9
  98:10
**august** 38:13 40:10
  40:15,25 41:6,9,11
  44:11 55:19,23
  57:9 93:18 102:7
  104:11
**authoritative** 20:9
**authority** 20:15
**authorization** 50:1
**authorized** 121:5
**auto** 9:19
**automatically**
  39:25

**available** 50:24
  111:12
**average** 61:25
  81:10,10 99:17
  104:19,24 110:11
**avoid** 6:20
**awake** 78:3
**aware** 18:5 30:9
  31:24 57:10 61:18
  73:24 78:17 80:3,4
  80:13 85:7 113:12

**b**

**b** 59:16 79:15
**back** 6:22 23:19
  24:7 28:14 38:11
  39:8 40:14 41:8,19
  41:19 45:24 47:19
  53:12 55:3,7 57:20
  60:24 66:20 72:24
  75:4 77:11 83:5
  86:13 87:2,7 90:4,6
  92:25 94:19 101:7
  110:11 113:5
  114:22
**background** 10:8
**backseat** 112:13
**bad** 67:20
**balance** 106:12
**banks** 110:21
**bar** 12:15,16,20,23
  89:8 94:4 108:12
  109:5
**barnes** 40:21 72:21
**bars** 12:25 13:3
**based** 70:8 87:15
  95:20 102:10
  107:24
**basement** 108:9
**bases** 109:8
**basic** 19:2 40:1
  50:16 51:3

**basically** 5:17,21
  7:20 18:11,18 20:3
  34:6 52:8 56:6
  58:10,19,24 61:8
  64:21 67:5 68:23
  85:21 92:13 95:15
  107:3 108:10 116:3
  116:10
**basilar** 67:13
**basis** 76:16 77:4
  92:24 95:18 103:7
  103:8,14 105:12
  112:5 113:24 114:5
**bath** 108:11,12
  109:3,5
**bathe** 61:11 89:1
  95:10
**bathroom** 109:4
  110:10
**bear** 113:22
**becoming** 9:6 58:14
**beginning** 33:16
  62:25 70:15
**begins** 46:2
**behalf** 1:18 2:2,13
  26:22 27:3,7,10
**behavior** 60:22
**believe** 14:24 17:19
  27:12,15 29:10
  37:16 43:14 44:5
  49:4 50:20,22 51:7
  55:20 57:11 59:13
  63:10 69:8 72:19
  73:5,8 98:17
**bench** 108:11,12
  109:3,5
**bend** 16:18
**benefit** 78:25
**berger** 2:3,3 3:5
  23:3 45:11,14
  65:13 77:7,8 82:9

[berger - certificate]                                                    Page 125

91:11 102:2 118:9
118:10 119:9,21
**bergerlawsc.com**
2:6
**best** 5:2 70:12,14
90:2 116:11
**better** 59:24 70:6
81:23 82:19 87:25
112:20
**beyond** 28:13
**big** 59:8
**bilaterally** 67:6
68:19
**bill** 29:8,9 36:24
37:1,4 38:24 39:11
42:2
**billed** 29:5 36:21
**billing** 23:14 42:19
55:10
**bills** 41:23 62:12,13
75:1 116:9
**biomechanical**
99:6
**biomechanically**
62:3
**biomechanics**
99:10
**birth** 9:4
**bit** 33:23 63:1 70:2
80:2 89:8 97:18
109:19
**black** 18:10,11,20
18:22
**bled** 67:8
**bleeding** 76:18
**bleeds** 75:25
**block** 117:1
**blunted** 18:16,19
**blunting** 68:23
**board** 14:25 64:20
65:8

**boards** 10:17 15:3
**body** 99:9
**bold** 42:15 47:19
**bone** 21:1 67:14,15
**bothered** 87:22
**bottom** 77:15
106:15
**boulevard** 2:9
**brachial** 9:4
**brain** 5:16 9:10,12
40:17,20 53:16
55:3,5,6 60:11,12
64:5,25 65:1 66:6
66:13 67:2,16
68:11,14,18 75:19
75:22 77:10 95:22
**break** 4:22 45:9
46:10 87:1 102:2
**breed** 11:13
**brentwood** 2:9
**brevity** 42:5
**brian** 2:14 3:10
4:11 77:7,9
**brian.johnson** 2:17
**brief** 88:11
**briefly** 119:12
**bring** 33:5 47:2
51:2
**broken** 84:14
**broker** 110:18
111:2
**broker's** 111:17
**brought** 24:6,20
37:19,22 42:24
46:1 47:1 52:12
**bs** 120:14
**budget** 103:14
**built** 110:8
**bunch** 38:8
**burns** 96:15

**business** 6:8 10:23
**buy** 110:5 111:6
**buyer** 111:23
**buyers** 111:21

**c**

**c** 40:4 46:18
**cadence** 105:15
**call** 3:14 23:14 39:4
41:5,9 44:3,17 46:2
48:24 56:18,25
57:5,25 58:25 62:3
74:14 77:11 93:17
**called** 4:3 40:1 41:8
41:8 43:21 48:18
49:8 51:5,6 53:15
54:18 58:2 59:7
60:5 63:13
**calling** 39:20 74:17
**calls** 29:7,11 44:1
48:15 50:15 63:5
94:7,17
**cancel** 39:12
**cancelled** 39:14
**cane** 107:7,9,9,13
107:15
**capacity** 13:15,20
36:9 90:17 91:17
**car** 58:4,13 69:7,9
85:2 96:18 112:11
**cardiac** 105:12,19
105:23 106:3,6
**care** 5:19,25 24:20
32:13 33:6,14,21
34:5,10,13,18,24
35:5,8,10,14,22
36:3,6,8 37:11 40:4
43:2 49:3 74:14
95:8 96:6 97:7
102:18 113:17
115:25,25 117:12
119:2

**career** 26:2,17
34:10
**caregiver** 62:23
**caring** 74:10
**carolina** 1:1 2:5,15
27:8,11,14,17
30:17 46:20,25
47:6 82:15
**carried** 100:12
**carrier** 35:15 37:2
**carriers** 34:3
**case** 1:3 4:15 14:22
20:17 24:5,23,24
25:5,6,9,24 28:20
30:2,17,22 33:10
37:7 41:21 42:24
48:17 49:7,12,17
53:2 54:14 55:14
59:12 60:6 63:14
71:18 74:13 75:2
81:2,8 82:7 108:16
111:15 119:14
**cases** 23:24 24:13
24:16,22 25:18,20
26:21 32:21 108:23
**cash** 89:21
**cause** 1:23
**caused** 17:11 67:15
**cell** 100:14
**center** 22:11
106:21,23 107:2,3
**central** 54:6
**certain** 15:17 21:25
36:19 77:23 79:15
80:20 90:7 102:17
102:23 115:12
**certainly** 36:10
65:16 79:5 100:6
**certificate** 120:1
121:1

certification 14:25 35:21
certifications 16:3 16:5 35:8
certified 35:10
certify 120:6 121:5 121:10
cetera 8:8 33:13 76:11 81:12 119:19
chairman 13:7
challenge 115:9
challenges 71:4 116:12
challenging 107:11
change 33:18 57:19 58:23 59:8 88:3
changed 11:10 58:8
changes 8:21 40:19 60:21 69:20 70:8 79:10 105:6 107:22 109:6 110:10,23
changing 11:13 86:10
characterization 77:10
charge 28:15,18,22 29:5 30:22,24 31:5 71:2 74:5
charges 29:21 74:24
charging 28:9
charleston 1:2 2:15 30:17
chart 48:2
check 29:3 38:21 74:15 79:17 94:1,3 97:10 101:3
checked 54:16
checking 94:14,16
chicago 10:14 13:12 22:10 27:22

53:20
children 5:19 9:1,3
chiropractic 73:13
choice 96:18
choose 15:10 37:2 114:7
chose 22:5
chris 2:8 45:8,17
clarify 31:14 53:14
classification 75:20
classify 75:21 85:4
classroom 14:2,3
cleaning 61:13
clear 66:8,10
clearly 56:5,24 65:22 93:5
clients 22:23
clinic 13:20
clinical 13:21 82:8 93:9
clinically 93:8
closed 12:24 67:1
closer 51:19 106:14
cmes 119:18
codes 41:22
cognitive 60:13 81:14 88:19 90:18 91:16 92:21 115:4
colleague 16:23
collier 7:21 120:2
collier's 7:6
columbia 2:5
coma 76:1
come 20:3 27:13,22 30:16,21 34:24 35:16 47:2 48:7 57:20 94:4,18 97:6 97:9,19 110:13 114:22,23 115:19
comes 22:7 31:17 102:20 116:12

comfortable 96:17
coming 39:13 42:13
commentary 82:10
comments 89:12
commission 120:14
committed 21:6
committee 14:13
common 9:7 23:18 79:9,11,22 87:20
commonly 15:18 55:4
communicated 59:11
communications 46:5 48:1,3,14,15
communities 10:19
community 7:18,19 27:23 55:9 110:12
comp 25:1 34:3
companion 116:3
compare 74:25
compendium 20:11 64:7
competent 62:13
competitively 60:20 86:4,13,21 87:3,13 88:12 90:20,23 91:1,18
complete 34:17 121:8
completed 10:16 11:17 34:22 39:12 41:16,19 55:25 93:7
completing 11:1
concentration 70:4 83:12
concern 80:3 96:16 106:19 115:13
concerns 93:5 96:16,25

concluded 119:22
conclusions 64:17 65:11 67:25 119:6
concord 32:25 33:7
condition 69:21 70:9
condyle 61:20
conference 41:5 44:1 55:18,23 102:7
conferences 28:3
conflict 111:25
confront 62:10 99:24
confronting 19:25 62:24
connected 121:13
consequence 97:1
consequences 118:17,18,22
consider 20:9 96:12,22 113:1,19 114:8
considered 81:9
considering 109:11
consist 57:25
consisted 114:25
consistent 56:9 68:24 69:1 70:3 71:17 82:1 95:25 97:25 103:18
constant 88:3
consultation 7:3
consults 7:4,5 8:9 16:19
contacted 21:21,24 40:8 50:12
contain 80:5
contained 47:15 48:2 58:9 63:3,9,11

[continue - delay]

continue 78:25
104:16
continued 114:15
continuing 37:10
77:15 83:16
continuous 58:11
contributing 85:23
contusion 67:10
contusions 67:7
conventional
105:16,25 106:10
conversation
102:10
conversations
80:23
cooking 61:13
coordinate 39:22
57:12,14 70:24
coordinated 97:21
coordinating 31:20
48:13
copies 43:14
copy 10:1 30:6
42:20 45:9,15
46:10
cord 5:13,16 15:14
correct 4:20 10:6
11:19 15:8 16:10
17:19 24:8,9 31:9
35:9 36:18 37:15
47:17,18 50:13,22
51:10,11 53:21
55:20,21 57:7 68:2
68:3 71:7 72:2 74:2
77:18,19 78:3,4
80:8,9,17 81:5
84:20 86:6 92:7
98:7,8,14 100:17
100:18,22 102:11
102:18,19,21,22
103:1,17,24 104:1

104:4,6,8,13
114:11,16 117:4
118:3,15 119:16
cortical 66:12,14
cost 74:16,20
102:24 103:3
109:24 110:11
costs 71:6 73:21,24
74:24
counsel 31:13
64:14 121:11,13
counseling 73:17
counselor 79:16
94:10
counselors 117:16
county 120:2
couple 57:18 86:25
87:5,8 90:5
coupled 9:13
course 62:7 115:8
courses 34:23
37:11
court 1:1 3:12 24:7
26:10,12 32:6,9,13
32:15 33:9
courts 110:22
cover 7:4 8:9,11
9:2 11:12 116:17
coverage 95:5
115:16
covered 8:2,13
16:19,20,22
covering 6:24
cp 5:19
crashes 9:20
created 34:10
credentials 79:15
79:18
criteria 75:21 76:3
critical 21:5

criticisms 82:6
critique 91:16
cross 3:5 6:24
11:12 68:16 118:8
ct 66:22,24
cts 43:5 46:23
cue 116:4
cured 21:3
current 44:21
78:19
currently 11:4 13:4
13:14 23:25 71:22
78:10 91:8 98:15
107:6 112:2
curve 19:17
cut 77:9 97:10
cv 1:3 10:1 16:6,8
17:16 39:9 111:1

d

d 5:5
damage 64:25
66:17 67:12,16
68:11,11,14 70:3
95:23
damaged 55:3
data 118:2
date 10:4 50:14,18
50:25 59:7 70:23
88:4 100:24
dated 40:15 42:4
46:7 121:17
day 5:24,24 7:25
12:11 17:11 19:14
31:6 43:24 51:10
57:16 58:12 61:9
69:8 80:1 86:21,21
86:23 88:6,6 94:7
94:17 95:14,14
100:6 112:22
116:20 120:8,10
121:17

days 8:1 10:21
23:13,16 55:5
97:17,22
dcn 1:3
dead 66:14 76:22
deal 5:11,14 12:24
14:15 17:22 19:15
86:16,19 89:20
94:9 95:14 101:6
dealing 11:11
dealt 25:2 110:20
december 69:8
84:8 105:22 113:12
decide 116:14
decision 22:14 97:1
decisions 62:14,17
decompensated
87:10
decompensates
86:18
decreased 76:9
deep 66:15
defendant 1:9,18
2:13 4:3,12 25:20
25:23,25 27:8
defendant's 1:22
25:18
defense 3:8 9:21
24:3 30:14 45:21
deficits 60:13,16
66:3,8 68:12 69:3
82:25 89:4
defined 60:13 69:2
definitely 31:20
61:20 76:6
definitive 20:12
degenerative 100:5
degree 19:11
degrees 35:4,7
delay 3:15

denial 19:12
dep 29:22
department 14:13
  23:15
departments
  110:22
depend 110:4
depended 26:15
depending 6:23 8:9
  8:14
depends 7:15 8:2
  8:11 107:9
deposition 1:16,22
  4:19 24:10 25:13
  26:3 28:6,11,16
  37:13,14 49:21
  119:22,24 121:6
depositions 25:1
  26:6 31:21 49:16
depression 79:10
  79:20 81:13,19
deps 49:9
describe 8:23 77:2
described 18:12
  60:10 68:24 75:23
  76:13
description 3:9
destruction 99:11
detailed 52:16,18
  57:3 60:14
details 43:4 48:20
deter 114:6
determination
  91:21
determine 82:20
  83:22 87:13 101:12
devastating 70:17
develop 115:7
developmental
  5:19

devices 95:10
devoted 111:4
diagnosed 84:21
diagnosis 5:11 85:8
  95:20
diagnostic 21:10
  64:22
dictate 34:1 48:12
  52:20 53:9,14 75:6
  75:10 117:4
dictated 40:12
  63:18 71:9 103:5
dictation 40:12
  41:25 44:10
died 67:8
dies 96:15
different 20:13
  24:23 105:19
difficult 107:23
difficulty 88:23
diffused 67:17
diffusing 67:21
direct 3:4 4:7 62:4
  117:9
directions 18:14
directly 85:17
  117:13
disabilities 109:17
disability 9:19
  115:16
disagree 77:1 96:7
disallowed 82:12
discharge 113:11
discuss 33:25 52:24
  52:25 115:2
discussed 21:17
  32:14 35:17 58:20
  83:20 103:5 105:7
discussion 36:13
  44:1

disease 5:14
diseases 5:22
dishes 89:2
dismissed 17:12
disorder 85:20,21
disorders 15:13
distances 112:7,18
  112:21,23 113:2
district 1:1,1 33:9
division 1:2
dizzy 108:13
doctor 23:20 47:9
  119:5
document 102:7,13
documentation
  46:4
documented 56:5
  98:5
documents 3:11
  10:2 46:1,3
doing 12:24 23:9
  33:14 64:1 70:14
  87:8 88:12 91:2,5,9
  91:15,17 99:22
  109:22 110:4 116:7
dollar 105:25
door 23:2
doublecheck 15:17
  85:9
downtown 7:6,20
dr 3:10 4:9 20:16
  23:6 37:13 38:3
  40:4,22 42:22
  44:14 45:25 48:18
  54:1,3,10,14,17,20
  56:15 57:13 58:21
  59:6,16,19 60:4,14
  65:13,15,19,19,20
  65:21 68:1 69:23
  72:5 79:14 80:7,10
  80:15,19,24 82:7,9

  82:13 83:5,6,10,11
  83:19,25 84:24
  85:10 91:13 92:6
  102:6 103:25 104:2
  104:9,16,22 118:5
  118:10,12 119:12
draft 75:6
drafting 59:21
  118:2
drafts 75:8
dress 18:11
dressing 18:20
drink 80:1 89:9
drive 2:4 58:12
  100:20 112:10,12
driver's 101:13,18
drives 112:2
driving 96:17
  100:17,21,23 101:1
  101:3,11,20,20,23
  101:25
due 106:16 113:9
dues 12:22
duly 4:4 120:8
duty 30:13

**e**

e 2:3,3,14 5:5 32:22
  59:16
ear 20:25 58:7
  60:25 67:11 84:16
  103:15,19 106:21
  107:1
earlier 69:10 98:7
  119:13
early 20:23 42:21
  82:25
earning 89:13
eased 104:12
easily 62:19
easy 94:9

[economic - explained]      Page 129

**economic** 89:20
**education** 11:24,25
  37:10 110:15
  119:18
**educational** 10:8
**edward** 1:8 4:12
**edwin** 5:5
**eeg** 40:20 42:6 50:6
  56:1,10,15 66:2
  68:5 72:23 73:11
  77:23 78:2,5 95:1
**eegs** 41:13
**effective** 62:14
**effectively** 62:11
**eight** 26:14 31:4,5
  40:15 56:11 57:4
  76:1 86:23 116:23
**eilers** 1:16 3:3,10
  4:2,9 5:5 20:16
  23:6 37:13 42:22
  45:25 60:4 65:13
  65:15 82:9,13
  91:13 102:6 118:5
  118:10,12 119:12
  120:7 121:7
**either** 5:22 31:13
  38:15 47:11 54:17
  106:23 107:2
  113:18
**elaboration** 63:10
**electrodiagnostics**
  15:15
**electronic** 48:15
**element** 109:21
**elementary** 11:24
**elevation** 114:25
**elevations** 70:19
**else's** 77:10
**email** 38:4,7,13,23
  39:7,18,21 41:10
  41:15 45:16,17

48:1,3 117:14
**emails** 38:9,12
  39:16 40:5 46:4
  48:6
**emgs** 15:22
**eminently** 66:8
**emotional** 88:19
**employ** 63:24
  65:10
**employed** 6:1,2
  60:20 64:12 86:5
  86:22 87:4,14
  90:17,20 119:14
**employee** 121:11
  121:12
**ems** 46:25
**emt** 42:10
**encephalomalacia**
  40:19 60:12 65:1
  65:23 66:1,13,19
  67:4,7,10 95:22
**encouraged** 114:5
**ended** 72:25 76:10
**energy** 93:2
**ent** 50:7 71:25 72:5
**entails** 5:9 119:17
**entire** 64:1
**entitled** 24:6
**environment** 85:5
  88:4
**er** 46:25
**esquire** 2:3,8,14
**estate** 110:19,20
  111:2,17
**et** 8:7 33:13 76:11
  81:12 119:18
**eval** 40:25 42:20
  43:9 45:4 46:21
  59:9 73:9 93:6
  117:9

**evals** 116:24
**evaluate** 24:21
**evaluated** 81:18
**evaluation** 3:16
  21:22 39:22 40:24
  41:24 42:1 44:7
  45:2 46:7 47:10
  50:21 51:10,17
  52:3,7,21 53:9
  55:16 63:4 66:21
  75:4 80:6,25 82:7
  83:13,14,18 91:24
  92:6 93:19,20
  101:21,23 102:21
  114:9 117:4,10
**evaluations** 28:19
  56:6
**eventually** 59:10
  99:10 100:13
**everett** 1:5 14:23
  19:4,8 29:2,6 31:11
  46:6 48:4 49:18,24
  50:12,25 51:13
  52:4 55:17 56:18
  60:1 71:2,13 77:16
  80:24 83:17 97:8
  102:11
**everett's** 89:25
**everybody** 106:9
**everybody's** 20:11
**evidence** 92:15,22
**exact** 9:17 26:19
  31:18 50:18 97:22
  100:24
**exactly** 32:10 91:14
**exam** 64:21 68:13
  68:23 114:2,21
**examination** 3:4,5
  3:6 4:7 52:23 68:21
  69:1 118:8 119:10

**examined** 4:4
  114:19
**excellent** 54:11
  81:14
**excluded** 31:23
**executive** 1:12
**exhausted** 58:8
**exhibit** 3:10,11,12
  3:13,14,16 9:21,23
  24:3,5,16,22 25:19
  30:11,14 32:23
  37:17 38:15 45:10
  45:21,22,25 46:6
  47:16
**exhibits** 3:8
**expect** 31:10 70:5
**expectation** 19:21
**expectations** 84:2
**expected** 106:25
**expenses** 31:1,8
**experience** 63:25
  87:15 103:10
  110:15 119:1,16
**experienced** 9:9
**experiment** 64:19
  65:7
**experiments** 64:16
  64:18 65:3
**expert** 18:3 23:7,25
  24:14,14,17,21
  25:4,9 26:5 27:25
  31:17 32:5,12
**expertise** 89:23
**expires** 120:15
**explain** 5:9 23:12
  23:17,20 33:4,17
  36:14 56:3,20,21
**explained** 36:10
  56:23 60:17,19
  61:4 70:10 71:10
  96:13 115:13

**expressed** 63:21
**extensive** 60:13
**extraordinarily** 61:6
**extremities** 114:3
**extremity** 62:2 68:9,17 99:19 115:3
**eye** 47:9
**eyes** 51:13

**f**

**f** 32:22 40:4
**faapm&r** 1:16 3:3 4:2 120:7 121:7
**face** 51:14,15
**facilities** 7:22
**fact** 43:20 58:6,15 112:18
**faculty** 13:6
**fair** 27:5
**fairgrounds** 112:19
**fairly** 18:11 57:2,3 68:24 74:23
**fairness** 85:16
**falls** 9:20
**familiar** 54:7 71:9 73:22
**families** 7:4 8:7 19:22,23 36:14 73:23 109:1 110:21
**family** 33:4 35:18 49:23 62:16 71:8 80:22 108:7,8 111:11,21,23
**family's** 17:1
**far** 8:3 22:25 27:12 32:2 33:11 49:4,10 65:9 72:8,16 78:19 81:19 93:11 94:24 98:20 101:24 107:5 107:16 109:6

111:14 113:7,9 115:25 117:5
**farley** 32:21,24
**farms** 111:8
**favor** 45:12
**fax** 2:6,11,16
**fear** 85:12
**february** 6:21 38:7 38:10
**federal** 3:12 24:7 32:6,9,13 33:9 65:6
**feel** 52:24 76:16 86:1 87:3 96:13,20 96:24 100:21
**feeling** 92:9
**feels** 89:7
**feet** 107:17 109:15
**fell** 57:23
**fellow** 12:5 16:20 17:11 23:12 32:20 43:21 76:8 87:16
**fellowship** 15:6,19 16:2
**felt** 81:12
**fibrous** 62:7
**fibular** 62:6
**field** 18:5 20:9 32:13 86:9 118:13 119:1,5
**figure** 110:7
**file** 44:16 47:15 75:11 104:3
**filed** 4:13
**files** 25:3
**fill** 39:24 42:12 51:2 52:11 94:1
**filled** 12:7 42:12,13 42:15,18 59:7
**finances** 62:19 116:9

**financially** 95:4 121:14
**find** 89:6
**findings** 48:19 69:2 83:10,11 114:10 115:1,3,3
**fine** 5:3 30:12
**finger's** 117:8
**finished** 12:10 47:25 78:24 113:16
**finney** 2:7,8 22:21 22:24 29:18
**finneyinjurylaw.c...** 2:11
**firm** 2:14 37:15 38:5
**first** 4:4 15:3 19:15 28:11,12,18 64:23 65:2 75:16 84:15 87:12 99:1
**fitch** 40:4 44:14,15 54:3 103:25 104:2 104:9,16,22
**fitch's** 54:1
**five** 6:20 8:11 14:14 24:12 26:14 68:21 94:7,17 99:1 108:7 109:15
**fix** 115:10
**fixed** 21:3 99:1
**flat** 86:18 95:13 101:8
**florida** 1:13,20,21 6:14,25 16:10,25 17:23 120:2,5,6 121:4,22
**focus** 16:24
**focusing** 15:23
**folder** 37:19
**follow** 17:3 21:11 33:21 38:3 40:6,9

40:13 41:4,6 44:8 58:21 61:16 70:22 70:24,24 71:15 82:22 92:11 98:23 104:21 114:22 118:11
**followed** 24:19
**following** 18:14 42:9 50:7 64:1 71:24,25 72:1 114:8
**follows** 4:5
**football** 55:6
**foreman** 11:25
**forest** 2:4
**forgets** 89:1 95:10
**form** 47:19 51:2 52:8,11,19 65:15 82:10,13,16 91:12
**formal** 33:23 36:15
**formalized** 33:22 33:24
**formally** 36:8
**formation** 35:1
**forms** 39:23 42:11 42:18
**forte** 89:17
**forth** 6:22 18:2
**fortunately** 99:21
**forty** 23:21
**forward** 25:6 58:21 84:11 99:24
**forwarded** 117:13
**found** 40:21 53:15 54:17 66:17 84:1
**fountain** 42:15 47:19
**four** 14:5 17:11 28:7 69:13 94:7,17 103:12,15,22 104:18,23 105:1

[fpr - happens]

**fpr**  120:14
**fracture**  21:1,1
   52:17 53:17,18
   67:13,17,20 75:25
**fractured**  53:17
   67:13
**fractures**  61:19,20
   76:19 98:25 99:5,5
   100:4
**frankly**  70:15
**freaking**  58:13
**frequency**  98:1
   102:1,24 103:8
**frequently**  101:25
**friends**  49:23 94:16
   95:12 97:9
**front**  10:1
**frontal**  65:23 67:9
**frustrated**  70:13
**full**  5:4 7:11 33:11
**fully**  108:21
**function**  5:23
**functional**  61:2,7
**fund**  110:8
**funding**  79:2
**further**  21:16
   58:23 70:19 81:17
   92:11 93:6 121:10
**future**  63:15 93:8
   98:12,21 100:13
   102:18 105:5,9
   109:14 117:6

**g**

**gain**  111:10
**gait**  18:12 61:23
   62:3 78:24 99:10
   99:19
**garbage**  89:3
**gathered**  52:21
**gehrig's**  5:14

**general**  15:16 55:9
**generally**  6:22 7:2
   34:24 36:24 48:9
   48:13 76:17 116:24
**georgia**  16:10,20
   16:21
**getting**  18:17 41:17
   41:20 69:15 70:13
   72:24 78:9 86:20
   87:21 89:10 91:18
   94:6,7 95:5 99:8
   104:20 108:13
   112:20
**gg**  120:14
**gig**  91:2
**give**  10:7 13:23
   23:11 29:20 37:1
   41:22 43:22 52:24
   53:11 60:5 63:2,15
   74:19 86:11 89:9
   102:23 106:14
   110:12 112:4
**given**  14:20 36:11
   51:3 72:20 105:8
   109:23 110:1
   116:20 117:22
**gives**  109:18
**giving**  90:16 95:7
**glad**  70:22
**glance**  10:3
**glasgow**  76:1
**glasses**  66:4 103:24
   104:10,21
**gliosis**  66:17
**go**  6:22 12:4,6
   22:10,11 23:12,14
   23:17,20 26:10,13
   30:5 33:7 34:13
   35:18 38:17 45:24
   48:9 50:18 52:7,8
   54:15 60:24 61:11

64:24 68:14,17
   71:14 73:20 79:22
   83:5,7 86:9 87:2,7
   87:12 88:4,8 92:25
   94:20 101:20
   110:19 111:19
   112:6,8,9,14,18
**god**  38:25
**goes**  24:7 28:13,14
   66:16 67:3,10
   68:10 75:11,11
   89:8 92:12 97:20
   101:7 112:19
**going**  8:14 19:11
   21:2,3,14 25:6
   26:24 27:6 29:19
   30:18 31:15 34:4
   41:4,14 43:13,22
   45:8 55:7 57:17,22
   58:4,10 60:7,16,18
   60:24 61:4,7,20,21
   62:1,10,10,23,24
   65:14 69:17 70:5
   70:16 71:1,14
   72:14 74:4,5,16,20
   75:4 76:17 86:8,12
   86:22,23,24 87:3
   87:25 88:2,9 90:14
   90:22 91:4,6 98:19
   99:14,17,23,24
   100:7 106:5,20
   110:3,7,7 112:6,8
   112:20 113:3,5
   115:8,9,10,12,23
   116:8
**good**  4:9,10 50:9
**gotten**  41:12 44:10
   45:1 47:10 50:7,8
   89:10
**grab**  108:12 109:5

**grade**  84:15 114:3
**grandmother**  12:1
**grandparents**
   11:22,23
**graphesthesia**
   68:12
**grass**  97:11 108:1
**gravel**  107:22
**great**  54:19 99:2
   101:6 107:22
**ground**  107:22
**group**  90:23
**groups**  28:3
**guess**  23:16 24:12
   28:7 32:17 37:8
   59:2 81:2 92:5
   102:20
**guidance**  34:7
**guide**  95:16
**guidelines**  18:2
**guy**  18:21 61:21

**h**

**h**  40:4 46:18 59:16
**half**  81:16 113:4
   114:3
**hallways**  109:15,18
**hampshire**  32:15
   32:19 33:1
**hamstrings**  114:4
**hand**  9:24
**handle**  111:8 116:9
**handled**  48:13
**handrails**  109:18
**handwritten**  47:13
**hang**  94:4
**happened**  47:4
   52:14,15 72:8
**happening**  86:24
   88:20 89:6
**happens**  64:9
   115:14

happy  72:7
he'll  13:12 60:20
  61:15,24 105:18
  107:7 114:6
head  9:10,12 15:14
  19:15 51:4,7 56:6
  58:17 64:4 76:16
  79:10 85:13,15,22
  86:2 87:20 88:5,21
heal  66:18
health  36:18,21,24
healthcare  73:4
hear  58:13
hearing  60:21 61:1
  98:5,11
hearing's  50:9
heart  17:12
help  16:23 19:14
  21:13 39:22 54:7
  61:10,11 62:18
  88:1 95:16 100:15
  111:6 116:4
helpful  67:21
  109:20 111:9
helping  19:24
hematoma  66:25
hemisphere  67:1
hemorrhage  66:25
hemorrhages  76:19
hemorrhagic  67:6
  67:9
herbst  59:16,19
high  27:6
highlight  47:25
highlighters  47:24
highlighting  47:22
hinsdale  8:17,18
hip  62:7 98:24
hipaa  42:19
hips  99:9

hired  24:14 115:19
history  39:23 42:11
  47:19 51:2 52:8,10
  52:13,19 66:20
  69:25 84:11 95:21
hitting  69:13
hold  104:16
home  33:5,6,18,20
  97:7 108:4,7,10,15
  108:23,25 109:3,10
  109:16,24 110:6,12
  110:16,23 115:25
homes  12:1 110:20
honest  21:7 25:11
honestly  70:25
hood  2:14 38:5
hoodlaw.com  2:17
hopeful  19:21
hoping  19:18
hospital  7:6,18,19
  7:19,20,21,24 8:17
  8:18 36:25 46:20
  72:21 77:24 106:21
  106:24 113:11
hospitalizations
  106:16
hospitalized  107:1
  107:2
hospitals  7:16 8:15
hour  28:12,12,18
  30:25 31:2 42:6
  57:2 61:9 78:4,7
  88:14 90:21 95:5,8
  96:6
hours  7:14 8:7
  28:11 31:4,5 51:18
  51:20,20,24 57:18
  61:9 86:23 88:12
  91:4 92:24 116:25
  117:1

house  94:19 96:15
  110:8
huge  54:22,24
hundred  105:25
hundreds  26:6,18
  34:11,11
hyper  68:16
hyperreflexia  68:9
  68:14

i

icd  41:22
idea  110:12
ideal  78:5
identified  4:14 25:8
  25:10
illinois  6:3,14 8:4
  8:16,19 12:16,21
  16:9,23 17:23 54:6
  110:18,24
imaging  106:6
immigrants  11:22
impact  5:23 85:15
implemented  93:22
  94:25
important  109:21
improve  20:24 72:7
improved  50:9 72:9
  98:9
improvement  59:9
inaccurate  76:14
  83:19
incident  69:5 79:25
  84:7 90:5,9 98:2
  101:14 105:22
  112:15
include  24:10
included  9:25 46:3
  47:15 100:16
includes  103:23
including  75:18

income  31:16
incompetent  62:12
incomplete  83:19
inconsistent  83:10
  92:18 95:25 98:1
  101:4 103:19
incorporate  52:19
increase  92:24
increased  76:8
incur  31:1
incurred  75:2
independent  18:6
  46:13
independently  18:9
  18:24 19:7 51:21
  71:11
index  3:1
indiana  16:9,18
indicate  77:16,21
indicated  83:21
  92:10 93:8 98:8,9
  105:1 117:15
indicates  90:6
indicating  66:17
  104:10
indication  93:10
individuals  5:12
industry  89:16
inefficiency  99:7
info  2:11
information  32:16
  39:25 40:1,14
  41:13,21 50:8,16
  50:23 51:4 52:15
  52:16,18,22 56:3
  69:22 71:12 74:20
  74:23 81:21 96:3
  104:15 108:4
informed  41:15
infrared  109:19

initial  73:9 83:14
 93:19
initially  72:25
 92:23
initiate  61:13
initiation  94:21
injection  106:1
injections  100:12
 100:14
injuries  5:16,16
 9:19 19:16 55:5,6
 60:10 61:18 64:3,4
 75:18 87:20 98:24
 99:6 100:3 103:11
injury  2:7 5:13 9:4
 9:10,12 15:14 51:4
 51:7 53:16 56:7
 58:17 60:11 64:5
 66:6 69:6 75:19,22
 76:17 77:11 79:10
 81:3,16 84:10
 85:13,15,22 86:2
 88:5,21
inner  67:11
inpatient  7:4 8:9
input  22:12 110:25
insight  89:3 101:7
insist  101:20
instance  23:12
 35:15 74:14 86:8
institute  10:14
instructor  13:7
instrument  86:10
insurance  35:15
 36:18,21,24 37:4
intend  29:9 60:5
 63:2,14 70:19
 108:18
interaction  57:8
interchange  57:19

interest  13:2
interested  52:14
 121:14
interesting  84:13
interface  94:6
intermediate
 100:11
intern  12:16
internal  65:8
internship  10:12
intimately  73:22
intracranial  75:25
 76:9,18
invoice  38:24
involved  9:16 14:3
 14:22 24:18 26:24
 48:16 49:3 55:4,22
 59:21 62:18 66:11
 79:6 97:2 117:11
involvement  22:15
 24:23 29:24 62:6,6
 68:18
involving  14:22
irb  65:7
ireland  11:23
irritable  70:2
issue  25:1 65:2
 75:15 85:14,20
 86:18 98:19 101:8
 103:13
issued  30:1
issues  14:15,22
 21:14,15 58:15,18
 61:1 70:4 81:24
 83:14 85:4 88:21
 90:10 92:19 93:6
 106:4,12,12,24
 109:12 113:9
item  63:10

## j

jacqueline  1:19
 120:4,14 121:3,21
janice  32:24
january  6:21 40:10
 80:6
jeri  44:7 45:3 46:7
 48:24 54:9 59:5
 68:1 80:15
jewish  72:21
job  21:8 22:8 71:15
johnson  1:8 2:14
 3:4,6,10 4:8,12,12
 9:22 24:4 30:15
 45:8,13,18,23
 67:23 77:13,14
 82:15 83:4 91:22
 102:3,5 118:5
 119:11,20
joint  62:2,7 74:22
 99:12,22 100:3,8
 100:12 106:18
joints  99:18,21
journals  20:2,13
 36:6
jr  2:14
judge  32:16
judgment  90:15
july  24:8 41:12
junk  38:19

## k

keep  8:21 17:1 25:3
 43:3 53:12 90:23
 106:2
kellie  1:5 19:4,9
 20:19 39:18 40:8
 41:7,15 42:12
 47:11 51:5 56:18
 57:9 60:19 63:1
 69:22 95:16 98:8

 102:11 115:7
 117:14
kellie's  21:4
kenneth  2:3,3
kenny  45:8 77:8
 118:10
kentucky  10:11
 16:9,25 17:1,2
kept  16:14 41:15
kid  84:16
kids  111:6
kind  8:20 11:13
 18:10,20,21 39:25
 43:23 47:3 59:7
 63:19 94:8 115:11
 117:3
knee  61:22 62:4,8
 78:23 98:24 100:9
 106:18
knees  99:8
knew  51:8
know  4:21,23 5:1
 9:3,8,15,17 10:4
 11:10 14:12 17:10
 17:20 18:1,4,17,21
 18:23 21:15,25
 22:16,18,18,20,20
 22:25 23:1,1,5
 25:10,15 26:2,13
 26:16,19 27:12,18
 28:24 29:23 30:18
 30:20 31:18 32:2,2
 32:4,7,7,17 33:8,11
 34:9,21 35:7 36:12
 39:20 41:22 42:16
 43:1,7,21,23 45:1
 46:16,20 49:4,8
 50:18,19,23 51:6
 53:24,25 54:2,5,9
 54:16 56:5 57:13
 58:2 59:14,16,18

**[know - longer]**

60:15 61:24 62:15
62:15 65:19 68:15
69:20 70:17 71:16
71:19,22,25 72:8
72:12,16,23 74:6
74:21 76:5 77:1
78:8,12,13 79:1
80:10,18,20,22
81:25 82:3,20
83:21 84:9,23,25
85:9,10,24 86:11
86:17 87:20 89:15
89:16,18,21,22,24
90:2,8 91:7,9,14,18
92:12,17 93:13
94:12,13 95:2,24
96:2 97:22,25 98:3
98:9,25 99:15
100:3,23,24 101:13
101:15,16,19,24,25
102:1 103:18
104:25 105:3,6,8
105:10,11,17
107:16,18 109:2,17
110:2,8 111:10,11
112:3,19 113:7,10
114:17 115:10,11
116:10 117:8,17,20
117:21,25
**knowledge** 77:6
78:10 79:12,20
84:22 97:6 98:15
101:22 113:6
117:18
**known** 10:14 54:10
66:15
**knows** 38:25 108:2
**koenig** 1:5 4:13
14:22 18:7 22:16
22:22 23:4 29:1,6
29:18 31:10 35:16

36:17 39:4 41:24
43:18 46:3,5 48:3
49:17,24 50:25
51:13 52:4 55:16
60:1,9 63:15 70:20
71:2,13 77:21
79:19 80:18,24
83:17 84:1,22
93:12,23 95:8
107:6 112:2,16
116:19 117:3,24
**koenig's** 48:17
71:17 74:13 117:11
**koenigs** 28:21
117:14
**komin** 1:19 120:4
120:14 121:3,21

**l**

**l** 32:22
**label** 85:19
**lady** 19:10,17
**lagrange** 8:17,18
**laid** 51:13
**lane** 1:13
**language** 81:11
**large** 1:21
**late** 57:18
**laughed** 55:8
**lauren** 46:18 47:7
**law** 2:3,7,14 11:14
11:17,21 12:6,9,10
12:12 37:15 38:5
**lawsuit** 4:13
**lay** 35:17
**learning** 19:17
81:12 119:18
**leave** 22:9 51:20
87:9 94:20 111:6
**lecture** 13:10 14:7
36:12

**lectures** 13:23,25
14:2,4 36:11,15
**left** 53:17 61:9
66:11,24,25 67:4,9
67:11 95:9 96:19
**leg** 18:18
**legal** 1:12 9:19 13:3
**lenses** 104:14
**lessened** 114:18
**letter** 3:10 30:1,6
38:13 44:13 104:2
104:7,9
**letters** 29:13
**letting** 39:20
**level** 107:20 108:20
109:10,13,20
**levels** 93:2
**license** 17:2 101:14
101:18 111:5,17
**licensed** 16:12
**licenses** 16:5,14
17:5
**lien** 3:13 29:13 30:1
38:4
**life** 32:13 33:14
34:5,9,13,17,24
35:5,8,10,14,22
36:3,6,8 37:11
62:21 88:7 95:15
115:16
**lifetime** 104:19,24
105:4 106:8
**lift** 112:13
**ligamentous** 99:5
**light** 88:21 104:15
**lighting** 109:20
**lights** 86:15 87:19
**liked** 18:22
**likes** 18:10
**limitations** 107:18

**limited** 31:23
**limits** 112:23
**line** 75:1 82:24
**list** 3:12 24:5,7 25:6
25:6 37:21 43:13
110:19
**listed** 16:6 17:16
24:16,22 25:18
32:23
**listings** 111:10,15
**lists** 16:9
**literature** 14:18
20:12 36:2 49:12
49:14 64:8 76:4
**litigation** 9:16
29:17
**little** 21:4 33:23
62:25 63:10 70:2
80:2 89:3 107:11
107:23 109:19
117:9
**live** 61:25 82:3
99:16
**living** 61:5,8
**llc** 2:14
**lobe** 21:1 40:19
65:24 66:11,12
67:9 70:3
**locally** 100:25
**location** 7:8
**long** 6:8 23:9 37:7
51:16,21 56:25
57:3 58:25 64:4
70:18 72:9,13 75:5
86:11 98:19 112:21
114:7 115:23
118:21
**longer** 37:6 51:24
99:16 112:7,18,23
113:1

look   43:4 47:3
  62:22 64:23 66:9
  66:20,21 74:6 76:5
  84:25 85:11 89:6
  93:1 109:21 115:15
looked   46:22 47:2
looking   20:21,22
  21:7 75:16 84:18
  91:23 113:22
  116:15
looks   24:8 38:12
  43:17 50:11 55:17
  56:17 71:6 84:18
  102:13,23
loss   98:11
lost   98:5
lot   5:17 9:6,18
  11:11 14:8 18:14
  19:23 21:15 22:8
  27:21 34:3 56:24
  58:8,19,23 61:12
  67:15,19 69:23
  70:6 71:1 74:5,21
  78:23 87:19 98:17
  99:18 102:20
  107:22 110:5
lots   85:2
lou   5:14
louis   2:10 22:2,4
  40:18 42:20 46:17
  47:7,9 71:15 72:2
  72:24 80:7 111:16
louisville   10:10,11
  11:18 12:3
low   81:10
lower   62:1 68:9,17
  114:2 115:3
lsat   12:8
lyrics   87:19

**m**

maid   12:1
mail   59:9
mailed   45:4
maintained   114:5
major   66:7
making   22:14
  62:14 89:18,19
  95:19 116:16
malleolar   62:5
malpractice   17:9
man   18:10
manage   56:13
  62:11 79:7
management   14:9
  15:16,22
manager   41:21
  81:2
managing   62:13
  103:24
manipulated   62:19
march   6:21 39:21
  40:2,5 44:14 53:15
  104:5,7
mark   30:8,11 45:10
  52:1 73:16
marked   9:21,23
  24:3,5 30:14 37:17
  45:21,25 46:6
  47:16 63:4
markings   47:22
marriage   116:12
married   11:10
materials   37:20
  44:12 46:11,11
  50:3
matter   22:22 27:7
  28:10 36:3 47:14
  66:15,16
maximum   21:12
  69:11

meals   116:5
mean   14:1 18:22
  19:1,2 21:3,6 26:12
  27:15 34:5 48:10
  54:24 56:10 63:6
  64:23 65:2,6 71:14
  72:6 76:21 78:23
  79:5 81:1,9 84:11
  86:7 87:6 90:25
  99:16 110:2 111:19
  116:2 119:18
means   66:13 76:21
measures   84:2
mechanics   99:9
med   12:11 14:12
  64:23 65:2
medical   10:9,13
  14:17 16:25 19:8
  35:12 43:7 46:14
  46:24 47:6,11,23
  49:12,14 55:10
  59:25 62:17 75:1
  77:20 78:19 82:2
  84:6,12,14 103:9
  117:21 118:17,19
  118:23 119:2,7
medically   117:24
medicated   79:19
medicating   58:16
  78:12 79:8,21
medications   56:13
  78:11
medicine   5:8,10 6:6
  10:18,23 11:12
  15:2,7 20:5,10 22:1
  64:13 105:17 106:5
  118:13 119:2,5
meet   7:3 93:24
meeting   2:15 8:7
  19:23 50:24

meloxicam   78:15
meltdown   95:13
member   12:20
  17:16
members   49:24
  111:11
memberships
  17:21
memory   60:23
  68:22 70:4 81:11
  83:12
mental   115:4
mentioned   6:13
  12:5 43:12
merely   76:22
merging   8:20
met   4:11 13:17
methodical   18:12
methodology   63:23
  64:11 87:12 95:6
  103:7 119:13
methods   95:18
  109:8
michigan   16:9,19
  16:19 22:11
middle   20:25 107:1
midline   67:5
mild   76:6,13,16,25
  77:2
mile   113:3,4
mind   97:17
minimal   81:13
minutes   57:2 59:1
  75:7
miracle   20:22
misalignment   99:7
missed   71:3
missouri   2:10
mobility   106:4
moderate   76:6,13
  77:3 81:15

**modification**
  109:25 110:16
**modifications**
  109:2 110:23
  111:15
**modified** 70:7
**modify** 33:20
**moment** 63:13
  113:5
**money** 111:6
**month** 5:24 13:16
  13:16,18,19
**months** 6:19,20
  69:12,14,14 81:16
  83:24
**mood** 79:10 85:16
  115:4
**morning** 4:9,10,19
**morris** 38:3 40:22
  44:7 45:3 46:7
  48:18,25 54:9,10
  54:14,17,20 57:13
  59:5 60:14 65:19
  65:21 68:1 72:1
  80:16 83:6,10
  84:24 85:10
**morris's** 56:15
  58:21 59:6 69:23
**motor** 68:10,18
**move** 18:18 102:6
  112:13
**moved** 11:9 78:16
**movement** 15:13
**moving** 87:23
**mri** 40:17 42:5 50:6
  56:1,15 64:24
  65:22 66:9,22 68:4
  72:22 73:11 95:1
**mris** 46:23 56:8
**multiple** 62:1 75:18
  75:24 100:8

**music** 90:15
**musician** 88:15
**musicians** 42:8
  91:15
**myer** 25:24
**myringotomy**
  84:15

**n**

**n** 5:5 59:12
**naive** 19:10,20 21:4
**name** 4:11 5:4 6:5
  8:21 22:21 54:5
**name's** 54:6
**names** 22:19
**naples** 1:13 6:4,14
  7:9,12,17,18,19
**nch** 7:5,19,21
**near** 10:1
**necessarily** 18:14
  85:10
**necessary** 117:24
**need** 4:22 8:1,14
  21:18 23:13 33:17
  33:17,18,20,20,21
  34:4 35:16,23
  36:14 61:4,7,16
  64:19 70:11 72:12
  76:15 81:17 82:16
  83:21 88:5 93:6
  95:3 96:6,22 97:4
  105:1 108:20 109:9
  109:21 110:9 112:8
  115:7 116:8 118:17
**needed** 33:6 34:1,2
  39:9 53:12 56:2
  82:22
**needing** 76:10
  105:22
**needs** 21:16 23:13
  48:11 58:11 61:10
  61:16 62:12,21

  63:15 95:8,15
  104:17 105:18
  112:5 114:4 118:19
  118:23 119:7
**neuro** 5:17,21
  68:13 103:22
  104:18
**neurologic** 106:11
  109:11
**neurologist** 93:4,12
**neurology** 73:7
**neuromuscular**
  5:13,22
**neuron** 68:11
**neuropsych** 21:11
  38:3 40:25 41:3
  42:6,19,21 45:4
  46:16 50:6 56:8,16
  65:18,20 68:25
  69:16 82:18,21
  83:1,22 95:2,21
**neuropsychologi...**
  3:16 93:7
**neuropsychologist**
  54:11 55:1 80:14
  82:19 92:4,8
**neuropsychs** 55:25
**neuropysch** 115:2
**neurosurgeon**
  93:12
**neurosurgery** 73:7
**never** 72:20 87:22
**new** 32:15,19 33:1
  71:1 73:10 74:9
**nice** 19:17
**night** 12:9,12 91:2
  91:3,7,8
**non** 18:19 25:9
**normal** 40:21 61:24
  68:13 78:2

**normally** 31:4 61:3
**north** 6:20 7:6,21
**northwestern**
  10:12,19 13:6
  14:11 15:14 42:7
  54:15,16,23 55:2
  83:8
**nose** 103:15,19
**notarized** 39:9
**notary** 1:20 38:18
  120:5
**note** 40:22 43:10
  48:12 69:23 85:1
  86:3 98:12 103:15
**note's** 57:4
**noted** 46:22 58:3
  77:25 81:15 84:17
  88:22,24 92:8
**notes** 25:14 41:15
  43:6 47:13,13,21
  53:13 56:15 57:2
  58:10,21 59:6
  63:18 87:11 113:23
  116:15 121:9
**notice** 1:22 3:13
  29:19 30:10 37:14
**noticed** 11:14
**noting** 80:2 82:25
  92:18
**nuclear** 105:17
  106:5
**number** 9:17 26:19
  32:8 55:24 60:9
  97:22 98:12 103:12
**numbers** 35:19
  54:22,25 110:13
**nurses** 34:19

**o**

**o** 59:12
**o'bert** 72:5

**oath** 4:5 120:1
**object** 65:14 82:16
**objection** 82:10,13 91:12
**objects** 68:21
**obligation** 96:12
**observation** 64:22
**observer** 81:23
**obtained** 35:21
**obviously** 9:13,18 16:24,24 19:14 20:19,23 29:17 30:25 56:22 58:2 60:9,11,16,25 61:16 62:3 65:12 66:4,10,19 67:11 68:12,20 71:25 74:17,21 81:10 95:1,22 100:25
**occupation** 80:12 80:15
**october** 1:14 120:8 120:10 121:17
**office** 2:3,5,10,16 7:8 9:25 21:21,22 37:19 38:8 39:5,13 40:1,8,11 48:8 49:8 50:12 51:3 53:15 60:1 116:18
**oh** 30:23 31:18 37:8 38:23 54:10 64:24 89:20 99:1
**okay** 5:2,25 19:19 21:5 38:2 41:3,7 42:22 44:17 46:8,9 48:1 76:23 77:13 88:25 89:1,7 93:1 102:9 117:21 119:20
**older** 108:10

**once** 26:10,11
**ones** 15:18
**ongoing** 113:25 119:7
**online** 20:14
**ophthalmologist** 104:17,18
**ophthalmology** 103:22
**opine** 98:13
**opinion** 82:11 100:2,19 104:16 106:14 112:5 117:22
**opinions** 22:10 31:22 49:11 55:14 60:4 63:2,15,24 81:8 90:16 97:3 98:21 100:16 103:8 105:9 109:9,24 110:1 112:4 113:24
**option** 99:22 100:15
**optometrist** 44:16 66:5 73:12 103:23
**orals** 10:17
**order** 35:13
**ordered** 21:10 78:7 78:8
**organization** 17:20
**organizations** 17:15 18:1
**original** 69:6
**originally** 43:1 66:23 73:2
**orthopedic** 5:18,21 60:10 61:18 69:3 88:21 98:12,16,21 104:25 105:9 106:11,18 109:11 109:13 113:9 115:3

**orthopedically** 87:23 92:20
**orthopedics** 72:18 104:23
**orthotic** 14:9
**orthotics** 13:17
**otolaryngologist** 72:11
**outcome** 72:9
**outline** 34:4
**outlined** 33:5 117:23
**outpatient** 3:14 7:3 7:22 8:8 46:2 106:21
**outpatients** 7:2
**outreach** 94:8
**outside** 42:24 53:19
**owned** 8:19

## p

**p.m.** 1:14 102:4,4 119:23
**pace** 105:15 106:2
**packs** 17:11
**page** 3:2,9 16:8 17:18 42:2 75:16 77:16 84:18 88:22 91:23 92:1,2 98:4 100:16 102:15 106:15
**pages** 10:5 40:16 47:19 52:9,10 57:4 121:7
**paid** 28:21 29:1,3 42:3 89:10,21,22 89:23 91:19
**pain** 15:16,22 78:24
**panic** 85:3,18,25 87:16

**panther** 1:13
**papers** 39:1
**paperwork** 12:7 38:9
**paragraph** 75:17
**parent** 61:5 62:21 62:23 116:10
**parietal** 67:14
**part** 10:16 56:22 67:14 92:24
**particular** 28:10 30:2 35:4 103:3 105:21
**particularly** 60:21 101:10 110:9
**parties** 49:17 121:11,13
**partners** 11:5
**party** 17:8
**pass** 12:17 15:3
**passed** 12:23 117:17,18
**passes** 106:19
**patella** 99:6
**pathway** 68:18
**patient** 8:23 18:7 25:7 26:24 29:23 33:16,19,25 34:7 39:23,25 42:11 51:1 52:10 75:11 81:20,22 92:22
**patient's** 29:25
**patients** 5:15,15 6:3,23 7:3,24 8:7 8:12,13 9:9,11,16 9:18 14:1 16:21 17:2 19:22 37:3,5 39:24 43:3 47:2 54:3,6,21 55:3 64:8 64:14,20 65:7 73:23 74:11,18,22

99:3 103:11 108:25
111:11,25 116:18
116:19 117:2
118:12,18 119:1
**pay** 12:22 29:22
31:11 36:25 62:12
89:17 116:9
**payment** 38:21
39:2
**pays** 89:16
**pediatric** 9:1
**pediatrics** 15:12,22
**peer** 32:1 76:3
**pen** 42:15 47:20
**people** 11:9 22:3,9
22:10 27:21 34:20
35:11,11 38:25
55:7 64:1,4 79:22
82:4 86:11 89:16
89:17,22 93:25
94:3,6 97:12 98:18
98:23 106:4,7
111:19 115:20,20
117:7
**peoria** 54:1
**percent** 8:25 9:11
26:22 27:3 31:19
31:20
**percentage** 9:8,15
9:17 31:16,18
111:3
**perform** 64:17
87:24 88:10,14
90:20
**performances** 87:8
90:13
**performed** 67:24
68:7 78:2 80:6 82:7
83:18 84:1 90:8
**performing** 52:7
89:8 90:4,6 91:4,7

91:19
**performs** 89:8
**period** 24:12 81:17
84:7 97:7
**periodically** 94:15
**permanent** 60:17
**perseverance** 61:14
**perseverating**
69:24 86:20
**perseverative**
60:22
**persist** 83:16
**persistence** 93:9
**persistent** 98:11
**person** 18:19 29:19
34:4 76:22 90:15
116:3
**personal** 111:9,18
**personally** 29:1
48:6 51:13 53:24
53:25 54:2 120:7
**perspective** 88:20
92:21
**pertinent** 14:21
**phone** 8:13 23:14
29:7,11 40:13 41:9
56:25 63:5 77:8
93:17
**photophobia** 87:19
**physiatrist** 20:18
21:20 34:8,16
**physiatrists** 10:21
15:24 17:25 20:7
34:25
**physical** 5:7,10 6:6
7:8 10:18,23 15:2,7
20:5 22:1 52:23
64:13 69:1 79:5
88:20 90:19 91:16
93:14 113:25
114:12 118:13

119:5
**physician** 5:7 6:10
24:18,25 26:4 35:3
38:4 40:4 77:5
103:20
**physician's** 3:13
**physicians** 11:9
22:2 34:25 71:18
78:6
**pick** 105:15
**places** 112:18
**plaintiff** 25:19,22
26:22,24 27:1,10
**plaintiff's** 30:4
**plaintiffs** 1:6 2:2
27:4 54:13
**plan** 30:19 63:19
115:23
**planner** 34:14
35:15
**planners** 34:24
35:11 36:3
**planning** 30:16
32:13 34:5,18 35:5
35:9,22 36:6,9
37:11 115:16
**plans** 33:14 34:10
110:22
**plateau** 61:19
69:13 99:5
**play** 86:10 94:5
**players** 55:6
**playing** 86:13
**pleasant** 18:16 19:3
19:9
**please** 4:23 5:1
**plexus** 9:4
**plus** 31:8 44:20
**pm&r** 17:23
**point** 5:1 13:12
26:9 32:14 66:3

76:20,24 77:17
92:5 94:11 98:18
104:11 106:8
112:15 113:13
114:13,15
**polite** 19:2
**population** 8:24
**portal** 31:2,2
**posed** 84:24
**positive** 68:15
**possibility** 100:10
**possible** 19:13
44:25 48:10
**post** 81:16 85:19
**potentially** 61:17
**practical** 112:14
**practice** 5:18 6:3,5
6:11,14,17 8:3,4
9:9 11:2,9 12:13,22
16:15,16 31:3 37:4
63:25 64:2,13
98:25 99:4
**practiced** 10:17
16:17
**practicing** 119:5
**practitioner** 11:13
**practitioners** 11:12
**predictable** 88:6,8
**premier** 1:12
**preparation** 25:13
**preparing** 28:16
**prescribe** 35:12
**prescription** 35:24
**prescriptions** 42:4
52:25 53:3 104:20
**present** 82:4
**presentations**
14:21
**presented** 32:15
**pressure** 67:18,22
76:9

**pretty** 12:23 25:16 44:18 53:2 63:8,11 65:25 69:13,16,17 74:24 76:7 107:21 108:10,21
**prevented** 3:15
**previous** 24:11 91:24 92:6 102:21
**previously** 11:7 16:12
**primarily** 5:11
**primary** 16:24 58:9
**principle** 64:11
**principles** 63:23 95:6
**prior** 22:15,22 27:2 37:13 44:20 50:12 50:24 73:9 79:25 84:12,13
**prism** 66:4 103:24 104:21
**private** 36:25 37:4
**probably** 6:18,19 7:13 8:6,8,25 9:11 23:10 25:21 27:20 31:19 33:22 37:8 51:19,24 54:11 57:1 58:16 59:1 62:1 67:16 70:25 75:7 81:23 82:11 85:22 88:15 99:23 104:19 107:17 110:3,17
**probate** 110:22
**problem** 23:17 58:3 79:22 101:9 105:14 114:1
**problematic** 91:6 95:15
**problems** 18:14 19:11 20:20 60:23

**procedure** 68:22 69:23 83:13 83:15 85:2,6 87:22 93:2 99:18 101:7 106:18,19 114:6
**procedure** 98:7
**procedures** 65:6 98:13,22 109:13
**process** 4:22 9:19 50:10 52:6 73:20 74:1 81:11
**prodded** 94:23
**profession** 5:6
**professional** 1:19 1:20 17:15 20:1 36:5 111:3 120:4,5 121:4,4,21,22
**profusion** 106:5
**program** 16:17 42:8
**programs** 15:7,11 34:18
**progressive** 5:13
**projections** 74:25 102:24,24 103:4
**property** 111:6
**proposed** 86:1
**prosthetics** 13:17
**protocols** 64:21
**provide** 52:16 74:16,22 97:7 117:16
**provided** 24:20 36:2 38:20 50:4 71:12 96:4 117:10
**provider** 84:21 96:10 116:1 117:22
**providers** 46:14 48:16 53:23,24 59:25 76:12 82:2 96:1,5 98:16 101:3 101:17 105:1

**providing** 66:5 95:22
**psychiatrists** 79:13
**psychiatry** 61:17 79:7
**psychologist** 72:2 78:22 79:6,17 93:25
**psychologists** 79:13
**psychology** 61:17 79:7
**ptsd** 84:19,22 85:4 86:1 87:17
**public** 1:21 120:6
**publications** 20:8
**published** 14:17
**publisher** 13:21
**pugh** 25:22,24
**purpose** 11:20 112:24
**purposes** 49:11 55:13 77:12 81:7 100:2 103:3 111:9
**pursuant** 1:22
**put** 35:19 42:14 65:14 85:17 109:5 109:18

**q**

**quads** 114:4
**qualified** 32:5,8,12
**quality** 88:16
**question** 14:16 20:19 35:25 65:9 65:15 75:12 77:25 84:24 85:16,25 111:13 113:5
**questions** 5:1 23:15 53:1 58:23 70:25 118:6,11 119:9

**quick** 45:17 65:13 77:7 82:9 85:11 102:2
**quite** 6:22 19:3 97:18
**quote** 97:24

**r**

**r** 32:22 46:18 59:16
**radiologist** 59:18 59:19
**range** 69:15
**rapid** 19:16
**rarity** 26:20
**rate** 88:16 106:3
**reach** 69:11
**reaches** 21:12
**reaching** 63:24 64:17 65:10 67:25
**read** 25:14 63:20
**reading** 64:8 119:18,24
**real** 65:13 77:7 82:9 110:19,20 111:2,17 115:9
**really** 18:16 20:21 58:7 59:8 60:7 61:4 61:6,7,12 62:20 70:11,17 75:14 78:17 86:12 90:7 90:23 95:9 96:17 96:20 100:25 101:11,19 105:15 106:10 109:21 115:19,22
**reason** 53:12 77:8 97:16,23
**reassess** 83:24 115:2,4
**recall** 18:9,15,25 19:5,7 27:16 32:10 33:2 51:21 68:22

**[recall - required]**

78:1 88:23
**recapping** 58:19
**received** 9:25 37:14
　37:18 44:12,24
**receiving** 78:20
　114:12
**recess** 45:20 102:4
**recheck** 3:15 55:18
　55:23 102:7
**rechecks** 116:22
**recollection** 18:6
　46:13 72:3
**recommend** 20:20
　53:2 112:21 114:8
**recommendation**
　95:7,19,24 96:10
**recommendations**
　34:6 41:24 42:1
　52:25 70:8 71:6,16
　71:17 93:22 94:25
　98:4 101:17 102:17
　117:5,23
**recommended**
　33:13 54:15 63:18
　83:1 92:23 103:20
　105:4
**recommending**
　110:23 116:1
**reconstruction**
　20:25 58:7 106:22
　107:1
**record** 4:11 29:12
　30:9 35:14 43:11
　44:22 45:17,24
　47:2 65:14 77:12
　91:11 121:8
**recorded** 51:25
**records** 18:25 19:1
　19:8 25:3,15 28:23
　37:18,24 38:6,7,10
　38:14,16,22 39:2,3

39:8,16,16 40:3
43:1,2,7,12 44:19
44:19 45:6,10
46:14,19,19,22,25
47:3,5,9,12,23 49:9
50:11 51:25 52:12
52:17,22 53:5,11
55:11,18 59:4 63:4
63:7,9,11 65:22
71:20 72:4,15,17
72:20,24 73:1,1,3,6
73:10,14,16 75:23
77:20 80:5 83:9,25
84:6,10,14 96:9
**recovery** 81:15,17
**redid** 57:18
**redirect** 3:6 119:10
**redo** 72:12 110:5
**reduction** 114:4
**reevaluation** 93:7
**refer** 19:1 54:13
　68:4 92:4
**reference** 76:21,25
**referenced** 43:9
　47:10
**references** 84:19
**referred** 29:12
　67:25 118:1
**referring** 29:14
　32:18 79:3 92:5
　102:14 114:10
**reflex** 68:16
**reflexes** 68:8,16
**regard** 58:15
　110:14 114:8,9
**regarding** 37:11
　80:24 98:5,21
　102:18 103:8 119:6
　119:13
**registered** 1:19
　120:4 121:3,21

**regrading** 36:6
**regular** 88:7
**rehab** 7:7 10:20,23
　16:17 22:1,3 34:20
　35:11 42:8 55:9
　71:24
**rehabilitation** 5:8
　5:10 6:6 10:14,18
　15:2,8 20:6,10
　64:14 91:25 118:13
　119:2,6
**reinforces** 70:10
**related** 38:9 42:23
　46:5 47:14 62:15
　85:13,13,15,21,22
　100:17 105:21
　109:9,24 113:25
**relates** 105:22
**relating** 39:1
**relationship** 116:11
**relative** 121:10,12
**relatively** 18:19
　68:13
**relevant** 69:25
**relied** 95:19
**relocate** 108:20
**rely** 35:2 95:7
**relying** 49:14 75:21
　81:7,20 98:20
　100:1 109:8 119:15
**remainder** 9:2
**remember** 18:20
　18:22 68:20 87:17
　108:6
**remembering**
　86:14 87:18
**remind** 61:11 94:18
**reminded** 94:23
**renewed** 101:13
**rent** 108:8

**reordered** 21:11
**repeat** 40:17 50:6
　56:1 69:15 83:1,21
　93:10
**repeated** 77:23
　95:2
**rephrase** 5:2 65:9
**replaced** 99:8,9
**replacement** 61:22
　99:22
**replacements** 62:2
　74:22 100:8
**report** 53:9 59:5
　65:24 73:19 75:6,9
　77:15 81:5,7 84:3,5
　84:19 86:3 92:14
　108:9 117:3 121:6
**reported** 77:16
　81:25 82:1 101:2,4
　104:11 107:24
**reporter** 1:20,20
　120:5,5 121:1,4,5
　121:21,22
**reports** 25:14
　41:17 54:1 59:22
　60:15 81:19 89:12
　117:23 118:3
**represent** 4:12
　111:19,20,20
**represented** 111:22
**reprimands** 17:7
**request** 44:19,19
　49:10
**requested** 50:2,3
**requests** 38:19 39:1
　39:16 44:22
**require** 88:13
　98:13 106:7,23
**required** 12:8
　112:16

**research** 35:19
55:13 74:3,8,9
103:3 111:14
**reserved** 28:13
**reside** 108:5
**residence** 108:20
**residency** 10:12
11:1 23:22 33:15
**resident** 23:10
**residents** 13:11
23:17 36:10
**resolved** 114:18
**resorbed** 66:14
**responded** 43:15
**response** 9:24
37:18
**responses** 18:13
**responsibilities**
13:5,19 14:11
**responsible** 29:23
29:25 31:12,14,15
96:18
**responsive** 76:22
**responsiveness**
76:9
**rest** 62:21
**result** 100:5
**results** 53:4 99:11
**retained** 23:6,25
24:14,17 25:9,19
26:4 27:25 31:17
**return** 92:9,16,23
**returned** 27:22,23
100:23
**review** 26:21 32:1
44:12 49:12 50:11
52:12 53:5,10
64:20,22 65:8 76:4
83:9,25 115:1
**reviewed** 27:7 36:2
42:13,23 43:8

46:12,14 47:5,23
49:16,20 52:22
55:10 59:3 71:20
72:4,15,17 73:3,6
73:13,16 77:20
81:5 82:19 84:6
90:12
**reviewing** 23:25
65:8
**revisions** 75:9
**ride** 39:13,19 43:22
57:23 70:21 97:19
**rigging** 88:1
**right** 7:6 9:3 23:7
29:3 31:7 41:2 45:4
46:17 47:8 49:1
53:17 66:11 67:5
69:12 71:8 84:14
99:14,15 100:15
104:6 118:5,14
119:17
**road** 70:12 86:9,23
91:3 94:6 115:18
**robert** 1:16 3:3 4:2
5:5 120:6 121:6
**role** 20:16 62:24
**room** 52:3
**roughly** 74:16
99:16
**roundtable** 36:13
**routine** 74:23,24
105:20
**routinely** 74:10,12
95:3
**rpr** 120:14
**run** 69:6,9 85:5
106:2 110:10
**rv** 112:11
**ryan** 1:5 4:13 10:15
18:7 19:14 20:18
21:8,8 22:16 29:18

29:18 39:4 42:15
46:2 47:11 55:2
56:21 57:5,8,22
58:11 59:4 60:19
75:17 86:4 96:24
104:10 115:7
**ryan's** 77:10 119:2
119:7

**s**

**s** 38:19 46:18 59:16
**safe** 61:12 62:13
95:9 96:13,19,20
100:21 116:6
**sandwich** 89:9
**saved** 67:17
**saw** 20:18 25:7
26:15 27:21 28:24
50:17 55:18 57:13
59:7 72:25 73:2
84:10,13 93:12,15
**saying** 55:8 78:15
92:13 101:6 113:20
**says** 86:22 88:25
**scale** 76:1
**scan** 45:15,16
64:24 66:24
**scans** 65:1
**schedule** 57:19
88:4
**scheduled** 6:23
21:22 39:6 114:24
**schedules** 86:10
**scheduling** 40:6,7
41:11
**school** 10:10,13
11:14,17,21 12:4,6
12:9,10,11,12
14:12 16:25 34:13
47:25 65:2 113:18
**schools** 35:7

**schwarz** 46:17,18
47:7 65:19,20 68:1
80:7,10,19 82:7
83:5,11,19 92:6
**schwarz's** 80:24
83:25
**scooter** 112:6,8,10
112:12,16,21 113:6
113:13
**scope** 8:4
**scratch** 110:8
**second** 75:16
**secondary** 86:2
**secretary** 29:16
30:13
**secure** 112:10
**see** 6:3 7:2 9:3
16:21 19:14 21:19
22:6,7,7 24:25
28:23 29:8 37:3,19
38:2 41:3 44:23,24
45:18 47:4 48:7
49:10 50:19 51:9
53:19 57:15,20
60:1,19 70:22 75:1
76:18,18,19 78:14
79:9 80:19 82:23
86:24 87:2 88:13
88:20 90:18,24
91:17 92:12,12
93:3 99:4,7,14
100:7 104:17 105:1
108:25 109:23
111:1 114:23
116:18,20,21
**seeing** 7:24 64:9
72:1 73:18 79:6
94:10,13 98:15
101:5 107:25
**seen** 43:2,17 53:25
55:3 57:23 60:15

69:18 73:1,9,10
74:21 75:22 79:12
96:9 103:11 118:16
118:21
**seizure** 77:18
106:20
**seizures** 56:9,12,13
66:3 77:21
**self** 6:2 58:16 78:12
79:8,21
**seller** 111:23
**sellers** 111:20
**seminars** 14:20
**send** 25:15 48:6
**sending** 38:7 39:8
**sense** 67:20
**sensible** 109:12
**sent** 23:17 37:24
38:11,17 39:10,17
39:23,24 40:11,11
40:23,25 41:23,25
44:18,20 48:20
50:5 51:1
**september** 39:7,8
39:12,15 43:18
46:4 57:22 114:24
**sequella** 19:16
72:14 99:4
**serves** 103:7
**services** 27:25
74:21
**serving** 94:8
**set** 10:19,20 16:17
18:2 40:9 41:5,9
49:9
**sets** 19:21
**setting** 41:6
**seven** 6:19 56:11
76:1
**seventies** 61:25

**severe** 75:18,22
76:2,7,11,21 77:3
**share** 117:15
**shared** 54:3,20
**sharon** 39:17,22,24
41:8 48:7,9 51:6
**she'd** 48:10
**she'll** 59:9 94:18
**shearing** 66:16
**sheet** 50:15
**shift** 67:4,5
**shifting** 18:13
**shifts** 61:23 62:8
99:19
**shirley** 10:15 55:2
**shoot** 45:16
**shopping** 61:11
94:21 95:11 116:4
**short** 118:11,16,17
**shortage** 10:21
**shorter** 117:9
**showed** 40:18 66:9
66:24 81:10
**shower** 94:18
108:11
**showers** 116:5
**showing** 56:9 65:22
66:2 68:25 98:10
**shows** 68:22
**side** 61:22,24
**sided** 61:2
**sign** 38:18
**signature** 42:17
120:13 121:19
**signed** 120:10
**significant** 56:6
64:25,25
**signing** 119:24
**simple** 36:13
**simply** 111:9

**situation** 78:9 79:1
94:9 99:13 117:7
**six** 11:8 14:14 28:7
94:7
**skull** 53:17 67:13
75:25 76:20
**sleep** 93:3
**slow** 18:11,13
**smoked** 17:11
**smooth** 107:20
**snapshot** 10:7
**social** 79:16
**societies** 17:23
**sold** 111:8
**solely** 111:18
**solo** 11:12,13
**solutions** 1:12
**solve** 101:9
**somebody** 5:24
14:16 22:7 24:25
29:21 50:15 61:5,8
61:10 62:11,18,21
77:2 80:21,21
86:22 88:5,18
91:20 95:3,16
101:10 115:19
**somebody's** 8:12
**somewhat** 19:10
88:24
**songs** 88:23
**sorry** 92:1
**sort** 9:10 38:19
75:20
**sorts** 81:24
**sounds** 63:13
**sources** 47:12
**south** 1:1 2:5,9,15
16:18 27:8,11,14
27:16 30:17 46:19
46:24 47:6 82:15

**speak** 105:11
**specialist** 40:4
42:10
**specialities** 15:25
**specialize** 5:7
**specific** 34:17 66:3
68:12 110:13
**specifically** 59:17
90:2,11 97:13
102:14 104:22
**specifics** 97:12
**speed** 81:11
**spend** 7:24 8:6 74:5
99:3 110:3
**spending** 103:12
**spent** 28:15
**spinal** 5:12,16
15:14
**split** 6:16
**spoken** 28:2 49:2,6
49:23 53:22
**spouse** 61:5 62:23
116:10
**spouses** 19:22
**st** 2:10 22:2,3 40:18
42:20 46:16 47:7,9
71:14 72:2,24 80:7
111:16
**stability** 109:19
**stable** 107:12,13
108:12
**stack** 10:2 37:17
46:3
**staff** 41:5 55:1
**stage** 87:21
**stairs** 108:1
**stand** 87:24 88:10
**standard** 78:5
108:10
**standards** 18:2

standing  87:23
start  34:21 69:13
  93:24 94:22 99:20
started  12:9 15:13
  15:23,25 20:23
  34:19 94:10
starting  16:1 17:18
starts  58:13 86:19
state  1:21 17:4 22:6
  75:17 101:12 120:2
  120:6
stated  92:17 103:21
  106:25
statement  92:14
states  1:1 12:14
  13:1 16:13,14,16
  27:18,20 32:25
  84:3,3 110:25
status  90:19 101:11
  106:6 115:4
stem  100:14
stenographic  121:9
stenographically
  121:6
steps  108:7,9
sticks  97:17
stiffness  18:17
stimulation  86:15
stock  94:19
stool  87:25
store  116:6
straightforward
  65:25 108:22
street  2:15
strength  114:3
stress  85:20 87:21
  105:12,23,24,25
stresses  86:19
  95:15
stressful  90:21

stroke  14:9
strokes  5:12 9:13
structured  88:6,8
stuck  57:16
student  64:23
studies  64:22 118:1
study  68:5 78:3,7
  93:3 105:17 106:6
  106:7,13
stuff  37:23
subarachnoid
  66:25 76:19
subcortical  66:15
subdural  66:24
subjective  91:20
subjects  69:24
submit  37:1
submitted  31:25
submitting  41:23
subpoena  9:24
  37:14 38:6 43:16
subpoenas  37:24
subscribe  20:1 36:5
subsequent  29:5
  43:15 53:8 63:5
  66:22 93:17
subspecialization
  16:1
subspecialize  15:9
subspecialty  15:6
  15:11,19 16:3
sued  17:10
suggest  92:15,22
suggested  42:7
  70:21,23 83:7
  115:15
suit  17:9,13
suite  2:4,9
suites  1:12
summarizing  63:20

summation  63:12
summers  12:9 73:3
sunglasses  104:20
super  37:1 39:11
supervised  70:11
supervision  58:12
support  58:11
  62:22 76:11 106:24
supportive  19:12
supposed  25:3 30:9
sure  8:12 12:7
  34:11 44:18 45:11
  60:7 72:9 76:20
  90:22 98:3 109:1
  114:1 116:4,5,5,6
  116:16 118:7
  119:19
surface  107:20,21
surgeries  105:9
surgery  40:23
  41:14 50:9 60:25
  72:6,13 106:21,23
  107:2
surgical  98:6
surprise  91:10
suspect  25:22 57:1
  57:3
sustain  97:1
sustained  60:9
  75:18
sweet  19:10
swelling  67:1,3
sworn  4:4 120:8
symptomatology
  106:16
symptoms  93:9
  104:12 114:17

| t |
| --- |

t  40:4 59:12,16
  79:15

tack  61:2
take  4:18,22 5:19
  45:9 51:17 52:11
  56:25 75:5 84:25
  85:11 89:2 94:18
  97:10 102:2
taken  1:18 12:25
  17:4 37:10 45:20
  84:11 102:4
talk  13:10 19:23
  33:12 41:9,11
  43:19 48:11 50:1
  52:12 56:2 76:15
  77:3 88:25 89:5
  92:19 104:21
  109:14 115:5
talked  42:3 43:17
  44:9 46:21 48:11
  52:22 56:4,14,17
  56:19 57:1 58:6,15
  58:17 63:17 64:5
  73:11 78:16 84:4
  85:18,24 86:16
  87:10 93:1,16
  94:16 95:14 99:24
  112:17
talking  66:18 89:11
  115:6
talks  85:11 94:17
tamiami  7:10
taub  79:14
taught  36:8
tbi  81:15
teaching  13:4,14,19
  13:25
tear  99:11
tears  99:5
telephone  48:15
telephonic  2:4,8
tell  18:9 19:7 25:12
  29:14 32:18 47:1

48:10,19 55:22
60:4,8 63:22 71:1
74:12 81:4,20
83:17 86:7 88:18
96:19,23,23 103:21
109:7 114:19
117:20
**telling** 63:7 74:15
**tells** 32:9
**temporal** 21:1,1
40:19 65:23 66:11
66:12 67:6,14 70:3
**ten** 8:11 26:14 31:4
31:5 33:24 34:20
37:8
**tend** 116:22
**term** 70:18 72:9,13
86:11 98:19 114:7
115:23 118:16,17
118:21
**terms** 19:10 20:24
71:24 73:20,23
74:15 98:10 100:8
105:5 107:25
110:18
**test** 105:12,23,24
106:1
**testified** 4:5 26:3
26:17 27:13,19
32:8,11 69:10
**testify** 33:7 63:14
**testimony** 3:12
18:3 24:7,11 26:8
27:2 31:22,25 33:3
49:20,21
**testing** 21:11 41:13
41:16 42:6,9 53:3
56:5 64:16 65:10
65:18,20 67:24
68:1,6,25 82:18
83:2,18,22 92:11

95:2,21
**tests** 21:10 33:22
40:14 41:7,10
55:25 65:17 66:7
74:17 115:1
**thank** 42:22 92:3
118:6 119:21
**therapy** 17:12
72:24 78:24 79:1,3
79:5 93:14 113:17
113:25 114:12
**thing** 9:14 39:15
44:13 55:7,18 60:8
60:15 63:10,22
67:16 74:19 79:9
91:5
**things** 6:24 7:14
9:5 12:1 19:2 20:24
21:2,17 25:15
26:23 31:21 33:6
35:13 43:5 51:7
52:18 53:18 56:14
58:7 60:20 61:15
62:9,16 85:24
87:17 88:11 94:5
94:20,22,22,23
95:11 97:11 99:20
102:25 106:22
108:14 110:9 111:7
113:16 115:5 116:4
116:7,10
**think** 6:9 8:19 10:1
11:8 12:8 14:5,8,14
14:21 19:9,20
20:21 22:18 24:1
25:21,22,23,24
26:11,25,25 27:2,5
28:23 29:3,17
32:14,16,20,21,25
33:8,22 34:19
35:10 36:15 37:23

38:5,10,14,22 39:7
40:6,24 41:7,14
42:1,15 43:12,25
44:9,13 45:5 46:21
47:15 49:9 50:5
51:4,5 52:9 56:19
56:19 59:18 62:25
63:17,19 65:19
66:7 70:15 72:22
72:22 76:15 79:14
80:14,20 83:20
84:9,12,13 85:11
86:4 87:7,25 88:9
89:9 91:5 93:17,17
94:14 95:9 97:16
100:7 101:6 103:2
104:5,6 108:19
109:4,6 110:2
112:24 113:14,15
115:7,8,22
**thinking** 21:4
22:13 97:23
**thinks** 89:1,7
**thoroughly** 21:9
**thought** 77:17
81:14 93:3
**thoughts** 105:5
**three** 8:1 14:5 24:1
37:24 44:22 51:19
51:20 68:20 91:4
103:12 116:21
117:1
**throat** 103:15,19
**tibia** 53:17 61:19
**time** 4:23 5:1 6:12
6:16 7:11,23 10:13
13:7 14:2 19:15
21:11 28:5,15
29:11 30:22 31:3
50:12 51:12,14
52:1,2 54:1,1 56:10

56:13 57:12 62:10
64:1,15 66:4 74:5
77:17 81:12 84:7
84:10 88:11 92:5
92:24 95:17 97:7
98:18 99:3,17,20
99:23 100:5 103:16
104:12 109:17
111:3,22 113:10,13
114:13,15,20
**times** 26:3,14,17,18
32:8 87:1,6 90:8
94:17 100:9 103:12
103:22 104:18,23
105:1 107:7
**tire** 86:18 95:13
101:8
**tires** 112:7,20
**tobin** 73:17
**today** 6:15 25:5,13
28:6 42:25
**told** 51:6,18 53:16
63:6,8 71:8 73:18
82:4 87:17 96:1,2,5
96:16,22 97:3
103:2 119:15
**tolerated** 92:25
**top** 45:6
**topic** 14:7 91:24
**topics** 86:20
**totality** 88:12 89:7
**tour** 87:7,9 97:15
97:19,20
**touring** 98:1
**town** 22:9 91:5
**track** 11:25 25:1
26:19
**traffic** 3:15 57:16
58:14
**trail** 7:10

**trained** 15:21
**training** 15:20 16:2
  110:15
**transaction** 111:7
**transcribe** 59:23
**transcribed** 75:10
**transcript** 121:7
**transcriptionist**
  59:23 75:13
**transplants** 100:14
**transportation**
  83:13
**trauma** 9:10,12,14
  62:4 118:18,22
**traumas** 5:22
**traumatic** 5:16
  53:16 55:5 60:11
  64:5 75:19,22
  85:19 98:24 100:3
**travel** 22:5 31:3,8
  70:14 86:9,24
**traveling** 58:9 91:3
**treadmill** 105:16
  105:20 106:10,11
**treated** 23:18 26:15
**treating** 20:18
  24:15,18,24 26:4
  48:16 53:23,24
  64:3 66:5 71:18,23
  76:12 78:6 84:21
  96:1,5 101:16
  117:11,15 118:12
  119:1
**treatment** 5:12
  21:17 22:15 49:3
  73:21 78:20 102:18
  103:9 117:12
**treatments** 100:12
**trial** 24:11 26:8,17
  27:13 30:16,21
  33:10,12 60:6 63:3

63:14
**tried** 86:25 87:5
**tries** 94:19
**trigger** 85:24
**triggering** 85:25
**triggers** 85:23
**trisha** 59:11
**trouble** 86:14,17,20
  87:18 115:15
**true** 121:8
**trunk** 112:13
**trust** 110:21
**try** 6:20 21:9,13
  42:7 43:10 103:13
**trying** 19:13,18
  57:12,14 70:12
  80:21 86:16 87:7
  93:24,25 94:9
  97:18 108:6 112:12
**tubes** 84:15
**tuition** 12:5
**turn** 19:19
**twenty** 69:13
**twice** 26:10 65:21
**two** 2:4 8:1 10:16
  21:12 24:1 28:11
  29:7 31:19 51:18
  51:24 69:11 80:1
  100:6,9 116:21,25
**tying** 66:22
**type** 9:12,14 52:17
  55:7 61:18 105:24
  106:12,19,23
  115:16,25
**types** 5:22 6:24
  46:25 53:18 61:15
  62:9 64:3 82:24
  83:15 94:23 100:4
  103:10 106:22,24
  108:14 116:9

**typical** 7:1,23 8:5
**typing** 59:24

**u**

**u** 59:12 79:15
**ultimately** 29:25
  31:12
**umbrella** 7:20
**unable** 100:20
**uncommon** 22:12
  100:4
**undergraduate**
  10:9
**underlying** 69:5
**understand** 4:18
  4:24,25 19:18,24
  21:13 25:8 36:17
  62:19,25 65:5
  70:16 75:14 90:4
  98:6 105:18
**understanding**
  4:14,16 21:23
  31:23 64:9 69:4
  78:21 79:24 86:25
  89:14,25 93:11,21
  97:9,14 107:5
  112:1
**understood** 39:19
  70:17
**unexpected** 70:1
**unfortunately**
  75:17 85:6
**unit** 7:7
**united** 1:1 32:25
**units** 10:20
**university** 10:10,13
  11:18 12:4 42:20
  46:24 47:6,7 80:7
**unlevel** 107:10,22
  108:2
**unlicensed** 35:6

**unresponsive** 76:23
**unusual** 9:20 83:3
  86:19
**updated** 38:15 56:3
**upper** 68:10
**ups** 104:21
**upwards** 64:2
**use** 52:20 79:25
  107:7,9,9 111:18
  112:22,23
**uses** 112:12
**usually** 35:11 43:11
  47:18 51:20 53:11
  53:13 69:12 83:23

**v**

**vacations** 12:15
**van** 112:9,9,11,14
  112:25
**various** 3:11 64:20
  73:21
**vehicles** 112:4
**ventilator** 76:11
**ventricle** 67:2
**verify** 71:12
**veritext** 1:12
**verse** 86:14
**versus** 89:19 90:1
**vestibular** 42:9
**videos** 90:12
**view** 20:16 24:22
**visit** 40:12 43:20
  57:12 70:14,24
  108:15,23
**visits** 82:5 103:13
**voc** 35:11
**vocational** 34:20
  90:10
**volunteer** 115:20
  115:20
**volunteering**
  115:21

**vs**  1:7 25:24

**w**

**w**  5:5 38:25 46:18
  89:22
**wages**  89:10,13
**waived**  119:25
**walk**  50:10 52:6
  106:2 107:8,12
  113:3
**walked**  23:1
**walker**  107:8
  113:15
**walking**  61:24
  87:23 105:14
  107:10 108:1
**walks**  107:7
**want**  11:11 12:19
  30:5 35:19 38:23
  43:3 79:8 101:10
  102:6 108:19
  111:11 114:1
  115:15
**wanted**  33:5 38:25
  50:6 56:2
**wanting**  40:9
**wants**  13:11 101:19
  112:18
**wasting**  65:1
**way**  30:12 45:14,15
  60:18 69:25 70:16
  82:23 88:8 96:2
  114:18
**ways**  19:18
**we've**  9:23 24:5
  37:17 46:6 63:4
  73:11 74:21 115:6
**weakness**  114:2
**wear**  99:11,21
**wearing**  18:22
**wednesday**  1:14

**week**  7:14,23,25
  8:1,1,10 12:15
  88:12
**weekly**  114:5
**weeks**  28:7 44:9
  90:5
**weight**  18:12 62:8
  99:19
**went**  11:14 12:5,11
  16:25 29:12 74:1
  77:24 83:6 87:7
  90:6
**wheelchair**  113:8
  113:13,14,16,18
**white**  66:15,16
**who've**  64:2
**widened**  109:14
**wife**  32:24 43:21
  81:22,23 87:1,8
  89:5 93:25 96:13
  101:5 108:5
**wife's**  80:2 95:11
  116:8
**window**  56:12
**wisconsin**  16:10,22
**witness**  3:2 4:3,6
  4:14 18:3 23:7,25
  24:17 31:17 32:6
  60:5 65:17 82:18
  91:14 118:7
**witnesses**  82:12
**word**  65:3
**work**  6:2,22 7:11
  7:14 9:19 10:9 13:9
  23:6 25:4 27:3 28:9
  31:17 86:22 88:7,7
  92:9,16,23,25 94:1
  95:5 115:8
**worked**  11:2 12:1
  22:16,23 33:4
  110:21

**worker**  34:3
**workers**  25:1
**working**  31:4 78:22
  79:14 81:2,11 87:2
**workload**  89:25
**workweek**  7:1 8:5
**world**  26:20
**worried**  115:17
**worry**  99:2
**worse**  67:19
**wow**  64:24
**write**  35:1,23
**writing**  42:14,15
**written**  34:1 41:18
**wrong**  21:7 27:16
**wrote**  12:22 41:19
  47:18

**y**

**y**  32:22 59:12
**yeah**  10:5 18:4 27:5
  29:18 30:8 38:11
  45:13 49:25 54:18
  66:7
**year**  6:18 9:5 24:12
  26:10,11,14 56:11
  64:23 65:2 83:23
  98:7 103:16,22
  104:5,18,23 105:2
**years**  13:8 14:6,14
  21:12 23:21,22,23
  26:7,13 27:21
  33:24 34:12,20
  37:9 54:11,12,22
  60:17 63:25 64:2,4
  64:7,10 69:11
  98:23 99:1,8,16,17
  100:7 105:18
  110:17,20 113:19
  118:14,25 119:4,16
**young**  19:10 61:21
  84:16

**z**

**z**  46:18

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under
rule 1.330(d)(4).




DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.