# PHYSICAL MEDICINE AND REHABILITATION ASSOCIATES

PHYSICAL MEDICINE  
& REHABILITATION  
ELECTROMYOGRAPHY

PHONE (630) 556-9900  
FACSIMILE (888) 328-2601

OFFICE ADDRESS:  
BLUFF CREEK  
45W699 JETER ROAD  
BIG ROCK, ILLINOIS 60511

ROBERT E. EILERS, M.D., FAAPM&R  
email: contact@pmrassociates.org

## CONFERENCE / RECHECK

RE: KOENIG, RYAN

DATE: August 14, 2018

HISTORY: I had the opportunity to talk with Kellie Everett by call at the end of the day today, as they have difficulty with Ryan traveling in the car due to his PTSD. We have now received his neuropsychological testing done by Dr. Morris at Northwestern, as well as his MRI report, which was completed in St. Louis, and reviewing his history.

Since the time I last saw Ryan, which was on April 2, 2018, he was able to complete his neuropsychological testing on May 1, 2018, and he did complete his MRI study, which demonstrated clear deficits.

I had the opportunity to review the MRI, which was done on April 10, 2018. His MRI was actually quite revealing. It demonstrated him to have bilateral, left greater than right, temporal lobe cortical encephalomalacia, with cortical and subcortical white matter signal abnormality visible on the FLAIR image and showing gliosis in the injury bed. These are consistent with traumatic brain injury with contusion with encephalomalacic changes. There were no acute hemorrhages noted. It appears he has much more extensive involvement on the left than the right, extending from the tip of the temporal lobe to the posterior margin of the temporal lobe inferiorly, and the encephalomalacia at the temporal lobe is along the posterior margin of the Sylvian fissure, indicating gliosis. Certainly, the MRI clearly shows brain damage and encephalomalacia.

His neuropsychological testing was reviewed, and a report authored by Dr. Jeri Morris, which found that he has deficits in attention, concentration and problem solving, and showed that he had diffuse brain involvement. His most serious deficits were in problem solving. He does not have insight into incorrect solutions even when identified, and he has problems with new situations in terms of problem solving. His memory function showed deficits in his ability to store new information consistent with his temporal lobe involvement, and he does show deficits with regards to his sensory and physical problems. I would interject that he is probably showing deficits with his sensory processing issues.

He has problems with sensitivity with light. He has had an ophthalmologic evaluation in Peoria, and they are planning to provide him with prism glasses for his diplopia or double vision, as well as to provide him with prism glasses and dark tinted lenses to reduce his photosensitivity outside during the day.

He has had follow-up studies for his vitamin D. As he does not like going outside, he certainly does not get much skin exposure and takes supplemental vitamin D.

He has not demonstrated any seizures over the past 4 months.

Basically, he had a hearing loss due to the inner ear injury on the right. He may need surgery to reconstruct the ossicles in the middle ear. He however does continue to have problems with vestibular processing and balance and is actually returning back to using his cane with ambulation, both for his lower extremity pain at the ankle and the knee, but particularly to assist with his balance. He does not feel at all comfortable with his balance. He will need surgery for his hearing loss, but I believe his temporal lobe involvement may have a significant impact on his ability to process music. He is having difficulty learning and relearning old songs. He is having to look at music but finds that also can be difficult for him to do.

He continues to have the problems that his wife noted with lightheadedness, dizziness and balance. He still shows the light sensitivity, and they are addressing that with his visual glasses and prism glasses due to his double vision.

He does get overwhelmed when he is alone. He does show clear sensory processing issues, misinterpreting sensory ques, both visual and tactile. He does become very fearful of abnormal triggers and is demonstrating a great deal of PTSD. He is afraid to get in cars. He will not drive. He is concerned about the dizziness. He could physically drive, but then he has more incoordination, visual processing and double vision, and he is afraid to drive, which is certainly not unreasonable.

He notes that he still has a great deal of pain with his ambulation, which is frustrating to him.

He notes that he is not able to travel much now. He had tried going back with the band he had originally been in. They went on the road, but he totally decompensated and had to return home. He has tried some gigs, but somebody has to drive him there. They have to arrange it for him.

His wife notes he cannot handle his financial affairs. She has been forced to go on tour much more now, since she is now the primary breadwinner, which he had been. She notes that when she is gone on tour, she is concerned about him.

He shows a great deal of sleep disruption with nocturnal awakening. He tends to have more sleep disruption, staying up until 5 a.m. and then sleeping until 1 in the afternoon. She noted he had tended to stay up in the past, maybe to 1 or 2 o'clock; now it is becoming much more problematic.

He does not use a cell phone, so it is a landline. If he does not answer they get concerned

and check on him.  His wife notes that he will call her 4, 5, 6 times a day, if not more, when she is on the road.

He becomes panicky about situations, particularly when he is alone, and she notes that she is able to help calm him in talking him through some of these issues. At the present time, she notes that he is still having a great deal of difficulty. She is now trying to arrange some PTSD counseling and trying to arrange some counseling in the St. Louis area.

She noted that, for instance, in April he tried to do maybe 3 gigs. He has not done much since then. He might make a quarter of what he did before. She noted that when she is gone he is at home. She was saying, "He seems okay." When I asked her about what she has found, she notes that he still has a great deal of difficulty with anxiety, calling her frequently.

I asked her if he is self-medicating in any way, and she notes that now he is drinking much more. He notes that if he drinks more, he is calmer, so he is actually self-medicating. He is drinking more beer at home. He is staying in.  He could drink 2 beers, to 8 or 10, depending on his level of anxiety. She notes that that is becoming a go to medication for him. She notes that he used to have some drinks before, but now he is finding it is more medicinal in his approach to the drinking. She is concerned that if he drinks and she is away what would happen.

He cannot go to the store and does not. Friends or family have to come and get him and take him to the store. The friends also mow the yard if she is not there, as he is not able or safe enough to do it.

She notes his problem solving is poor when she is away, and there is much more anxiety. He cannot shop. She has to call a friend and get him help. She notes he really cannot problem solve very well at home. If there was some disruption he would call her. She notes his problems learning new songs and difficulty remembering the old songs. He has to try and use lyric books to remember the names, and he does not seem to be doing as well with automatic melodic intonation.

At the present time, his activity will vary quite a bit. He does not like being around groups or large clusters of people or even entertaining. He has difficulty hearing from the right side. He has to position himself differently.

He tried going back with a group he had toured with, but he had to pull back. She notes that they are not really calling him back since he is not really desirable. He is not able to do the trip. He cannot really tour. He really decompensates and becomes very anxious and then cannot perform. I would say certainly cannot rely on. She notes that he is not able to book any gigs. He gets very confused trying to do that, handle calls or voice messages, so she has to get friends to try and help him with that, and she notes she is making multiple calls to try and assist.

When she is gone he will do some cooking. She notes when she returns, dishes will be in the sink. He has been calling her frequently. She notes that he has not taken out the trash or the recycling; it will just be there. She notes the table is dirty; he has not really cleaned it. She notes that he tends to have more disinterest in keeping the place clean. She notes he can

clean his clothes. His personal hygiene is okay, but if he is not reminded to do things he does not really initiate them, which is very different.

She notes that when she is gone she would feel better if there was somebody there. She tries to have friends check in.

I did ask her if she were to die tomorrow, what she would expect he would need. She indicated immediately that he would need somebody living with him all the time. A roommate or caregiver, kind of like a parental model.

She notes that at the present time, he probably needs somebody at least 4-8 hours to help him with shopping, cooking, and cleaning. He cannot pay his bills.

He gets very anxious. She notes that he will start pacing and then call her. She has called friends to do his shopping. Before she leaves, she tries to stock things up at home, so he will have the items he needs.

He is very fearful of going out. He does not like crowds. He does not like the lights and shows a great deal of classic withdrawal, consistent with his head injury. She notes that he can order some things on line, but he does make mistakes with some of the orders. Sometimes he does not remember that he ordered the item. She notes that if he does have a performance, he has to be driven there, and somebody will stay with him if he gets nervous and then bring him back.

As she noted, he really would need someone 24-hours a day if she was not around. Someone as a companion to remind him about daily tasks, the garbage and cleaning. She notes he will leave outdated food in the refrigerator. He does not check expiration labels. She has come back to find ice cream just left out and melted. She does have concerns about his judgment and awareness in his environment. She notes the house is not clean. The bathroom is not clean. He has not vacuumed, and while she said he was not an obsessive housekeeper before, he would do those things. He seems to just not take interest now. The trash piles up. She notes that she will find beer bottles around, something he would not have done. He puts them in recycling and they just are there. She is concerned about his overall wellbeing and is looking into the counselor.

She notes that she is very concerned if she is not around and she is having to travel more, if there is going to be a greater problem.

She notes he has not wandered off or gotten worse or lost, but she has concerns. She notes that he does not really get angry. He has more of a blunted affect. He will perseverate on items, continuously talking about the same thing – more of a nondominant hemisphere pattern. She notes he really does not pay attention a lot of times with what is being said. You have to repeat it frequently, and then he will repeat the same things not being aware that he has already talked about that subject.

Relative to his cognition, she is very concerned about his ability to really live safely independently if she is not there or friends are not there. He needs somebody to assist him, more of a parental role model.

4

At the present time, relative to his orthopedic status, both of them note, and he particularly notes that his leg is still painful. He uses a single-point cane to help with the balance, as well as his transfer and shifting of weight. He notes that he is still getting a great deal of ankle pain. His knee will swell. He does elevate the leg at the end of the day. He notes his findings really have not changed dramatically, but the pain in the left knee and the ankle continues to persist. He did have a hemorrhage in the joint space, and he still gets some wobbling at the knee. His left medial malleolus fracture and other fractures are stable.

He has completed physical therapy, but notes he still continues to have the pain with ambulation and transfers. He does note using the cane helps to weight shift, but more importantly helps with his balance.

Overall his function has not changed dramatically. If he pushes himself, he can walk 3/4 of a mile to a mile, but he will be very sore. He notes he will just use vitamin D. If he really hurts, he will take Aleve or Advil over-the-counter. His wife notes he is less active than he used to be.

I had a chance to review the neuropsych, the MRI findings and what they were told by the ophthalmologic consultant – all of which are consistent with what we know is his traumatic brain injury. The problems that he has addressed before continue to persist and his safety is of concern.

As I discussed with them, my impressions from the initial evaluation remain the same. He clearly had a traumatic brain injury with bitemporal involvement and encephalomalacia noted, which can be devastating for a musician. He has had the left frontal lobe involved and the temporal lobe involved. He had multiple skull fractures. He does require the inner ear surgery, and he will require orthopedic management.

She is correct to be concerned about him living alone. I would recommend that they look into having a 24-hour caregiver available to him now and in the future. If she predeceases him, he is going to need significant supervision and assistance.

He certainly would benefit with psychological counseling on probably a several time a month basis, to continue to get input in psychological counseling. Generally, they should be able to work with somebody at about $180 to $200 per visit, which I think would help with some of his problem solving and his memory deficits.

If she is not available or a family member is not available, they should have a plan for an attendant or individual care provider to be with him. Generally the St. Louis area is less expensive, around $22 an hour, at Interim, Cooperative and ComForCare for home care services, and they would need to determine if she is on the road to have that covered for two weeks or other type of structuring, so that she would feel comfortable; somebody who could take him shopping, cut the grass, help him with going out, getting outside, and help him if he wants to book gigs for avocational activities.

I do not see him being competitively employed as a musician any longer. In light of his hearing deficit, his temporal lobe involvement, his brain damage, and his panic and anxiety,

he is not going to be able to be competitively employed. I do not think he is going to be able to do many jobs competitively due to his withdrawal, visual involvement, and certainly he is limited because of his orthopedic limits.

He will certainly continue to follow up with Ear, Nose and Throat, probably 4 times a year because of the ear involvement. He is going to need to follow up with Ophthalmology/Neuro-Ophthalmology, probably 4 times a year. He will probably follow up with Orthopedics on average over the years about 4 times a year and will require future surgeries. I would recommend that he would probably need to budget a couple of hundred dollars per visit for each of these going forward, and to continue with psychology follow-up which would be helpful for both him and his wife.

He does have a number of orthopedic issues, including his bilateral hips will be affected because of his altered gait. His bilateral knees, due to the direct trauma and the weight shifting, as well as his ankle, which will require follow-up. I would anticipate that he is probably going to have five MRIs of his hips and knees, probably once every 10 years. They will run around $3,000 a unit. Those will be done long-term. I would anticipate in the future that he will definitely replace his traumatized knee; however, he is probably going to have that done several times.

I would anticipate him having an ankle joint replacement and/or a fusion and probably 4 total joint replacements for a total of 5 and possibly 6, at a cost of about $40,000 per procedure or almost a quarter million dollars, that they should think about this long-term due to his orthopedic involvement.

He is going to have difficulty running or doing cardiac stress test, and to do a cardiac perfusion imaging test may be once every 20-30 years would be around $4500.

He should probably have a sleep study carried out at a cost of about $2500.

His neuropsych testing will need to be done about every 10 years at the least to assess his progress and decline and that would be around $3000 or so per session.

Unfortunately, he has a 2% risk of developing Parkinson's disease due to his traumatic brain injury. He also is at a profoundly increased risk of developing early dementia. He is already showing gliosis and changes consistent with brain injury, and probably by 65 he will have far greater cognitive loss and at that time need continuous supervision.

I do feel he will require an MRI of the brain, maybe once every 10 years, due to any change in status, as well as possibly EEGs. The MRI of the brain would be the most expensive, around $3000.

He will have some hospitalizations due to symptomatology. I expect he will be hospitalized to have the middle ear reconstruction, or possibly done as an outpatient.

He would probably benefit with physical therapy once a month. Usually the home visits are around $130 to $150 per visit.

6

I think psychology is going to be very important for him and, as I explained to them, I think probably both of them would benefit with counseling. She is having to work more, and she is concerned about his status. He is having PTSD, and he has some limitations with walking.

I think probably in the future, he is going to need something like a Quantum scooter for around $6000, plus a wheelchair accessible van for the scooter for him to go longer distances as he ages, and a van can run about $10,000/year. He will continue with a single-point cane. In the future, he may use a walker more. I would be concerned about problems with carpal tunnel in the upper extremities secondary to his altered weight shifting as a result of that, and possible problems with his shoulders.

In talking with Kellie and Ryan, I think there is a fair amount of denial about his problems. She will kind of note that he is okay. Then you ask her about how he does when she is gone. She explains that he does not empty the garbage, the table is dirty, his behavior is different, and he perseverates on topics. In asking her if anything happened to her, what does she feel he would need, she noted he would have to move in with parents, or have a roommate, somebody to help do shopping and cleaning, remind him to do things, and handle his bills and finances, which she does, and he has tremendous difficulty doing. Clearly, he is going to require a great deal of support.

I did recommend they consider a home that is on one level without stairs and one not requiring Ryan to do any maintenance. Shower needs to be walk in and not a tub shower and room for a solid shower chair. Handheld shower head is needed. Halls should be 5 foot wide for his lifetime as he will likely need a wheelchair at home from time to time due to orthopedic issues as he ages. The doorways should be 42 inches and I would recommend infrared sensors for lights. A security system and fire detection monitored is important and a residence with sprinklers and current fire codes and fire resistant doors, direct exit to outside and fire suppression if forced air system. He is likely to be confused in a fire.

I stressed to them the need to seriously consider this type of planning, maybe looking at some type of life insurance that she would get. As I suggested that she has to have a 24-hour-a-day attendant, and she needs to understand that that is $528 per day or on annual basis would be approximately $193,000.00 per year, so they would need to look at some type of a life insurance policy that could provide for that type of coverage. At the present time, as Ryan is about 32 now, he probably will live to be at least 75, so I explained that they would need to consider a 43-year plan which could be 8-1/2 to 9 million dollars, so they may want to look into a life insurance policy upwards of 10 million to provide safety for him over the long-term should she be disabled or unable to care for him or deceased. She indicated she really had not thought about those issues, nor had Ryan.

Certainly, he can enjoy things in life and do things. Traveling is going to be a problem. Mobilization is difficult. The orthopedic procedures that would be required would be possibly a quarter million dollars, and over the years the number of doctor visits would not be as substantial but would add up over time, and they will need to make sure that they have adequate health coverage and a plan in place so that if anything does happen to Kellie, as I discussed with both Kellie and Ryan, they would have the resources to provide that.

Unfortunately, his deficits at this point in time are essentially permanent. I do not see this

improving. While he may have some subtle improvement, he is likely to continue to have significant deficits.

Unfortunately, he did have a profound injury. He had abnormalities on his Glasgow Coma Scale. I explained to them that he has abnormalities on his MRI, his brain has atrophied and will not regenerate. He fortunately does not show any seizure activity, and his neuropsychological testing done by Dr. Morris confirms his memory, attention, concentration, and temporal lobe deficits, which will be permanent.

Additionally, he has a number of orthopedic issues, which are going to limit his mobility in the future. He is not going to climb ladders. He is not going to walk around the yard. Cutting the grass and walking longer distances and other tasks will be quite difficult.

Unfortunately, these deficits will be permanent and pervasive. I think that Kellie is understanding this more and more. When she is away, she has realized the anxiety, the fact that he needs someone to hold his hand, somebody to drive him, do the shopping, and handle money. He is an extremely vulnerable individual, which he was not before.

Unfortunately, these deficits are permanent, and they will need to address and plan for it.

I will await the findings from the eye doctor in Peoria that they saw and can make further determination as to whether there is anything additional there that is inconsistent with these findings.

I will follow up with them potentially in about another 6 months to a year, and they will contact the office for follow-up, but they know to call if they have any further questions.


Robert E. Eilers, M.D.

REE:dm