

Deposition of:
## Robert Eilers FAAPM&R

*October 2, 2019*

In the Matter of:

## Ryan Koenig, Et Al Vs. Edward Johnson

A. William Roberts, Jr & Assoc.
800-743-3376 | calendar-awr@veritext.com | www.veritext.com

Robert Eilers FAAPM&R                                      October 2, 2019
Ryan Koenig, Et Al Vs. Edward Johnson

Page 1

1              UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
2                  CHARLESTON DIVISION
3              CASE NO.: 2:18-cv-03599-DCN
4
5    RYAN KOENIG and KELLIE EVERETT,
6
               Plaintiffs,
7
     vs.
8
     EDWARD JOHNSON,
9
               Defendant.
10   _____/
11
12                            Veritext Legal Solutions
                              Premier Executive Suites
13                            1415 Panther Lane
                              Naples, Florida
14                            Wednesday, October 2, 2019
                              10:00 a.m. - 1:00 p.m.
15
16         DEPOSITION OF ROBERT EILERS, FAAPM&R
17
18        Taken on behalf of the Defendant before
19   Jacqueline A. Komin, Registered Professional
20   Reporter, Florida Professional Reporter and Notary
21   Public in and for the State of Florida at Large,
22   pursuant to Defendant's Notice of Taking Deposition
23   in the above cause.
24
25

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson
October 2, 2019

Page 2

```
 1   APPEARANCES:
 2   ON BEHALF OF PLAINTIFFS:
 3        LAW OFFICE OF KENNETH E. BERGER
          BY: KENNETH E. BERGER, ESQUIRE
 4            (Via Telephonic Appearance)
          5205 Forest Drive - Suite Two
 5        Columbia, South Carolina 29206
          Office: 803-790-2800
 6        Fax: 803-790-2870
          bergerlawsc.com
 7
          FINNEY INJURY LAW
 8        BY: CHRIS FINNEY, ESQUIRE
              (Via Telephonic Appearance)
 9        1600 South Brentwood Boulevard
          Suite 220
10        St. Louis, Missouri 63144
          Office: 314-334-1814
11        Fax: 31-754-9477
          info@finneyinjurylaw.com
12
13   ON BEHALF OF DEFENDANT:
14        HOOD LAW FIRM, LLC
          BY: BRIAN E. JOHNSON, JR., ESQUIRE
15        172 Meeting Street
          Charleston, South Carolina
16        Office: 843-577-4435
          Fax: 843-722-1630
17        brian.johnson@hoodlaw.com
18
19
20
21
22
23
24
25
```

Robert Eilers FAAPM&R                                    October 2, 2019
Ryan Koenig, Et Al Vs. Edward Johnson

                                                            Page 3

```
 1                        INDEX
 2   WITNESS                                          PAGE
 3   ROBERT EILERS, FAAPM&R
 4       Direct Examination by Mr. Johnson .......4
 5       Cross-Examination by Mr. Berger ........118
 6       Redirect Examination by Mr. Johnson ....119
 7                    - - - - -
 8                  DEFENSE EXHIBITS
 9   DESCRIPTION                                      PAGE
10   Exhibit 1  08-22-19 Letter to Dr. Eilers ...8
                from Brian Johnson
11
     Exhibit 2  Affidavit and various documents .9
12
     Exhibit 3  Federal Court Testimony List ....24
13
     Exhibit 4  Notice of Physician's Lien ......30
14
     Exhibit 5  05-06-19 Outpatient Call .......45
15                Traffic Delay Prevented Recheck
16   Exhibit 6  05-18-19 Neuropsychological .....45
                Evaluation
17
18
19
20
21
22
23
24
25
```

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson
October 2, 2019

                                                    Page 4

1    Thereupon:

2                ROBERT EILERS, FAAPM&R,

3    was called as a witness by the Defendant, and after

4    having first been duly sworn, was examined and

5    testified under oath as follows:

6                THE WITNESS:  I do.

7                    DIRECT EXAMINATION

8    BY MR. JOHNSON:

9        Q.    Good morning, Dr. Eilers.

10       A.    Good morning.

11       Q.    We met off the record.  My name is Brian

12   Johnson.  I represent defendant Edward Johnson in a

13   lawsuit filed by Ryan Koenig.  And it's my

14   understanding you've been identified as a witness in

15   this case.

16            Is that your understanding?

17       A.    Yes.

18       Q.    And you understand we're here to take your

19   deposition this morning?

20       A.    Correct.

21       Q.    And I know you've been through this

22   process before, but if you need to take a break at

23   any time, please let me know.

24       A.    I understand.

25       Q.    And if you don't understand any of my

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson
October 2, 2019

Page 6

1          Q.    Where are you employed?

2          A.    I'm self-employed.  I work at my own

3     practice in Illinois, and then I also see patients

4     in Naples.

5          Q.    What's the name of your practice?

6          A.    It's Physical Medicine & Rehabilitation

7     Associates.

8          Q.    How long have you had that business?

9          A.    I think since 1981, somewhere in there.

10         Q.    Are you the only physician in that

11    practice?

12         A.    At this time, yes.

13         Q.    And you mentioned that you have that

14    practice in Illinois.  We're here in Naples, Florida

15    today.

16              How do you split your time in your

17    practice?

18         A.    I probably -- if you add up over the year,

19    I'm probably here about seven months, and then I'd

20    be up north maybe five months.  I try and avoid

21    January, February and March, but that doesn't

22    generally quite work out.  I go back and forth,

23    depending on patients who are scheduled or

24    cross-covering, those types of things.

25         Q.    When you're here in Florida, what's a

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson

October 2, 2019

Page 7

1   typical workweek for you?

2        A.   Generally, I would see some outpatients,

3   do outpatient consultation, meet with patients'

4   families.  And then I'd cover inpatient consults in

5   our admissions at -- NCH would be consults in the

6   downtown hospital, and North Collier's right up here

7   would be the rehab unit.

8        Q.   Do you have a physical office location

9   here in Naples?

10       A.   Yes, over here on Tamiami Trail.

11       Q.   And you work there full-time when you're

12   in Naples?

13       A.   I probably would do anywhere from 20 -- it

14   could be 40 hours a week that I'd work at things, so

15   it just depends.

16       Q.   And with which hospitals are you

17   affiliated here in Naples?

18       A.   It's Naples Community Hospital and their

19   other hospital, Naples Community Hospital.  NCH is

20   basically an umbrella.  It has the hospital downtown

21   NCH and North Collier Hospital, and at some other

22   outpatient facilities.

23       Q.   How much time on a typical week do you

24   spend seeing patients in the hospital?

25       A.   It could be anywhere from a day a week to

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson

October 2, 2019

Page 8

1   two or three days week, or if they need a week

2   covered.  It just depends.

3        Q.   And as far as your practice, when you're

4   in Illinois, what is the scope of your practice in a

5   typical workweek?

6        A.   Again, I probably spend anywhere from 20

7   to 40 hours meeting with patients and families, et

8   cetera, that would probably be outpatient.  And then

9   I would cover the inpatient, depending on consults.

10  You might have a week without any.  You might get

11  five or ten.  It just depends.  And then I'd cover

12  patients if somebody's away, to make sure their

13  patients are covered.  That might be by phone or

14  going in, just depending on what you need to do.

15       Q.   What hospitals are you affiliated in

16  Illinois?

17       A.   It would be Hinsdale Hospital and LaGrange

18  Hospital, and they're in Hinsdale and LaGrange,

19  Illinois.  I think now they're owned by Ameda, but

20  Ameda -- anyway, they're all just kind of merging

21  all over.  I can't even keep up.  The name changes

22  annually.

23       Q.   How would you describe your patient

24  population?

25       A.   Probably about 20 percent would be

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson                    October 2, 2019

Page 9

```
1   pediatric, or children under 18 to 20, and the
2   remainder would be adults.  And they cover from 102
3   down to -- you know, we'll see some children right
4   after birth if they have a brachial plexus injury,
5   things like that, but from a year to 102.  Don't
6   have a whole lot of 102s, but it's becoming more
7   common.
8       Q.   Do you know what percentage of your
9   practice would be patients who have experienced some
10  sort of head trauma or brain injury?
11      A.    Probably 40, 50 percent of the patients
12  would have some type of head injury or brain trauma.
13  Some get, obviously, strokes coupled with their
14  trauma, that type of thing.
15      Q.   Do you know what percentage of your
16  patients are involved in litigation?
17      A.   I don't know the exact number percentage,
18  but, obviously, a lot of our patients end up in the
19  legal process with work injuries, disability, auto
20  crashes, falls.  So it's not unusual at all.
21           (Thereupon, marked as Defense Exhibit 2.)
22  BY MR. JOHNSON:
23      Q.   We've marked as Exhibit No. 2, and I'll
24  hand it to you, it's a response to a subpoena that
25  we received from your office.  And included in this
```

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson                    October 2, 2019

Page 13

1   states?

2        A.   No, I have not.  No interest.  Not the

3   legal bars.

4        Q.   Do you currently have any teaching

5   responsibilities?

6        A.   I'm on faculty at Northwestern as an

7   instructor; at this time, whatever the chairman

8   assigns, but I've been there 40 years or so.  So

9   whatever he asks me to do I'll work with some of the

10  amputees or if he asks for a lecture, talk to

11  residents.  Whatever he wants me to do at this

12  point.  So if I'm in Chicago, he'll say will you do

13  this or that.

14       Q.   Are you currently teaching in any

15  capacity?

16       A.   This month, no.  I was up there last month

17  and met with some of the orthotics, prosthetics, but

18  not this month.

19       Q.   Last month your teaching responsibilities

20  were of a clinic capacity?

21       A.   Yes, it's clinical.  I'm not a publisher

22  in academic admissions.

23       Q.   You said you give lectures sometimes as

24  well?

25       A.   It's more one-on-one lectures teaching

Robert Eilers FAAPM&R          October 2, 2019
Ryan Koenig, Et Al Vs. Edward Johnson

Page 14

```
 1  patients.  I mean, I did in the past, but I don't do

 2  classroom lectures at this time.

 3       Q.   When were you last involved in classroom

 4  lectures?

 5       A.   I think that was maybe three our four

 6  years ago.

 7       Q.   What topic would you lecture on?

 8       A.   I think a lot of that had been amputations

 9  and some will be on stroke or orthotic management.

10       Q.   And do you have any administrative

11  responsibilities at Northwestern?

12       A.   You know, I was on the med school

13  admission committee from the department for, I

14  think, for five or six years.  I'm not now.  But,

15  no, I don't deal with administrative issues, other

16  than if somebody asks me a question, but no.

17       Q.   And have you published in the medical

18  literature?

19       A.   I have not.

20       Q.   Have you given any seminars or

21  presentations that you think are pertinent to the

22  issues involved in this case involving Mr. Koenig

23  and Miss Everett?

24       A.   No, I don't believe so.

25       Q.   And your board certification is in what
```

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson
October 2, 2019

Page 34

1    they needed it written down, you'd dictate it,
2    whatever they needed.
3            A lot of the worker comp carriers would
4    ask us to outline what that person is going to need.
5    So I'm not -- whether life care planning. I mean,
6    it's basically the recommendations of what the
7    patient would make is something you did as guidance
8    as a physiatrist.
9        Q.   Do you know approximately how many life
10   care plans you've created in your career?
11       A.   I'm sure I've done hundreds and hundreds
12   over the years.
13       Q.   Did you go to school to become a life care
14   planner?
15       A.   No, not at all. That's what you do as a
16   physiatrist.
17       Q.   You did not complete any specific life
18   care planning programs?
19       A.   No. I think they started for nurses and
20   vocational rehab people maybe ten or so years ago.
21   I don't know when they start.
22       Q.   And you've not completed any of those
23   courses?
24       A.   Life care planners have to generally come
25   to the physiatrists and the physicians to get the

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson

October 2, 2019

Page 35

1    formation that they would write up.  So they have to

2    rely upon what we would say or what another

3    physician in another area would say.

4         Q.   You don't have any particular degrees in

5    life care planning?

6         A.   No.  It's an unlicensed area.  I don't

7    know that they're actually degrees or schools.

8         Q.   There are certifications in life care

9    planning, is that correct?

10        A.   I think there's some certified life care

11   planners, usually voc rehab people, and people who

12   are not medical, because they can't prescribe or

13   actually order things.

14             It's for them to record.  A life care

15   planner, for instance, for an insurance carrier will

16   come in and ask us, well, what does Mr. Koenig need?

17   And I can lay that out, the same as I discussed with

18   the family.  And then they would go ahead if they

19   want to research it or put numbers with it, they do

20   so.

21        Q.   So you have not obtained any certification

22   to life care planning?

23        A.   I don't need to.  It's like I write the

24   prescription.  No, I have not.

25        Q.   So the answer to my question is no?

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson

Page 73

1    haven't seen any records, additional records, since

2    I originally saw him.

3         Q.    Have you reviewed any records from Summers

4    Healthcare?

5         A.    I don't believe so.

6         Q.    Have you reviewed any records from

7    Neurosurgery & Neurology?

8         A.    I don't believe so.  Anything that was

9    prior to the initial eval I would have seen, but

10   anything since then, I haven't seen any new records,

11   other than what we've talked about; the MRI, the EEG

12   and the optometrist.

13        Q.    Have you ever reviewed any chiropractic

14   records?

15        A.    No, I have not.

16        Q.    Have you reviewed any records from Mark

17   Tobin counseling?

18        A.    No.  I just was told that he's seeing him.

19        Q.    In your report from April 2nd, 2018, what

20   process did you go through in terms of assigning

21   costs to various aspects of treatment?

22        A.    That's what I'm intimately familiar with

23   in terms of patients and families and advising them

24   on those costs.  So that's very much what I'm aware

25   of.

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson

October 2, 2019

Page 74

1      Q.    So that's the process you went through?

2      A.    Correct.

3      Q.    You didn't do any research?

4      A.    I can.  It's just going to be the same, so

5   I'm not going to charge them to spend a lot of time

6   to look up what I already know.

7      Q.    So the answer is, no, you didn't do any

8   research?

9      A.    No.  I didn't do any new research, other

10  than what I've routinely done in caring for

11  patients.

12     Q.    Tell me what you've routinely done that

13  applies to Mr. Koenig's case.

14     A.    For instance, for attendant care, we call

15  the agencies.  I check with them in terms of telling

16  what it's going to roughly cost to provide that.

17  And, obviously, calling to get tests done for

18  patients.

19          It's the same thing.  You give them

20  information on what it's going to cost for those

21  services.  You know, we've, obviously, seen a lot of

22  patients with joint replacements and provide that

23  information to them.  That's fairly routine.  These

24  are pretty routine charges and costs.

25     Q.    And you did not compare your projections

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson

October 2, 2019

Page 96

1    treating providers have told him?

2         A.    I don't know what they told him one way or

3    the other or what information they have been

4    provided.

5         Q.    If his other treating providers have told

6    him that he does not need 24-hour care, you would

7    disagree with that?

8         A.    I do.

9         Q.    Have you seen any records that any other

10   provider has made that recommendation?

11        A.    If they have or they haven't, you all can

12   consider that.  My obligation to him and to his

13   wife, as explained, I don't feel he's safe being on

14   his own.

15             Now, if he burns the house down and dies,

16   I've told them my concern.  I have concerns about

17   him.  I really am not comfortable with him driving a

18   car, but that's his choice.  I'm not responsible for

19   that.  But if I tell her he's safe to be left alone,

20   I don't feel that he is really safe to be on his

21   own.

22             I told them what they need to consider.  I

23   don't tell her what she has to do, and I don't tell

24   Ryan what he must do.  I advise them what I feel

25   what is most appropriate and my concerns.  They make

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson

October 2, 2019

Page 97

1    the decision.  They sustain any consequence that's

2    involved.  And I've advised them.  They've asked my

3    opinions.  I've told them, whether they like it or

4    not, I done what I need to do, and from there on

5    it's up to them.

6         Q.   To your knowledge, has he had anyone come

7    into the home to provide care during the time period

8    Miss Everett is away?

9         A.   My understanding is, his friends will come

10   in or check or they'll take him out or cut his

11   grass, things like that.  I would have to ask her

12   for specifics and people.  I just can't answer that

13   as specifically as you might like.

14        Q.   Do you have an understanding as to how

15   often she is away on tour?

16        A.   I think she's -- for some reason, 150 some

17   days sticks in my mind, but I would have to ask her

18   that.  But she's gone quite a bit now, like trying

19   to get a ride for him to come, and she's on tour and

20   she goes out on tour, I can't get everything

21   coordinated.

22             So I don't know the exact number of days

23   that she's gone.  For some reason I was thinking it

24   was 150 or something, but don't quote me.

25        Q.   Do you know if that's consistent or

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson

October 2, 2019

Page 98

1    inconsistent with her touring frequency before this

2    incident?

3          A.    I don't know for sure.

4          Q.    In your recommendations on page 11, you

5    have documented regarding some lost hearing.

6                You understand he did have a surgical

7    procedure earlier this year, correct?

8          A.    Correct.  And he indicated, or Kellie,

9    they both indicated it had improved.  I don't know

10   what the audiogram showing in terms of any

11   persistent hearing loss or not.

12         Q.    You note a number of future orthopedic

13   procedures that you opine he will require?

14         A.    Correct.

15         Q.    To your knowledge, is he currently seeing

16   any orthopedic providers?

17         A.    I don't believe so.  There's not a lot

18   that people can do at this point in time.  It's just

19   going to be the issue of long-term.

20         Q.    And what are you relying upon as far as

21   your opinions regarding future orthopedic

22   procedures?

23         A.    Over the 40 years, I follow people with

24   knee and hip and other traumatic injuries and

25   fractures.  You know, when I was in practice for

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson
October 2, 2019

Page 99

1    maybe the first five years, oh, they fixed you,

2    you're great, don't worry about it.

3           As you spend more time, those patients are

4    in your practice and you see the sequella of those

5    fractures or plateau fractures or ligamentous tears,

6    patella injuries, and you get biomechanical

7    misalignment inefficiency.  You see them 20, 25, 30

8    years later, they're getting knees replaced, the

9    hips replaced because of the altered body mechanics

10   and the biomechanics of gait, that eventually

11   results in the wear and tear and destruction of the

12   joint.

13          And so that's the situation that he's

14   going to see.  Right now he's what, 30?  His age

15   right now was 32.  You know, he's got another 43

16   years, roughly.  I mean, he may live longer, but on

17   average, 43 years.  In that time, he's going to have

18   a lot of problems with the joints.  He does still

19   have abnormal gait.  He weight shifts his extremity.

20          Those are all things that over time start

21   to wear down those joints.  And fortunately, you

22   have the option of doing a joint replacement at this

23   time.  And that's probably what he's going to

24   confront going forward.  And that's what I talked to

25   him about.

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson

October 2, 2019

Page 100

1     Q.     Anything else that you're relying on for
2     purposes of that opinion?
3     A.     No.  We know traumatic joint injuries and
4     these types of fractures is not uncommon for them to
5     result into degenerative arthritis over time.  Not
6     in a day or two, but certainly, over 5, 10, 15, 20
7     years is what you'll see.  I don't think he's going
8     to have multiple joint replacements in terms of his
9     knee being done two times or more.  It's a
10    possibility.
11           And there will be some intermediate
12    treatments with joint injections that can be carried
13    out.  But eventually and in the future, maybe there
14    will be stem cell transplants and injections that
15    will help, but right now that's not an option.
16    Q.     You also included on page 11 some opinions
17    related to driving, correct?
18    A.     Correct.
19    Q.     And it was your opinion in April of 2018,
20    that he was unable to drive?
21    A.     I didn't feel he'd be safe driving,
22    correct.
23    Q.     Do you know when he returned to driving?
24    A.     I don't know the exact date he has
25    locally.  Obviously, he doesn't do really well

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson
October 2, 2019

Page 109

1  families, sure.

2      Q.   Do you know what, if any, modifications

3  they made to their home, other than the bath bench?

4      A.   I think it was mainly the bathroom, the

5  grab bar.  They put in a bath bench.  Those, I

6  think, were changes that they made, as far as I can

7  tell.

8      Q.   And what methods and bases are you relying

9  upon for your opinions related to the need to be on

10  a one-level home?

11      A.   Considering his orthopedic and neurologic

12  issues, it's more sensible that he be on a one

13  level, if he does have orthopedic procedures in the

14  future.  That's why we talk about the widened

15  hallways at about five feet.

16          So it's a home in which he can age with

17  any of his disabilities over time.  You know, you

18  put in handrails in the hallways.  It gives him a

19  little bit more stability.  Some of the infrared

20  lighting is helpful.  The one level is the more

21  important element that they really need to look at

22  doing.

23      Q.   And I don't see in here that you've given

24  any opinions related to the cost of home

25  modification.

Robert Eilers FAAPM&R
Ryan Koenig, Et Al Vs. Edward Johnson                    October 2, 2019

Page 110

1          Have you given those opinions?

2          A.    You know, I don't think I did.  I mean,

3     they're probably going to spend about 50, 60,000.

4     It will depend on what they end up doing, if you

5     have to buy the lot, redo it.

6              They don't own a home now, so they're

7     going to have to figure out how they're going to

8     fund that.  You know, a house built from scratch

9     with things they might need, particularly the

10    bathroom changes, and that can run them 370,

11    400,000.  You can back out the average cost of a

12    home in their community to give you an idea.  But,

13    no, I didn't come up with specific numbers in that

14    regard.

15         Q.    What education, training and experience do

16    you have in home modification?

17         A.    I've done it for probably 40 years.  I

18    actually am a broker in Illinois and here in terms

19    of real estate.  I don't actually go out and list

20    homes, but I've dealt with real estate for years.

21    And we worked with families, banks, trust

22    departments, the probate courts, assessing plans,

23    recommending home modifications and changes.  I've

24    done that, Illinois and here, and even gave some

25    input in other states.