**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| RYAN KOENIG and KELLIE EVERETT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 2:18-cv-3599-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| EDWARD JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The following matter is before the court on plaintiffs Ryan Koenig ("Koenig")

and Kellie Everett's ("Everett") (collectively, "plaintiffs") motions to exclude, ECF Nos.

48 and 49, and motion for partial summary judgment, ECF No. 50; and on defendant

Edward Johnson's ("Johnson") motion for partial summary judgment, ECF No. 51, and

motion to exclude, ECF No. 52. For the reasons set forth below, the court grants in part

and denies in part plaintiffs' first motion to exclude, grants plaintiffs' second motion to

exclude, denies plaintiffs' motion for partial summary judgment, grants in part and denies

in part Johnson's motion for partial summary judgment, and denies Johnson's motion to

exclude.

## I.  BACKGROUND

Plaintiffs allege that on December 5, 2017, while they were walking on the

sidewalk along Maybank Highway in Charleston County, defendant Edward Johnson

("Johnson") struck plaintiffs with his vehicle while he was pulling out of a dry cleaner's

parking lot and onto the highway. Plaintiffs further allege that Johnson's vehicle

proceeded to run over Koenig, pinning him under a wheel of the vehicle for a brief

period. As a result of the accident, plaintiffs claim various injuries, including catastrophic injures to Koenig. On December 28, 2018, plaintiffs filed the instant action with this court against Johnson alleging negligence and negligence per se as to Koenig and negligence, negligence per se, negligent infliction of emotional distress, and loss of consortium as to Everett. ECF No. 1.

Many of the facts of the accident are not in dispute. Johnson was stopped in the parking lot of James Island Cleaners, perpendicular to Maybank Highway, waiting for an opportunity to make a right turn onto the highway. At some point before plaintiffs attempted to cross in front of Johnson, Johnson moved his car forward a few feet and then reversed his car a few feet back. Shortly thereafter, plaintiffs attempted to cross in front of Johnson's vehicle. At that time, Johnson's vehicle lurched forward and hit plaintiffs, pinning Koenig under the vehicle for a short time. The primary factual dispute between the parties is the respective locations of Johnson's vehicle and plaintiffs leading up to and at the time of the accident. Johnson has retained an expert who has concluded, based on his 3D modeling of the scene, that the front of Johnson's car was across the sidewalk and in the roadway when plaintiffs crossed in front of it, meaning that plaintiffs had to leave the sidewalk and walk onto Maybank Highway in order to cross in front of Johnson's car. Plaintiffs, conversely, have presented witness testimony and the conclusion of their own expert to show that Johnson's vehicle was stopped short of the sidewalk and that plaintiffs were located on the sidewalk, not the roadway, when they crossed in front of Johnson's vehicle and the accident occurred. Plaintiffs have also presented video evidence of the accident, although the video does not reveal the particulars of the accident with any clarity. This factual dispute—the respective locations

of the parties before and during the accident—lies at the heart of the motions before the court.

Plaintiffs filed their first motion to exclude, ECF No. 48, their second motion to exclude, ECF No. 49, and their motion for summary judgment, ECF No. 50, on February 21, 2020. On March 6, 2020, Johnson filed responses to each of plaintiffs' motions. ECF Nos. 55, 56, and 57. Plaintiffs did not file replies. Like plaintiffs, Johnson filed a motion for partial summary judgment, ECF No. 51, and motion to exclude, ECF No. 52, on February 21, 2020. Like Johnson, plaintiffs responded to the motions on March 6, 2020. ECF Nos. 58 and 59. Johnson filed a reply with respect to his motion to exclude on March 13, 2020, ECF No. 61, but did not file a reply with respect to his motion for partial summary judgment. The court held a telephonic hearing on the motions on April 30, 2020. Thus, these matters are ripe for the court's review.

## II.  STANDARD

### A.  Motions to Exclude

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

District courts serve as gatekeepers for expert testimony.  The court has a "special obligation" to ensure that expert testimony is relevant and reliable.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999).

Under Daubert v. Merrell Dow Pharmas., Inc., 509 U.S. 579 (1993) the court's gatekeeping role requires that it address two questions: first, whether the expert's testimony is based on "scientific knowledge"; and second, whether the testimony "will assist the trier of fact to understand or determine a fact in issue."  Id. at 592.  The first question is answered by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid."  Id. at 592–93.  The court should consider several nondispositive factors in determining the reliability of a particular scientific theory or technique: whether it (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; and (4) has attained general acceptance in the pertinent scientific community.  See id. at 593–94.  In considering these factors, the focus "must be solely on principles and methodology, not on the conclusions that they generate."  Id. at 595.  The factors are not exclusive; what factors are relevant to the analysis "depends upon the particular circumstances of the particular case at issue."  Kumho Tire, 526 U.S. at 150.  The second inquiry "goes primarily to relevance."  Daubert, 509 U.S. at 591.  Relevance is determined by ascertaining whether the testimony is sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute.  Id. at 593.

The proponent of expert testimony must demonstrate that the testimony satisfies these requirements.  Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) ("The proponent of the testimony must establish its admissibility by a preponderance of

proof."). "[T]he trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." United States v. Stanley, 533 F. App'x 325, 327 (4th Cir. 2013) (quoting Fed. R. Evid. 702 advisory committee's note). While Rule 702 was intended to liberalize the introduction of relevant expert evidence, courts "must recognize that due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (quoting Daubert, 509 U.S. at 595).

### B. Motions for Partial Summary Judgment

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) of the Federal Rules of Civil Procedure requires that the district court enter judgment against a party who, "after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment

will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

Any reasonable inferences are to be drawn in favor of the nonmoving party. Anderson, 477 U.S. at 255, Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012). However, to defeat summary judgment, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence. See Anderson, 477 U.S. at 252; Stone, 105 F.3d at 191. Instead, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)). If the adverse party fails to provide evidence establishing that the fact finder could reasonably decide in his favor, then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" Id. (quoting Anderson, 477 U.S. at 248).

### III.  DISCUSSION

**A.  Plaintiffs' Motion to Exclude Brian Boggess**

Johnson has designated Brain Boggess, P.E., ("Boggess") as an expert in the field of engineering and accident reconstruction.  Boggess prepared an expert report based on a 3D modeling reconstruction of the accident, which he and his team created by utilizing specialized software that analyzed and matched the perspectives of photos taken at the scene, surveillance video that captured portions of the accident, and laser scanning data recorded at the scene.  Johnson intends to present to the jury eight of Boggess's opinions. For ease of analysis, the court divides Boggess's opinions into two categories: (1) opinions about the location of Johnson's vehicle and plaintiffs at the time of the accident (the "location opinions") and (2) human factor opinions based on the location of the vehicle and plaintiffs (the "human factor opinions").

Plaintiffs do not object to Boggess's qualifications as an engineer and accident reconstructionist.  Instead, plaintiffs object to Boggess's specific opinions, arguing that Boggess's location opinions are unreliable and his human factor opinions extrapolated therefrom would be unhelpful to a jury.  The court finds that Boggess's location opinions are based on reliable methodology and thus admissible and Boggess's human factor opinions would be unhelpful to the jury because they are not based upon scientific or specialized knowledge.

**1.  Location Opinions**

Plaintiffs seek to exclude the following opinions that relate to the location of Johnson and plaintiffs at the time of the accident:

> [1] the Audi driven by [Johnson] covered the sidewalk and extended partially into the roadway at all times;
>
> [2] [Plaintiffs] departed from the sidewalk and entered the roadway of Maybank Highway in front of the Audi from its right as it attempted to turn right from the [d]riveway;
>
> . . .
>
> [8] [Plaintiffs' expert]'s layouts are not supported by the objective evidence, and thus, his reconstruction and subsequent opinions on the positions of the Audi and pedestrians are in error.

ECF No. 56-1 at 4–5. Plaintiffs argue that Boggess's location opinions should be excluded because they "ignor[e] all the eyewitness testimony [] and, perhaps more importantly, the video evidence." ECF No. 48 at 15–16. Essentially, plaintiffs argue that the opinions are unreliable because the "overwhelming" evidence is to the contrary. Id. Because the existence of counter-evidence is irrelevant to the reliability inquiry under Daubert and because factual disputes are reserved for resolution by the jury, the court disagrees.

Plaintiffs argue that the location opinions are unreliable based on the existence of conflicting evidence. This argument improperly focuses on Boggess's conclusions rather than the methodology and reasoning that underlie them. Daubert makes clear that a court must determine the reliability of an expert's opinions based on the expert's methodology, not upon his or her conclusions. 509 U.S. at 592–93 (the reliability inquiry focuses on "whether the reasoning or methodology underlying the testimony is scientifically valid."). If an expert opinion is relevant, helpful to the jury, and based upon sufficiently reliable methodology, it is admissible under FRE 702 and Daubert, even where conflicting evidence exists.

As Johnson points out, Boggess employed a well-accepted method of perspective matching photogrammetry, utilizing 3D modeling software. To create his model, Boggess input into the modeling software surveillance videos, photographs, and laser scans of the accident scene. Brief research into the field reveals that photogrammetry is an ancient science[1] that courts have long found a reliable basis for expert testimony. See Gecker as Tr. for Collins v. Menard, Inc., 2019 WL 3778071, at *4 (N.D. Ill. Aug. 12, 2019) ("[P]hotogrammetry itself has a long, recognized history of reliability in the scientific and judicial community . . . .") (collecting cases). Indeed, this court has admitted expert testimony based on photogrammetric analysis. See United States v. Slager, 2018 WL 445497, at *3 (D.S.C. Jan. 16, 2018), aff'd, 912 F.3d 224 (4th Cir. 2019), cert. denied, 139 S. Ct. 2679 (2019). Plaintiffs do not dispute the reliability of the methodology Boggess employed in reaching his location opinions. Therefore, the court has no reason to doubt the reliability of Johnson's location opinions, whether Johnson uses them as substantive evidence to establish a fact at issue or to cast doubt on the opinions of plaintiffs' expert. Thus, the court finds that Boggess's location opinions are admissible.

Moreover, plaintiffs' counter-evidence, while compelling, is hardly conclusive. Plaintiffs rely on testimony from two eye witness, both of whom testify that plaintiffs were on the sidewalk, not Maybank Highway, when the accident occurred. Eye-witness testimony is far from determinative, and, as Johnson points out, both eye witnesses

---

[1] "The art of photogrammetry, defined as 'the science of measurement from photographs,' is old . . . [B. B.] Talley, [Engineering Applications of Aerial and Terrestrial Photogrammetry,] credits Aristotle with the first recorded reference to the optical projection of images about 350 B.C. O. M. I. Corp. of Am. v. Kelsh Instrument Co., 173 F. Supp. 445, 461 (D. Md. 1959), aff'd, 279 F.2d 579 (4th Cir. 1960).

rendered their opinions regarding the parties' respective locations more than a year after the accident occurred. Plaintiffs also rely on the video surveillance evidence. The surveillance video, however, hardly captures a clear picture of the accident. The grainy footage, taken from a security camera located inside of the dry cleaners, depicts the accident through a window of the dry cleaners in the very top corner of the shot. The distance from the camera and the glare from the sun make it difficult to make out the exact location of Johnson's vehicle or plaintiffs with any accuracy. It is the duty of the jury to weigh the conflicting evidence and determine the facts of this case. Boggess's location opinions are some of evidence the jury will be able to consider in determining those facts, along with plaintiffs' evidence to the contrary. The court cannot exclude expert testimony because conflicting evidence exists. Of course, the court's finding that Boggess's location opinions are admissible is not an endorsement of their accuracy, and Boggess's testimony is nonetheless "subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." United States v. Moreland, 437 F.3d 424, 431 (4th Cir. 2006). Therefore, the court finds that Boggess's location opinions (identified by the court as opinions 1, 2, and 8) are admissible.

### 2. Human Factor Opinions

Plaintiffs seek to exclude the remaining opinions included in Boggess's report:

(3) [Johnson's] vehicle was visible to the Plaintiffs from the time the Defendant first pulled up to the driveway;

(4) the Plaintiffs departed from the sidewalk in front of [Johnson]'s vehicle without confirmation from the Defendant he was aware of their presence;

(5) it is foreseeable [that] [Johnson] would not perceive the presence of the Plaintiffs at the time he pulled to the end of the driveway;

10

(6) [] Johnson, more likely than not, reversed the Audi initially to limit encroachment to the rightmost lane as a tractor-trailer approached; and

(7) a driver in Johnson's position would more likely focus his attention toward oncoming traffic and away from the Plaintiffs' approach.

ECF No. 56-1 at 5.  Because these opinions are factual conclusions extrapolated from Boggess's location opinions and informed by "human factors," the court refers to them as "human factor opinions."[2]  Plaintiffs argue that the court should exclude these opinions because "they are based on either pure speculation or personal opinion."  ECF No. 48 at 18.

Rule 702 requires that an admissible expert opinion be based upon "scientific, technical, or other specialized knowledge."  By negative implication, "Rule 702 makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance."  Scott v. Sears, Roebuck, & Co., 789 F.2d 1052, 1055 (4th Cir. 1986).  The Fourth Circuit applies the "common knowledge" rule, which finds expert testimony to be unnecessary when reaching the expert's opinion "is something that can sufficiently be done by the jury without help from an expert."  United States v. Dorsey, 45 F.3d 809, 815 (4th Cir. 1995).  This rule applies to both an expert's opinion that might help the jury determine the facts of the case and an expert's opinion that might help the jury interpret certain evidence.  Minnesota Lawyers Mut. Ins. Co. v. Batzli, 2010 WL 670109, at *2

---

[2] In his response to the motion to exclude, Johnson notes that several of Boggess's opinions are based upon "human factors."  ECF No. 56 at 11.  Additionally, in his report, Boggess notes that he considered "the human factor elements of Mr. Johnson."  ECF No. 48-5 at 20–21.  The court need not determine whether Boggess is qualified to testify as an expert in the field of human factors because it finds that his proposed human factors opinions would not assist a jury and are therefore inadmissible.

(E.D. Va. Feb. 19, 2010) ("Where lay jurors are fully able to understand and appreciate the implications of the evidence admitted, proffered expert testimony will not assist the jury in determining a factual issue[] and is therefore inappropriate.").

The admission of "common sense" expert testimony is dangerous because "the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense." Scott, 789 F.2d at 1055. This is especially true with issues that are traditionally resolved by the jury. For example, issues of "foreseeability and reasonableness . . . are factual issues that lay jurors can independently understand and assess." Minnesota Lawyers, 2010 WL 670109, at *2; see also Tyree v. Bos. Sci. Corp., 54 F. Supp. 3d 501, 564 (S.D.W. Va. 2014), as amended (Oct. 29, 2014) ("The reasonableness of conduct and a party's then-existing state of mind 'are the sort of questions that lay jurors have been answering without expert assistance from time immemorial.'") (quoting Kidder v. Peabody & Co. v. IAG Int'l Acceptance Grp., N.V., 14 F.Supp.2d 391, 404 (S.D.N.Y. 1998)).

To be sure, Boggess's location opinions are based upon his specialized knowledge of creating, utilizing, and interpreting a 3D digital reconstruction to pinpoint the location of certain objects. Because they are reliable, relevant, and helpful to the jury, Boggess's location opinions are admissible. Boggess's human factor opinions, however, are mere common-sense extrapolations of his location opinions, unsupported by "scientific, technical, or other specialized knowledge." In other words, Boggess's human factor opinions are lay interpretations of his location opinions. The jury is on an equal footing to make such factual determinations because such determinations require common sense, not specialized or scientific knowledge. For example, Boggess's opinion that Johnson's

vehicle was visible to plaintiffs shortly before the accident is a common-sense inference based Boggess's conclusions as to the location of the parties. Once the jury hears Boggess testify about the respective locations of Johnson's vehicle and plaintiffs, it is for the jury to determine whether plaintiffs could see the vehicle because such a determination does not require specialized or scientific knowledge.

Similarly, Boggess provides no specialized or scientific basis for his opinion that plaintiffs walked across Johnson's vehicle "without confirmation" from Johnson. For one, how Boggess could use 3D modeling to determine whether plaintiffs had permission to cross Johnson's vehicle, which could have been given by a single look or slight wave, is beyond the imagination of this court. An expert's opinion must be derived from specialized knowledge, not speculation or conjecture. See Kale v. Douthitt, 274 F.2d 476, 482 (4th Cir. 1960) ("The facts upon which the expert bases his opinion or conclusion must permit reasonably accurate conclusions as distinguished from mere guess or conjecture."). Moreover, Boggess's report does not identify the specialized knowledge on which this opinion is based. Thus, the court finds it inadmissible.

Further, Boggess's opinion that "it is foreseeable that [Johnson] would not perceive the presence of the Plaintiffs" is another extrapolation from his location opinions, unsupported by additional specialized or scientific knowledge. Boggess is in no better position than the jury to assess the "foreseeability" of Johnson's perception of plaintiffs as he pulled onto Maybank Highway. Likewise, Boggess's opinion that Johnson "more likely than not" reversed his vehicle to allow a tractor trailer to pass is unsupported by any specialized knowledge. Courts have long held that issues of intent and foreseeability are "factual issues that lay jurors can independently understand and

assess." <u>Minnesota Lawyers</u>, 2010 WL 670109, at *2. Thus, expert testimony on these subjects is not required and should be excluded.

In fact, Johnson concedes that many of Boggess's opinions are based upon knowledge readily accessible by the jury. For example, Johnson notes that Boggess's opinion that Johnson backed up his vehicle in response to an oncoming tractor tailor is based upon the "video surveillance", which shows "the truck go by and, once the tractor-trailer cleared the driveway, Mr. Johnson began to turn when traffic was clear." ECF No. 56 at 13. In other words, Johnsons admits that many of Boggess's human factor opinions are based upon his lay-interpretation of the evidence. Interpretation of the video evidence to determine Johnson's intent in reversing his vehicle does not require specialized knowledge; the jury is on an equal footing with Boggess to interpret the video, and he cannot testify upon matters on which he does not have superior scientific or specialized knowledge.

While Boggess's locations opinions are based on his specialized knowledge, his human factor opinion that stem therefrom are not. An expert's common-sense testimony based on knowledge well within the grasp of a jury is inadmissible, even where that common-sense testimony is extrapolated from legitimate expert testimony. The factual issues on which Boggess opines are critical to the outcome of the case and the court must not allow "the evaluation of the commonplace by an expert witness" to "supplant a jury's independent exercise of common sense." <u>Scott</u>, 789 F.2d at 1055. As such, the court finds that Boggess is permitted to provide his opinion as to the location of Johnson's vehicle and plaintiffs at the time of the accident, but he is not permitted to offer inferences and extrapolations from that opinion that do not require specialized

knowledge.  Therefore, the court finds admissible Boggess's location opinions and excludes Boggess's human factor opinions.  Plaintiffs' motion to exclude is granted in part and denied in part.

### B.  Plaintiffs' Motion to Exclude Stephanie Borzendowski

Johnson intends to present the testimony of Dr. Stephanie Borzendowski ("Borzendowski") as an expert in human factors.  ECF No. 27.  Plaintiffs ask that the court "preclude any expert testimony of Stephanie Borzendowski."  ECF No. 49 at 7. Specifically, plaintiffs argue that Borzendowski's opinions either lack a proper basis in scientific knowledge or are the result of misapplications of proper scientific bases and thus irrelevant.  Because Borzendowski's opinions would not assist a jury, the court excludes her testimony.

So that the court can effectively analyze each of Borzendowski's opinions independently, it has combed through Borzendowski's report and separated her conclusions into five distinct opinions.  Those opinions are as follows: (1) Johnson's "gaze behavior" is consistent with a study, which found that younger drivers (aged 25-55 years) are "more likely than older drivers to concentrate their glances to the near or far left" as they approach an intersection;  (2) "it is possible that when Johnson looked right, his vehicle at least partially obscured his view of the plaintiffs"; (3) "it is possible that the plaintiffs were far enough away from Johnson's vehicle that he did not perceive them to be a potential hazard"; (4) because "eastbound traffic coming from Johnson's left posed the most probable potential hazard, Johnson's behavior was consistent with that of a reasonable driver"; and (5) because "[d]rivers typically expect that pedestrians will yield to vehicles rather than placing themselves in the path of a moving vehicle", Johnson

"would not have expected a pedestrian to walk in front of his vehicle."  ECF No. 55-1 at 4–5.

The study of "human factors" is "essentially the study of 'the interrelationship between human behavior or capabilities and the surrounding environment.'"  Hickerson v. Yamaha Motor Corp., 2016 WL 4123865, at *3 (D.S.C. July 29, 2016) (citing Douglas R. Richmond, Human Factors in Personal Injury Litigation, 46 Ark. L. Rev. 333, 335 (1993)).  Trial courts have a long history of grappling with human factors expert testimony to determine whether such testimony is "based upon scientific, technical or other specialized knowledge" and thus helpful to a jury, or whether such testimony is "within the common knowledge of jurors" and thus unhelpful and inadmissible.  Fed. R. Evid. 702; Scott, 789 F.2d at 1055.  Such a determination is within the discretion of the trial judge and turns on whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue."  Id. (quoting Fed. R. Evid. 702).

In Scott, the Fourth Circuit confronted this issue head-on.  789 F.2d at 1053. There, the plaintiff brought a premises liability action against Sears after she stepped on a displaced and partially dilapidated curb in the parking lot, fell, and broke her leg.  Id. The question of Sears's liability turned on whether the irregularity of the curb was "open and obvious."  To show that it was not, the plaintiff presented the testimony of an expert in human factors who offered several opinions, three of which are relevant to the court's analysis in this matter.  Because those opinions mirror the opinions of the human factors expert in this case, the court disuses each in turn and compares each to the corresponding opinions of Borzendowski.

In Scott, the Fourth Circuit first considered the human factors expert's opinion that the undamaged portion of the curb was higher than the damaged portion and thus likely obscured the damaged portion from the plaintiff's view. The Fourth Circuit found that this opinion was "of scant help to the jury" because the expert merely interpreted photographs and other evidence already before the jury without utilizing specialized knowledge. Id. at 1055. Because the opinion was a mere common-sense interpretation of evidence already available to the jury, the Fourth Circuit determined that it was not helpful to the jury. This opinion from Scott is similar to two of Borzendowski's opinions here: first, that "it is possible that when Johnson looked right, his vehicle at least partially obscured his view of the plaintiffs"; and second, that "it is possible that the plaintiffs were far enough away from Johnson's vehicle that he did not perceive them to be a potential hazard." ECF No. 55-1 at 4. As to the former opinion, photographs of the A-frame of the vehicle, which allegedly partially obscured Johnson's view of plaintiffs, will be available to the jury. Determining whether a driver's view is obscured by an opaque object does not require a specialized human factor analysis. The jury is capable of making a common-sense determination of whether Johnson's view was obscured by the A-frame of his vehicle, and that determination will not be aided by Borzendowski's common-sense opinion. Likewise, evidence of the parties' respective locations leading up to the accident will be presented to the jury.[3] Analyzing that evidence and

---

[3] Moreover, notwithstanding the unhelpful nature of the substance of the opinions, expert opinions couched in terms of "possibilities" are per se unhelpful and inadmissible. While the rules of evidence "do not require [an] expert to testify with absolute certainly," an expert opinion is "fatally speculative" where it "has no tendency to prove a consequential fact by probability." Samuel v. Ford Motor Co., 112 F. Supp. 2d 460, 470 (D. Md. 2000), aff'd sub nom. Berger v. Ford Motor Co., 95 F. App'x 520 (4th Cir. 2004). Borzendowski's opinions identified by this court as opinions two and three begin

determining whether Johnson could see plaintiffs from such a distance is another determination that requires only common sense. Wary of "supplant[ing] a jury's independent exercise of common sense," the court excludes the opinions. Scott, 789 F.2d at 1055.

The second opinion the Fourth Circuit considered in Scott was that "persons wearing heels tend to avoid walking on grates." Id. This opinion was undoubtedly rooted in scientific knowledge; the expert provided studies and statistical evidence to back up his claim. The Fourth Circuit nevertheless found that the testimony was unhelpful to the jury because "the witness was simply repeating what is already common knowledge and common sense." Id. In other words, a common-knowledge opinion is not rendered admissible as an expert opinion merely because it is supported by scientific data or other specialized knowledge. This principle applies to two more of Borzendowski's opinions: one, that Johnson's "gaze behavior" is consistent with a study, which found that younger drivers are "more likely than older drivers to concentrate their glances to the near or far left" as they approach an intersection; and two, that because "[d]rivers typically expect that pedestrians will yield to vehicles rather than placing themselves in the path of a moving vehicle", Johnson "would not have expected a pedestrian to walk in front of his vehicle."[4] ECF No. 55-1 at 4–5. Although

_____

with the phrase, "It is possible that . . ." Thus, according to their own language, these opinions are "fatally speculative" and thus unhelpful per se.

[4] The court also notes that these opinions are of questionable relevance. With respect to the former, the study on which Borzendowski relies compares the driving tendencies of different age groups. The court has a difficult time understanding how the fact that younger people have a greater tendency to focus their attention toward oncoming traffic is relevant to the issue of Johnson's alleged negligence. With respect to the latter opinion, it is undisputed that Johnson's vehicle was stopped when plaintiffs crossed in front of it. Thus, the court doubts the relevance of Borzendowski's opinion because it

Borzendowski supports her opinions with studies in the field of human factors, the jury does not require specialized knowledge to determine that pedestrians will typically not step in front of moving vehicles or that drivers turning right onto a highway generally look in the direction of oncoming traffic. The court finds that testimony recounting these opinions will not be helpful to the jury as it simply reiterates "what is already common knowledge and common sense." Scott, 789 F.2d at 1055.

The Fourth Circuit in Scott also considered the expert's opinion that the curb's yellow paint "might prompt the human eye to fill in discontinuities," such that the plaintiff could not discern the curb's irregularities. Id. According to the Fourth Circuit, this was "a paradigm of admissible human factors testimony" because it was a "statement of scientific understanding of the effect of color upon the human perception" and thus not within the general knowledge of the jury. Id. The court finds that none of Borzendowski's opinions rise to the level of "statement[s] of scientific understanding" outside of the general knowledge of a jury. As such, the court exclude Borzendowski's opinions identified by this court as opinions 1, 2, 3, and 5 because none would assist the jury.

The court's findings based on Scott leave before the court only Borzendowski's opinion that because "eastbound traffic coming from Johnson's left posed the most probable potential hazard, Johnson's behavior was consistent with that of a reasonable driver." ECF No. 55-1 at 5. "The reasonableness of conduct [is] the sort of question[] that lay jurors have been answering without expert assistance from time immemorial."

---

offers a conclusion with respect to "a moving vehicle." However, because the court finds that the opinions would not help a jury, it need not reach the issue of the testimony's relevance.

Tyree, 54 F. Supp. 3d at 564. Borzendowski's opinion that Johnson acted reasonably is not based upon scientific or specialized knowledge, but rather the fact that "eastbound traffic coming from Johnson's left posed the most probable potential hazard." ECF No. 55-1 at 5. Therefore, this opinion is nothing more than a common-sense inference on the ultimate issue of the case, Johnson's reasonableness. As such, it is inadmissible. Having found each of her opinions inadmissible, the court grants plaintiffs' motion in full and excludes the testimony of Borzendowski.

### C. Johnson's Motion to Exclude Robert Eilers and Tricia Yount

Johnson's motion asks the court to exclude the testimony of Dr. Robert Eilers ("Eilers") and Tricia Yount, CPA ("Yount"). Eilers is a physical medicine and rehabilitation physician, who has provided his opinion as to the future medical treatment Koenig will require as well as the costs of such treatment. Johnson does not argue that Eilers is unqualified to testify on the issue of future medical treatment; instead Johnson argues that Eilers's specific opinions are unreliable under Daubert. Yount is a master analyst in financial forensics who plaintiffs have retained to determine the cost of Koenig's lifetime medical care. Johnson does not argue that Yount is unqualified or that her methods are unreliable; instead, he argues that Yount's opinions are unreliable because they are predicated upon Eilers's allegedly unreliable opinions. Thus, the court need only determine whether Eilers's opinions are reliable to determine whether both his and Yount's opinions are admissible. Because the court determines that Eilers's opinions are reliable, the court denies Johnson's motion.

Johnson argues that although Eilers is qualified to testify as an expert on the issue of future medical expenses generally, his opinions in this case are unreliable "as they are

speculative with no foundation." ECF No. 52 at 7. Essentially, Johnson argues that Eilers's opinions are based entirely on his experience in the field and are otherwise unsupported by scientific or specialized methodology. As a result, Johnson argues, Eilers's testimony with respect to both future medical treatments and their estimated cost "leaves too great an analytical gap between the opinion offered and the underlying basis." Id. The court disagrees.

The objective of Daubert's gatekeeping requirement "is to ensure the reliability and relevancy of expert testimony." Kumho Tire, 526 U.S. at 152. "It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. The Supreme Court has made clear that "the test of reliability is flexible" and that "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Id. at 142 (citing General Electric Co. v. Joiner, 522 U.S. 136, 143 (1997)). The court's goal in determining the reliability of an expert opinion is not to ensure that the purported expert conformed to a rigid court-mandated process, but to ensure that the expert's specialized knowledge will "assist the jurors" in resolving the case. Id.

A "reliable expert opinion must be based on scientific, technical, or other specialized knowledge." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 200 (4th Cir. 2001) (quoting Fed. R. Evid. 702). The Supreme Court has made clear that a sufficiently reliable basis for admissible expert testimony can exist in a number of forms, including the expert's experience. Kumho Tire, 526 U.S. at 156.

> Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from . . . specialized experience." Hand, Practical Considerations Regarding Expert Testimony, 15 Harv. L. Rev. 40, 54 (1901). And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest "upon an experience confessedly foreign in kind to [the jury's] own." Ibid. The trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge.

Id. at 148–149. Thus, the standard for reliability is not so rigid to require that every analytical step of an expert's opinion be based on objective data or scientific theory; gaps between objective data and an admissible expert testimony may be filled in by specialized knowledge the expert has garnered through years of experience. Id. (". . . no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

Further, "[t]he court need not determine that the proffered expert testimony is irrefutable or certainly correct" because, "[a]s with all other admissible evidence, expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Moreland, 437 F.3d at 431 (quoting Cavallo v. Star Enter., 100 F.3d 1150, 1158–59 (4th Cir.1996) and Daubert, 509 U.S. at 596) (internal quotation marks omitted).

Eilers's opinions regarding Koenig's future medical treatments are sufficiently reliable because they are based on Eilers's interpretation of objective medical data viewed through the lens of his extensive and specialized experience, training, and education. When pressed on the methodology that underlies his opinions by Jonhson's counsel, Eilers noted that his opinions arise from "[j]ust 40 years of experience . . . I've

been treating head injuries for 40 years." ECF No. 59-4, Eilers Depo. 63:25–64:5. Read in isolation, one could conclude that Eilers arrived at his conclusions solely through the use of experience. The record, however, establishes the Eilers's experience merely provided the lens through which he analyzed the objective medical data to arrive at his opinions.

Eilers evaluated Koenig and Everett in his office four months after the accident, on April 2, 2018, and conducted a follow-up telephone call four months later. Prior to conducting his report, Eilers reviewed and analyzed Koenig's extensive medical records, including those that reflect Koenig's health prior to the accident. In his motion to exclude, Johnson argues that "[d]espite being given multiple opportunities to establish the bases for his recommendations, Dr. Eilers wholly fails in both his deposition and in his August 14, 2018 report to set forth how his experience leads to the conclusions reached." ECF No. 52 at 6. To the contrary, Eiler's deposition reveals that his opinions were derived from his personal examination of Koenig and an in-depth review of Koenig's medical records, which included "neuropsych testing", an MRI scan, diagnostic studies, electroencephalogram results, an initial post-injury CT scan, psychiatric evaluations, and medical records prior to the accident. Eilers Depo. 64:16–68:25. Eilers states in significant detail the various physical and mental conditions he diagnosed from the objective medical evidence and how those diagnoses require certain medical treatment.

Even a brief look at Eilers's discussions of Koenig's condition quickly reveals that his opinions are based on far more than mere experience.

> I think the major tests that makes it eminently clear on the deficits is when we look at the MRI done 4/10/18. And it showed -- just so we're clear, he, obviously, has the left temporal lobe more involved than the right temporal lobe. He has cortical encephalomalacia, which means that the brain is dead,

and it's been resorbed. Cortical is known as the deep subcortical white matter which goes along with white matter shearing. And they found gliosis, indicating the damage and the attempt to heal. And they're talking about the encephalomalacia. And, obviously, he had a history when we look back at his -- why don't we look at his evaluation just so I'm tying it out to the subsequent MRI, or his CT originally.

His CT scan showed the left subdural 25 hematoma, subarachnoid hemorrhage, left hemisphere swelling, and that it closed out the ventricle because of the amount of brain swelling. And that goes along with the area of 4 encephalomalacia. He also had a left shift, or basically a shift to the right of the midline. He had bilaterally temporal hemorrhagic contusions. Those now have encephalomalacia, so it bled and it died.

The left frontal lobe hemorrhagic contusion goes along with the encephalomalacia on the left. Obviously, he had the inner ear damage because he had like a -- he had a basilar skull fracture. He fractured through the temporal bone and part of the parietal bone, and that caused a lot of his additional brain damage. Probably the one thing that saved him was the fracture may have diffused some of the pressure that would have made this a lot worse.

Eilers Depo. 66:7–67:19. Eilers's in-depth analysis of the objective medical data makes clear that his opinions have a sufficiently reliable scientific basis. Moreover, in his deposition, Eilers explained why certain conditions would require specific future treatments. For example, Eilers noted that Koenig's "temporal lobe damage" is consistent with his "memory, attention, [and] concentration issues" and has had "devastating" effects that will require Koenig to be supervised 24 hours a day. Eilers Depo. 70:2–18. In short, Johnson's argument that Eilers relies on mere experience to arrive at his conclusions is unavailing.

Nevertheless, Johnson argues that Eilers's conclusions are unsupported because Eilers "has completed no programs in life care planning", "has not reviewed any life care planning literature", "has not spoken with [] treating physicians [other than Dr. Morris]", "has not done any research for purposes of any of his opinions", and "has not reviewed

any deposition of witnesses . . ." ECF No. 52 at 4–5. Johnson's argument points out a number of possible bases for Eilers's opinion on which he did not rely. The critical inquiry, however, is not the bases on which Eilers did not rely, but that bases that actually support Eilers's opinions. The record makes clear that Eilers based his conclusions regarding Koenig's future medical treatment on the objective medical data in conjunction with his extensive training, education, and experience in the field. Such a basis assures the court of the reliability of Eilers's future medical treatment opinions.

Johnson also points to conflicting evidence to show that Eiler's opinions are unreliable. Discussed above with respect to Boggess, <u>Daubert</u> makes clear that a court must determine the reliability of an expert's opinion by examining the basis for his or her opinions, not his or her conclusions. 509 U.S. at 592–93 (the reliability inquiry focuses on "whether the reasoning or methodology underlying the testimony is scientifically valid."). If an expert opinion is relevant and based upon sufficiently reliable methodology, it is admissible under FRE 702 and <u>Daubert</u>, even where conflicting evidence exists. In other words, evidence that conflicts with Eilers's conclusions goes to the weight of his testimony, not to its admissibility.[5]

Next, Johnson argues that Eilers's opinions with respect to the cost of Koenig's future medical treatment are "speculative with no foundation." ECF No. 52 at 7. The court disagrees. Eilers's cost estimations are based upon his review of Koenig's medical record and Eilers's forty years of experience in the field of rehabilitative medicine, which includes advising clients on necessary treatments and the cost of those treatments. In assigning costs to the recommend treatment, Eilers stated that his forty years of

---

[5] What's good for the goose is good for the gander.

experience in the field has made him "intimately familiar" with rehabilitative medical costs. Eilers Depo. 77:19–25. Eilers's experience and education in the field provides a sufficiently reliable basis for his opinion as to the cost of Koenig's future medical treatments. The Supreme Court noted in Kumho Tire that "an expert might draw a conclusion from a set of observations based on extensive and specialized experience." Kumho Tire, 526 U.S. at 156. Such is the case here. Of course, the court does not endorse Eilers's opinions as correct, and Johnson will be free to call them into question through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Moreland, 437 F.3d at 431.

Johnson urges the court to rely on two district court decisions to exclude Eilers's testimony: Queen v. W.I.C., Inc., 2017 WL 3872180 (S.D. Ill. Sept. 5, 2017) and Israel v. Spring Indus., Inc., 2006 WL 3196956, at *2 (E.D.N.Y. Nov. 3, 2006), aff'd sub nom. Israel v. Springs Indus., Inc., 2007 WL 9724896 (E.D.N.Y. July 30, 2007). For a shared reason, neither case is persuasive here. In Queen, the Southern District of Illinois found that a future medical treatment expert's opinions were not reliable under Daubert because his recommendations were "unsupported by the medical records generated by Queen's treating physicians" and he "fail[ed] to explain the basis for his additional treatment recommendations and valuations." Queen, 2017 WL 3872180, at *4. As such, the court found the opinions unsupported, as nothing more than "bottom line" opinions. Id. Similarly, in Israel, the Eastern District of New York excluded a future medical treatment expert's opinions where the opinions were based on "speculative assumptions." 2006 WL 3196956, at *2.

In both cases, the courts determined that the expert opinions were unreliable because the opinions were unsupported by the objective medical evidence. See Queen, 2017 WL 3872180, at *4 ("[The expert] relied on his own assessment of Queen to develop his life care plan and opinions as to Queen's condition and future needs, rather than the assessments prepared by Queen's treating physicians."); Israel, 2006 WL 3196956, at *2 ("[The expert] did not take into account Joseph's past medical expenses and did not speak with any of Joseph's treating physicians or review any of his medical records in formulating the Life Care Plan."). In other words, court found that the opinions were "ipse dixit" conclusions with no basis in objective data. Israel, 2006 WL 3196956, at *2. As made clear above, that is not the case here. Eilers reviewed Koenig's medical records, including tests and reports prepared by Koenig's treating physicians, and explained the ways in which his opinions are consistent with the objective medical data. In short, Eilers's opinion have considerably more indicia of reliability than the opinions of the experts in Queen or Israel. Therefore, the court finds Eilers's opinions admissible. Thus, the court denies Johnson's motion to exclude Eilers and Yount.

### D. Plaintiffs' Motion for Summary Judgment

Plaintiffs request summary judgment on "defendant's liability"[6] and on Johnson's affirmative defenses of sole and comparative negligence. ECF No. 50 at 1. At the hearing, plaintiffs conceded that their motion for summary judgment is dependent upon the court's exclusion of Boggess's location opinions because Boggess's locations opinions, if admitted, would create a clear issue of material fact. Finding that Boggess's

---

[6] The court takes this a request for summary judgment on each of plaintiffs' claims.

location opinions are admissible, the court finds that summary judgment on plaintiffs' claims and Johnson's defenses is precluded by clear genuinely disputed issues of fact that must be left for resolution by the jury. "The Court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'" Wood v. Fanslau, 2018 WL 5617943, at *2 (D.S.C. Oct. 29, 2018) (citing Campbell v. Hewitt, Coleman & Assocs, Inc., 21 F.3d 52, 55 (4th Cir. 1994)). Therefore, the court denies plaintiffs' motion for summary judgment.

### E.  Johnson's Motion for Summary Judgment

Johnson's motion requests summary judgment on Everett's claim for negligent infliction of emotional distress and on plaintiffs' claim for punitive damages. In response, Everett states that "she does not oppose [Johnson's] motion for summary judgment as to" her cause of action for negligent infliction of emotion distress and agrees to "waive" that cause of action. ECF No. 58 at 1. Because that issue is undisputed, the court need only address whether Johnson is entitled to summary judgment on plaintiffs' claim for punitive damages. Because plaintiffs have presented evidence of Johnson's violation of a statute, South Carolina law mandates that the issue of punitive damages be submitted to the jury for resolution. Therefore, the court denies Johnson's motion with respect to the issue of punitive damages.

In South Carolina, the issue of whether to award punitive damages should be submitted to the jury where "there is evidence that a tortfeasor's conduct was willful, wanton, or in reckless disregard of the rights of another." Cartee v. Lesley, 350 S.E.2d 388, 390 (S.C. 1986) (citing Fox v. Munnerlyn, 323 S.E.2d 68 (S.C. Ct. App. 1984)).

"Ordinarily, the test is whether the tort has been committed in such a manner or under circumstances that a person of ordinary reason or prudence would have been conscious of it as an invasion of the plaintiff's rights." Id. (citing Hinson v. A.T. Sistare Construction Company, Inc., 113 S.E.2d 341 (S.C. 1960)). "It is always for the jury to determine whether a party has been reckless, willful, and wanton." Wise v. Broadway, 433 S.E.2d 857, 859 (S.C. 1993) (citing Ralls v. Saleeby, 182 S.E. 750 (S.C. 1935)).

In South Carolina, a defendant's violation of a statute "does not constitute recklessness, willfulness, and wantonness per se, but it is some evidence that the defendant acted recklessly, willfully, and wantonly." Wise, 433 S.E.2d at 859. Therefore, South Carolina courts have long held that the test for punitive damages "may also be satisfied by evidence of the causative violation of an applicable statute." Fairchild v. S.C. Dep't of Transp., 727 S.E.2d 407, 412 (S.C. 2012) (citing Cartee, 350 S.E.2d at 390). Evidence of a defendant's statutory violation "creates[s] a jury question as to whether or not" that defendant "acted with recklessness." Fairchild, 727 S.E.2d at 413. Accordingly, such evidence "requir[es] submission of the issue of punitive damages to the jury." Id.

The South Carolina Supreme Court has held that even evidence of a violation of a traffic statute requires a court to submit the issue of punitive damages to the jury. In Wise v. Broadway, the plaintiff argued to the trial court that evidence that the defendant violated S.C. Code Ann. § 56–5–1930(a), which makes illegal following another's vehicle too closely, required the issue of punitive damages to be submitted to the jury. 433 S.E.2d at 859. The trial judge disagreed and struck the plaintiff's prayer for punitive

damages, reasoning, "I don't think that a simple violation of this statute would give rise to anything but actual damages." Id. The Supreme Court of South Carolina disagreed:

> Here, there is evidence from which the jury could have concluded that respondent violated section 56–5–1930(a). Had the jury so found, the violation of section 56–5–1930(a) would be negligence per se and evidence of recklessness from which the jury could find that the respondent was guilty of reckless conduct, and, consequently, liable for punitive damages.

Id. Accordingly, the Supreme Court reversed the decision of the trial court and remanded the case for a new trial. In Fairchild v. S.C. Dep't of Transp., the Supreme Court reaffirmed Wise, finding that evidence that the defendant violated two traffic statutes "required" submission of the issue of punitive damages to the jury. Fairchild, 727 S.E.2d at 413.

Here, plaintiffs allege that Johnson violated S.C. Code Ann. § 56-5-3250, which provides: "The driver of a vehicle crossing a sidewalk shall yield the right-of-way to any pedestrian and all other traffic on the sidewalk." As discussed at length above, plaintiffs have presented evidence that Johnson failed to yield to plaintiffs, as well as evidence that plaintiffs were on the sidewalk at the time of the accident. Therefore, there is evidence that Johnson violated S.C. Code Ann. § 56-5-3250. The court, because it sits in diversity, is bound by the substantive law of this state. In this case, the law is clear. Evidence that Johnson violated a South Carolina statute requires that the issue of punitive damages be submitted to the jury. Therefore, the court finds that the issue of punitive damages must be submitted to the jury. Thus, the court denies Johnson's motion for summary judgment with respect to the issue of punitive damages and grants Johnson's motion with respect to Everett's claim for negligent infliction of emotional distress.

## IV.   CONCLUSION

For the foregoing reasons the court **GRANTS IN PART** and **DENIES IN PART** plaintiffs' motion to exclude Boggess, **GRANTS** plaintiffs' motion to exclude Borzendowski, **DENIES** plaintiffs' motion for partial summary judgment, **GRANTS IN PART** and **DENIES IN PART** Johnson's motion for partial summary judgment, and **DENIES** Johnson's motion to exclude Eilers and Yount.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**May 8, 2020**
**Charleston, South Carolina**